ELIZABETH A. BROWN (SB# 235429)
JENNIFER SVANFELDT (SB# 233248)
MICHELLE T. McGUINNESS (SB# 257151)
RYAN C. KING (SB# 351149)
lisabrown@gbgllp.com
jensvanfeldt@gbgllp.com
michellemcguinness@gbgllp.com
ryanking@gbgllp.com
GBG LLP
601 Montgomery Street, Suite 840
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANDY SAECHAO, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED PARCEL SERVICE, INC.; and DOES 1 through 10, inclusive,<br><br>Defendant. | Case No. 3:25-cv-02431-RFL<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 19, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Rita F. Lin<br>Courtroom: 4 |

## Table of Contents


Page

I. INTRODUCTION ..... 7

II. STATEMENT OF FACTS ..... 8

A. Overview of UPS Operations ..... 8

B. Teamsters Contract Confers Generous Benefits ..... 10

C. The Security Process Varies At Each Facility and Often Takes Seconds ..... 10

D. Since August 2021, UPS Has Paid Employees for Security Screening ..... 11

E. UPS Does Not Control Employee Arrival, Departure, or Time on Premises ..... 12

F. UPS Does Not Require Employees to Use Any Particular Time Clock. ..... 13

G. UPS Has Compliant Timekeeping and Meal and Rest Break Policies ..... 13

H. Plaintiff Worked at One UPS Facility – Visalia – on 29 Shifts ..... 14

I. Plaintiff Submitted No Evidence To Support Her Theories of Liability ..... 15

1. Plaintiff Presented No Testimony From Any Other Class Member ..... 15

2. Plaintiff Has Not Shown How She Will Prove Her Case at Trial ..... 16

3. Plaintiff's Expert Report Is Not Based on Evidence ..... 16

III. PLAINTIFF MUST ESTABLISH ELEMENTS OF A CLASS ACTION ..... 16

IV. PLAINTIFF CANNOT ESTABLISH ADEQUACY ..... 18

V. PLAINTIFF CANNOT ESTABLISH TYPICALITY ..... 18

VI. PLAINTIFF CANNOT ESTABLISH COMMONALITY OR PREDOMINANCE ..... 19

A. Plaintiff Did Not Establish a Common Unlawful Policy ..... 19

B. Meal Periods – Common Issues Do Not Predominate ..... 21

1. Whether Any Employee Felt "Discouraged" Is an Individualized Question That Cannot Be Answered in One Stroke ..... 21

a. Plaintiff Presents No Evidence of Uniform Policy ..... 21

b. Security Checks Do Not Impede or Discourage Employees ..... 22

c. *Hamilton v. Wal-Mart* Does Not Require Certification ..... 22

d. Courts Post-*Hamilton* Have Rejected Plaintiff's Theory ..... 24

**Table of Contents**

(continued)

**Page**


2. Class Treatment Is Not Proper for "No Lunches Recorded" Theory........ 25

3. Plaintiff's Own Meal Period Claim Is Not Typical of the Class.............. 26

C. Rest Breaks – Common Issues Do Not Predominate.......................................... 27

D. Off the Clock Theory – Common Issues Do Not Predominate ........................... 28

1. California Law Does Not Mandate Pay for all Time on Premises........... 28

2. Walking Not Amenable to Classwide Analysis of Liability or Damages........................................................................................... 29

3. Affirmative Defense of Offset Creates Individualized Issues.................. 30

E. Common Issues Do Not Predominate for Plaintiff's Derivative Claims ............. 31

VII. PLAINTIFF HAS NOT ESTABLISHED MANAGEABILITY OR SUPERIORITY..................................................................................................... 31

VIII. CONCLUSION ............................................................................................................ 31

## Table of Authorities

Page(s)

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ... 17

*Augustus v. ABM Sec. Servs., Inc.* 2 Cal. 5th 257 (2016) ... 28

*Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004 (2012) ... 19, 21

*Brown v. Google, LLC*, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ... 31

*Campbell v. Vitran Express Inc.*, 2015 WL 7176110 (C.D. Cal. Nov. 12, 2015) ... 27

*Carter v. Jai-Put Enterprise Inc.*, 2022 WL 1637212 (N.D. Cal. May 24, 2022) ... 21

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ... 18

*Depina v. FedEx Ground Package System, Inc.*, 2024 WL 5430193 (N.D. Cal. Nov. 8, 2024) ... 24

*Ellis v. Costco Wholesale Corp.*, 657 F. 3d 970 (9th Cir. 2011) ... 18, 19

*Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1232695 (N.D. Cal. Mar. 30, 2021) ... 24, 27, 28

*Frlekin v. Apple Inc.*, 8 Cal. 5th 1038 (2020) ... 11

*Gales v. Winco Food*, 2011 WL 3794887 (N.D. Cal. Aug. 26. 2011) ... 17

*Godfrey v. Oakland Port Servs. Corp.*, 230 Cal. App. 4th 1267 (2014) ... 27

*Hale v. Brinker Int'l, Inc.*, 765 F. Supp. 3d 904 (N.D. Cal. 2025) ... 17, 25, 26

*Hamilton v. Wal-Mart Stores, Inc.*, 2018 WL 4813082 (C.D. Cal. Aug. 21, 2018) ... 23

*Hamilton v. Wal-Mart Stores, Inc.*, 2022 WL 2374445 (9th Cir. June 30, 2022) ... 22, 23

//

## Table of Authorities

(continued)

**Page(s)**

**Cases**


*Hanon v. Dataproducts Corp.*, 976 F. 2d 497, 508 (9th Cir. 1992) ........ 17, 18

*Howard v. CVS Caremark Corp.*, 2014 WL 11497793 (C.D. Cal. Dec. 19, 2014) ........ 19

*Huerta v. CSI Electrical Contractors*, 15 Cal. 5th 908 (2024) ........ 28, 29

*Lampe v. Queen of the Valley Med. Ctr.*, 19 Cal. App. 5th 832 (2018) ........ 26

*Miles v. Kirkland's Stores*, 89 F. 4th 1217 (9th Cir. 2024) ........ 8, 17

*Morand-Doxzon v. Delaware North Companies Sportservice, Inc.*, 2021 WL 5979267 (S.D. Cal. Sept. 9, 2021) ........ 25

*Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000) ........ 29

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651 (9th Cir. 2022) ........ 17

*Ridgeway v. Walmart Inc.*, 946 F. 3d 1066 (9th Cir. 2020) ........ 23

*Schwartz v. Harp*, 108 F.R.D. 279 (C.D. Cal. 1985) ........ 18

*Stewart v. Quest Diagnostics Clinical Laboratories, Inc.*, 2022 WL 5236821 (S.D. Cal. Oct. 5, 2022) ........ 27

*United Steel v. Shell Oil Company*, 2010 WL 11508796 (C.D. Cal. Aug. 27, 2010) ........ 21

*Valencia v. VF Outdoor, LLC*, 2022 WL 4397084 (E.D. Cal. Sept. 23, 2022) ........ passim

*Valentino v. Carter-Wallace, Inc.*, 97 F. 3d 1227 (9th Cir. 1996) ........ 18

*Villalpando v. Exel Direct Inc.*, 2016 WL 1598663 (N.D. Cal. Apr. 21, 2016) ........ 27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........ 16, 17, 23

## Table of Authorities

(continued)

**Page(s)**

**Cases**

*Weinberger v. Thornton*, 114 F.R.D. 599 (S.D. Cal. 1986)........ 18

*Zinser v. Accufix Research Inst., Inc.*, 253 F. 3d 1180 (9th Cir. 2001)........ 17, 18

**Statutes**

Cal. Lab. Code § 512 ........ 25

**Rules**

Fed. R. Civ P. 23(a)........ 17, 19

Fed. R. Civ. P. 23(a)(2)........ 17

Fed. R. Civ. P. 23(b) ........ 17

Fed. R. Civ. P. 23(b)(3)........ 17, 19

Fed. R. Civ. P. 23(c)(4)........ 19

**Regulations**

8 Cal. Code Regs. § 11070, subd. 2(H)........ 29

## I. INTRODUCTION

Plaintiff Mandy Saechao worked for UPS on one shift (Preload) at one facility (Visalia) over the course of 29 days in November and December 2024. Plaintiff now moves to certify a class of over 62,000 individuals who worked in 16 different positions at 39 different locations throughout the state of California, extrapolating from her unique and very limited experience. In support of this motion, Plaintiff submits nothing beyond her own speculation, one class member declaration (her own) which contradicts her sworn deposition testimony, and evidence of compliant policies and practices. Plaintiff's motion offers no common proof.

UPS maintains compliant meal and rest break policies, prohibits off the clock work, and pays (often overpaying) for security checks. During breaks, UPS does not restrict employees from leaving the facilities and relieves them of their job duties. Plaintiff must overcome numerous individualized employee experiences and preferences to show an unlawful policy was uniformly applied to each putative class member. She cannot do so:

- The level of security and security equipment varies from facility-to-facility. Many employees stated they walk through security without breaking stride. Unlike Plaintiff, who claims her bag was searched and rifled through, employees do not have their bags "checked." Indeed, the only common policy prohibits security from touching personal belongings.

- Plaintiff presents no common evidence that security impacts an employee's decision to leave the facility during meals or rest breaks, much less "discourage" them from leaving. Rather, employees describe reasons for choosing to stay on premises during breaks that are completely unrelated to security, including lack of restaurants and other places to visit in the remote areas where many facilities are located, the time of day (e.g., early morning, evening, or middle of the night), ability to relax in the break room, safety of the neighborhood, and a preference for bringing lunch to work or staying on-site and socializing with colleagues. That security does not discourage employees is corroborated by Plaintiff's testimony (she left), and badge swipe data showing that nearly 20% of employees left the facility mid-shift.

- Even supposing security took longer than seconds or even a few minutes, many facilities have provided employees with more than 30 minutes for lunch. Putative class members

confirmed that they did in fact enjoy daily meal periods that were more than 30 minutes, including daily 60-minute and 120-minute meal periods. This fact is corroborated by security (SCAR) data, showing that – in those instances where employees left the facility for meal periods – at least 32.2% of them clocked out for lunch for more than 30 minutes. Further, timecard (GTS) data for examined employees shows that 14.1% of all reported meal periods were longer than 30 minutes. At least 13.1% exceeded 40 minutes. As a matter of basic arithmetic, the security process does not serve as a uniform failure to provide 30-minute meal periods.

- Many employees work fewer than five hours and have signed meal period waivers. UPS expert's analysis of certain timekeeping data showed that after accounting for those circumstances and the 507,497 meal premiums UPS paid during class period, the records flag only 2.8% of shifts for individualized review of potential violations.

- Pursuant to multiple collective bargaining agreements between UPS and the Teamsters Union, many employees receive "guaranteed" pay for hours not worked and far more generous overtime pay than the legal minimum, raising individualized offset defense.

Neither Plaintiff nor her expert has identified any reliable methodology for addressing these significant variations, which impact both liability and damages. Instead, they propose applying Plaintiff's internally-inconsistent testimony regarding her unique and short experience to each and every putative class member, regardless of their job title, their facility, and/or whether they work part-time or full-time. As the Ninth Circuit aptly put, "[A] party **cannot plead or speculate her way to class certification**. She must marshal facts showing, by a preponderance of the evidence, that class issues predominate." *Miles v. Kirkland's Stores*, 89 F. 4th 1217, 1222 (9th Cir. 2024) (emphasis added). Plaintiff has failed to meet this burden. UPS respectfully requests that the Court deny Plaintiff's Motion in its entirety.

## II. STATEMENT OF FACTS

### A. Overview of UPS Operations

United Parcel Service, Inc. is a global transportation and logistics company. UPS employs tens of thousands of hourly, non-exempt employees throughout California, including loaders, unloaders, preloaders, sorters, office staff, and part time managers. Declaration of Ashley Felsing

dated September 11, 2026 ("Felsing Decl."), ¶2. The majority of hourly employees in the smaller "package centers" and larger "hubs" unload, sort, and load packages of various size into and out of vehicles, under the supervision of hourly part-time non-exempt managers. *Id*. The operations are generally split into "Package" (involving drivers and preloaders) and "Hub/Transportation (involving hub loaders/unloaders/sorter), although some non-exempt employees also perform work in the "Air" operation (pilots, flight crews), "Revenue Recovery" (clerical), "Automotive" (mechanics), "BaSE" (maintenance and housekeeping), and "Non-Operations" (security and human resources). Id., ¶3. Bulk of putative class members are in Package and Hub operations.

In Package and Hub, hourly employees work one of several different "sorts" (or shifts), with start times varying depending on the anticipated package volume, with the largest increase around UPS's "peak" time between November and January. Brown Decl., Ex. 33; Fact 1. The various sorts include the Preload (where Plaintiff worked), Day, Twilight, and Night, although not every facility runs each such sort and some facilities add sorts during peak. *Id.* Some facilities run two sorts at the same time – e.g., Preload and Sunrise. *Id*. Depending on the sort, employees work in designated areas of the facilities (e.g., certain "belts," "lines," "centers," or "doors"), and are often staggered in their arrivals and departures. *Id.* For example, Plaintiff worked on a portion of a line in the Visalia Preload. Brown Decl., Ex. 1, 20:3-12; 66:6-11. The majority of employees work part-time, although some are in "combination" positions that combine two part-time shifts into one full-time shift. Felsing Decl., ¶4. During peak, employees who would ordinarily be scheduled to work part time may work full time. Brown Decl., Ex. 33, Fact 1. Some employees volunteer to work multiple shifts. *Id*. Package and Hub have different timekeeping systems – GTS and STMS, respectively. Brown Decl., Ex. 3, 12:23-13:19; Felsing Dec., ¶5; Cruz Dec., ¶¶4-5.

During the relevant time period, 39 facilities in California have had security screenings, aimed mainly at ensuring employee safety and protecting customer property. Deposition of Jeff Savage ("Savage"), Brown Decl., Ex. 6, 17:22-18:6; 40:6-21. Some facilities, such as the Olympic facility and the San Francisco Hub, conduct security screenings inside the facility itself, i.e., with no walking between the security are and the building. Brown Decl., Ex. 33, Facts 2, 3, 11-13. Others, such as Plaintiff's Visalia facility, have separate screening areas outside the

building. Brown Decl., Ex. 1, 121:8-122:12; Brown Decl., Ex. 4, 36:19-37:4; Brown Decl., Ex. 33, Facts 2, 3, 11-13. Security at one facility is outdoors. Savage Decl., Ex. 1, pp. 45-48.Depending on the setup of the facility, time clocks may be located right next to security checks or farther inside the building. Brown Decl., Ex. 33, Facts 11-13. The number of time clocks inside the facility varies, and employees may use any of them so long as it is loaded with the applicable timekeeping system. Felsing Decl., ¶4.

### B. Teamsters Contract Confers Generous Benefits

Putative class are unionized, working under collective bargaining agreements ("CBAs") between UPS and the International Brotherhood of Teamsters ("Teamsters"). Deposition of Veronica Terpening, Brown Decl., Ex. 7, 32:25-33:7. Two National Master Agreements and multiple supplements, including supplements for various local sorts (or shifts) apply to the putative class members. *Id.*, 32:25-34:25. Under the CBA, employees are guaranteed certain hours and pay for each day they work. For example, under Addendum No. 3 to the Southwest Sort Rider Addenda for the years 2018 through 2023, part-time employees are guaranteed 3.5 hours of work per day and are paid that minimum amount even if they do not work those hours. Brown Decl., Ex. 5, 32:25-34:25, Ex. 5 (UPS000383-384). Those same employees are paid overtime after the fifth hour of work – a full three hours before California law requires it. *Id.*

### C. The Security Process Varies At Each Facility and Often Takes Seconds

UPS has approximately 100 package processing facilities in California. The majority have no security protocols, and only 39 currently have some level of security protocol in place. Brown Decl., Ex. 6, Savage Tr. 18:18-19:1, Ex. 2. Security positions are staffed by full-time professional security guards supplied by security companies. *Id.*, 20:7-11. UPS delegates the screening (i.e. its "Clean In/Clean Out" procedures) to these vendors. *Id.*, 20:12-21:6. Security protocol is not uniform at these 39 facilities as Plaintiff contends. UPS's PMK testified that security protocols vary significantly by location. Brown Decl., Ex. 6, 20:12-21:6; 21:13-22:10; Exs. 3, 4. At the majority of secured facilities, the security process consists of walking through a metal detector barely slowing down and sliding their personal belongings (if any), such as a phone, keys and, if they bring one, a bag, across a table. Brown Decl., Ex. 33, Facts 5-9. Employees walk through

this security process without breaking stride. *See*, *e.g.*, Declaration of Kim Tse ("Tse Decl."), ¶¶5, 7, Ex. A; Brown Decl., Ex. 33, Fact 12. Some facilities have an x-ray machine for scanning bags, although even in those locations, employees bypass the machine and simply slide their belongings down a table. Tse Decl., ¶11, Ex. A. An employee's individual preferences and choices, such as whether to bring a bag inside the facility, and whether to hang out inside security to talk with co-workers and/or security guards, also impacts the amount of time an employee spends in security. Brown Decl., Ex. 33, Facts 19-25; Crandall Decl., ¶¶11(a), 17, 47-50

**D. <u>Since August 2021, UPS Has Paid Employees for Security Screening</u>**

On December 29, 2017, a former UPS employee named La Tasha Coates sued UPS in a putative class and representative action, claiming that UPS should pay its employees for security checks. On July 2, 2019, the Honorable Philip S. Gutierrez (Central District of California) denied plaintiff's motion for class certification, finding that UPS employees' security screening experiences were too varied to allow the case to proceed on behalf of tens of thousands of employees. RJN Ex. 1. In October 2021, in the wake of the California Supreme Court decision in *Frlekin v. Apple Inc*., 8 Cal. 5th 1038 (2020), UPS resolved a collection of follow-on lawsuits under *Navarro v. UPS* ("Navarro"), and began paying employees for security screening – a change that plaintiffs' counsel and the court approved. RJN Ex.4. The *Navarro* settlement release runs through March 29, 2022, which limits the scope of the present case. RJN, Ex. 5.

Since August 2021, UPS has paid for security time – a fact putative class members understand and attest. Brown Decl., Ex. 33, Fact 4. To capture employees' time spent in security, UPS installed badge readers at the start and end of the security process and has since instructed employees to scan their badges upon arrival (including before they stand in any line outside security, as Plaintiff herself confirmed at deposition) and to scan again after exiting security. Brown Decl., Ex. 6, 28:23-29:6; 33:1-34:2, Ex. 4; Brown Decl., Ex. 6, 87:10-21; 91:5-19, Ex. 7. Badge swiping, while required by policy to track time spent in security, is actually sporadic. For example, although Plaintiff testified at deposition that she always scanned her badge before and after security, her security records actually show that Plaintiff scanned her badge correctly on three occasions only. Compare Brown Decl., Ex. 1, 92:15-94:3; 94:10-96:8 with Brown Decl.,

Ex. 3, 55:1-56:9, Ex. 5. Andrew Delgado (Plaintiff's partner) **never** scanned his badge before security, even though he worked in the same location as Plaintiff. Savage Decl., ¶¶6-7, Ex. 2. Plaintiff's Motion ignores this discrepancy.

The badging system (Pro Watch) sends badging data to the SCAR system to calculate security time. Brown Decl., Ex. 3, 37:2-18; 40:8-19; Brown Decl., Ex. 6, 29:13-19. This calculation takes one of three forms – "Actual," "Calculated," or "Building Standard." Brown Decl., Ex. 3, 58:11-16. The "Actual" calculation computes actual time in security so long as the employee properly badged throughout the process, rounding it **up** to the full minute. The "Calculated" calculation computes the average time spent in security for those employees who did not badge before security using 15 minutes preceding their scan. The "Building Standard" calculation computes time for employees who did not badge before or after security by multiplying the prior week's average by 4. The time in security is added to payroll, and employees are paid. Brown Decl., Ex. 3, 58:17-59:9. Rounding up and averaging often results in **overpayments** to employees. *See* Crandall Decl., ¶67.

**E. <u>UPS Does Not Control Employee Arrival, Departure, or Time on Premises</u>**

UPS does not control when employees arrive or leave work. Brown Decl., Ex. 33, Facts 33-36. Several employees have testified that they decide when to arrive at work, and many choose to arrive early so that they can hang out, relax, and/or talk to their co-workers before clocking in for their shift. *Id*. Employees enjoy this flexibility and do not wish for UPS to prohibit access to the facility outside of their work hours. *Id*. Nor does UPS have a policy limiting how employees use their time as they enter or exit the facility. For example, employees talk on their phones, listen to music, surf the web, and chat with co-workers as they walk to their workstations or relax somewhere inside the facility before walking to their workstation. Brown Decl., Ex. 33, Facts 37-45. As they pass through security and walk around the facility, employees do not – and cannot – perform their actual job duties. Brown Decl., Ex. 33, Facts 10, 40.

As noted above, employees work in specific parts of UPS facilities. Under the Teamsters CBA, UPS must advise employees of their assigned group's scheduled start time, when that group begins to work. Declaration of Veronica Terpening ("Terpening Decl."), ¶3. UPS does not

permit employees to work before their scheduled start time. Felsing Decl., ¶5; Brown Decl., Ex. 1, 125:19-25; 132:2-4. Employees who arrive early, may clock in early before their scheduled start time, however it does not signify start of work. Felsing Decl., ¶5. In GTS, this entry is reflected as "actual" report to work; in STMS, there is no such entry. Cruz Decl., ¶5. Once employees begin to work (as a group) at their scheduled start time, UPS pays for that time. Brown Decl., Ex. 2, 235:3-6. Terpening Decl., ¶4. However, if an employee arrives to work after the scheduled start time and clocks in, reflecting an "actual start time" after the "scheduled start time," he or she is paid from that later time entry. Brown Decl., Ex. 7, 29:5-25. Terpening Decl., ¶4. Plaintiff herself was frequently tardy, clocking in after her scheduled start time approximately 57% of the time. Crandall Decl., ¶73.

### F. UPS Does Not Require Employees to Use Any Particular Time Clock.

UPS does not require employees to walk directly from security to a time clock or their workstation, does not assign employees a particular time clock, and does not direct employees' time prior to the start of a scheduled shift. Brown Decl., Ex. 33, Facts 29-45. The individual experiences of Company employees are illustrative. Brown Decl., Exs. 8-32. Plaintiff herself testified about her individual pre-work activities, which included getting bottled water in the break room before traveling to her workstation. Brown Decl., Ex. 1, 110:16-111:1.

### G. UPS Has Compliant Timekeeping and Meal and Rest Break Policies

Throughout the relevant time period, the putative class members were subject to express written policies and training unequivocally requiring them to accurately record all time worked. Brown Decl., Ex. 5, 29:1-10; Ex. 3. The UPS meal period policy is posted at UPS facilities. Notably, the policy **prohibits off-the-clock work** and **provides for legally-compliant meal and rest breaks**. *Id.*; Brown Decl., Ex. 4, 59:9-24, Ex. 4. Plaintiff herself acknowledged these policies applied to her. Brown Decl., Ex. 1, 125:9-126:18. Meal period waivers are voluntary, and employees are informed that they are free to rescind the waivers at any time. Brown Decl., Ex. 1, . 62:19-22; 63:25-64:3, Ex. 6. *See also* Brown Decl., Ex. 33, Facts 53-84.

The UPS meal period policy is implemented through full-time and part-time supervisors and managers, who have discretion on how to implement it. Brown Decl., Ex. 5, 19:6-11, Ex. 3.

At some facilities on some sorts, meal periods are taken at the same time. Brown Decl., Ex. 33, Fact 64; Brown Decl., Ex. 4, 68:20-69:24. On other sorts, meal periods are staggered. Brown Decl., Ex. 33, Facts 65, 68-69. Sometimes the same facility and same sort implement and schedule meal and rest breaks differently depending on time of year and volume. Brown Decl., Ex. 33, Facts 67-69; 75-84. The length of meal periods and rest breaks varies from employee-to-employee. Many employees testified they take more than 30 minutes for meal periods each day. Brown Decl., Ex. 33, Facts 53-61. This is corroborated by GTS records, showing that 14.1% of the meal periods reported by examined employees **exceeded** 30 minutes and 13.1% **exceeded** 40 minutes. Crandall Decl., ¶45. The SCAR data further shows that 32.2% of meal periods reported by employees who left the premises were 30 minutes **or more**. *Id.*, ¶59. Similarly, for rest breaks, some employees testified they take 15-minute rest breaks, while others testified they take 10 minutes. Brown Decl., Ex. 33, Facts 75-82. Brown Decl., Ex. 4, 68:20-69:24.

UPS pays putative class members one hour of pay for each workday during which a meal period was required by law and UPS policy but not provided. Brown Decl., Ex. 5, 29:1-10; Ex. 3. UPS human resources and management personnel receive **daily reports** of potential meal period violations for individualized determination on payment. Brown Decl., Ex. 5, 25:15-17; 26:5-21, Ex. 3. These reports also refresh management daily on the California legal requirements. *Id.*, Ex. 3, UPS001404-1416. UPS has paid a significant amount in meal period premiums. For example, as of December 29, 2023, in the Package and Hub operations only, UPS paid nearly $6.5 million in premiums for approximately 182,000 premiums in Package and 82,000 premiums in Hub. Felsing Decl., ¶6, Ex. A. *See also* Felsing Decl., Ex. B (In 2024, UPS paid nearly $4.5 million).

### H. <u>Plaintiff Worked at One UPS Facility – Visalia – on 29 Shifts</u>

Between October 29, 2024 and December 17, 2024, Plaintiff worked as a Preloader in UPS's facility located in Visalia, California. Brown Decl., Ex. 1, 22:3-5.; 31:1-14. **Plaintiff's scheduled shift was less than five hours**, beginning at 4 a.m. and ending at 8:45 a.m. (*id.* at 20:3-22). She typically worked at the same belt, line and door (*id.* at 66:10-11). Plaintiff never worked in any other position (*id.* at 65:19-66:5), never worked at any other facility (*id.* at 43:13-15), and never worked on any other sort at Visalia. Plaintiff has no knowledge regarding the

policies or procedures at facilities other than Visalia, and does not know how other preloaders or any other putative class members have reported their time worked. *Id.* at 66:22-67:11; 82:19-22.

Plaintiff signed two meal period waivers for first and second meals. Brown Decl., Ex. 1, 59:18-60:24. Saechao understood these waivers and never asked to rescind them. *Id.* at 61:19-64:6. Plaintiff worked more than 6 hours on three shifts only. Brown Decl., Ex. 3, 11:10-14, 12:4-8. Ex. 2. Plaintiff never worked over 8 hours in a day or over 40 hours in any week. *Id*. Pursuant to the terms of the CBA, UPS paid Plaintiff overtime on all hours worked over five hours. *Id.*

Plaintiff understood that UPS did not require that she be onsite before her shift started. Brown Decl., Ex. 1, 108:19-109:2. Plaintiff further understood that UPS did not control when employees could and did arrive, and that UPS provided break rooms for employees to utilize prior to starting a shift, although she rarely chose to arrive early herself. *Id.* at 109:16-110:3; 110:16-112:4; 112:19-113:6; 116:6-16; 117:3-12. Plaintiff agreed that UPS policy prohibited employees from working off-the-clock, including working before their shift started, after clocking out, or during a meal period. *Id.* at 125:12-25. Similarly, Plaintiff understood that UPS permitted employees to stay at the facility after their shift ended and that employees did in fact stay, for example, to use the bathroom or socialize. *Id.* at 117:23-118:17.

Plaintiff testified that she badged before and after security on the way in and badged before and after security when exiting. Brown Decl., Ex. 1, 93:23-94:3; 95:2-25. Although her badge data does not reflect this, Plaintiff also testified that she badged through security on the three occasions she worked long enough to take a meal period. Brown Decl., Ex. 2, 206:3-23. Plaintiff's own account confirms that she was not discouraged from leaving the premises during her meal period, testifying that she routinely left the facility to sit in her car and "[t]alk on the phone or listen to music" or have a snack. *Id.* at 127:15-20. Indeed, Plaintiff testified the **only** times she had issues with her meal period were days her supervisor (properly) sent her home without a meal period on days she worked less than six hours. Brown Decl., Ex. 1, 34:25-35:10.

## I. <u>Plaintiff Submitted No Evidence To Support Her Theories of Liability</u>

### 1. Plaintiff Presented No Testimony From Any Other Class Member

Plaintiff submitted evidence of her individual experience at Visalia as a Preloader. But

this evidence is limited to one person, one experience, one job, one location, one supervisor, just 29 days of work, and a few meal periods. Plaintiff presented no testimony from any other class member. Nor did Plaintiff present any data related to any of the more than **62,000 putative class members** other than Plaintiff. Plaintiff's experience represents less than 0.002% of the class.

#### 2. Plaintiff Has Not Shown How She Will Prove Her Case at Trial

Plaintiff did not present to the Court any viable trial plan. And when asked in discovery to identify her trial plan and describe how she would try this case. Plaintiff asserted objections only, refusing to respond. Brown Decl., Ex. 38.

#### 3. Plaintiff's Expert Report Is Not Based on Evidence

Plaintiff's expert, Justin Regus, did not evaluate any evidence related to any putative class member. Brown Decl., Ex. 39, 50:12-15; 82:15-19; 128:24-129:5. He only reviewed Plaintiff's time and payroll records. *Id*. 21:2-6. Regus was unaware of Plaintiff's testimony, nor did he attempt to interview her. *Id*. 21:13-23. Regus did not inquire whether Plaintiff worked before her scheduled start time (she testified that she did not), or analyze the 57% of the days when Plaintiff arrived late to work and reported that she started working after the scheduled start time. Regus attempted to claim that he could extrapolate Plaintiff's data to over 62,000 other putative class members. However, without having any other class member data or testimony from putative class members, Regus admitted that he did not account for differences in time keeping systems, jobs, security, meal breaks or other individual experiences, such as overpayment for security screening, late arrivals, or early arrivals, where, for example, an employee takes a nap in the break room after clocking in early. (Brown Decl., Ex. 39, at 54:14-55:12; 62:15-19; 75:23-76:1; 85:16-86:11; 130:10-131:22; 133:6-25.) UPS has moved to exclude Regus's declaration.

## III. PLAINTIFF MUST ESTABLISH ELEMENTS OF A CLASS ACTION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "For a named plaintiff to obtain class certification, the court must find: (1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the

class. Fed.R.Civ.P. 23(a).” *Hanon v. Dataproducts Corp.*, 976 F. 2d 497, 508 (9th Cir. 1992), *superseded by statute on other grounds*. The Court must conduct a “rigorous analysis” to determine whether a plaintiff has met her burden to establish all of the requirements of Rule 23(a), as well as one or more pertinent sections of 23(b). *Dukes,*564 U.S. at 350-51; *Zinser v. Accufix Research Inst., Inc.*, 253 F. 3d 1180, 1186 (9th Cir. 2001). “[T]he burden is **always on the named plaintiff** to demonstrate the existence of common questions of law or fact – questions that are susceptible to the **same answer for all class members**.” *Hale v. Brinker Int’l, Inc.*, 765 F. Supp. 3d 904, 913 (N.D. Cal. 2025), citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 663 (9th Cir. 2022). “[A] party **cannot plead or speculate her way to class certification**. She must marshal facts showing, by a preponderance of the evidence, that class issues predominate.” *Miles*, 89 F. 4th at 1222 (emphasis added).

With respect to Rule 23(a)’s commonality requirement, the Supreme Court in *Dukes* clearly stated the rule to be applied in resolving Plaintiff’s Motion: a plaintiff’s claims “must depend upon a common contention … **that it is capable of classwide resolution** – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims **in one stroke**.” *Dukes*, 564 U.S. at 350 (emphasis added). “What matters to class certification … is not the raising of common ‘questions’ – even in droves – but, rather the capacity of a class-wide proceeding to generate *common answers apt to drive the resolution of the litigation*.” *Id.* (emphasis added).

To certify a class under Rule 23(b)(3), Plaintiff must also prove that “questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” *Gales v. Winco Food*, 2011 WL 3794887, at *4 (N.D. Cal. Aug. 26. 2011). The predominance requirement of Rule 23(b)(3) is “**far more demanding**” than the commonality requirement of Rule 23(a)(2). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (emphasis added). The predominance and superiority requirements tend to merge, because where “individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of

confusion are magnified." *Zinser*, 253 F. 3d at 1189. This showing must be made for both liability and damages, the latter of which must be "capable of measurement on a classwide basis." *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013). "Without presenting [a common damages] methodology, [a plaintiff] cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34. And while the Ninth Circuit has left it up to the individual courts to require a trial plan, it has still ruled that the Plaintiff must make a "showing" of "how the class trial could be conducted." *Valentino v. Carter-Wallace, Inc.*, 97 F. 3d 1227, 1234 (9th Cir. 1996) (decertifying a class on these grounds). *See also Zinser*, 253 F. 3d at 1189 (trial plan required to address manageability).[1]

## IV. PLAINTIFF CANNOT ESTABLISH ADEQUACY

"To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F. 3d 970, 985 (9th Cir. 2011) (internal citation omitted). Plaintiff has not demonstrated that she and her counsel are adequate  representative of the putative class or would prosecute the case vigorously. As for conflict, Plaintiff's Motion is devoid of any evidence for the Court to make this finding.

## V. PLAINTIFF CANNOT ESTABLISH TYPICALITY

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F. 2d at 508, citing *Weinberger v. Thornton*, 114 F.R.D. 599, 603 (S.D. Cal. 1986). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon*, 976 F. 2d at 508, quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985). Plaintiff's recitation of her purported typicality is riddled with conclusory statements and errors, and ignores evidence, such as the existence of different time keeping

[1] In the Northern District, the Honorable Vince Chhabria requires a detailed discussion of class trial manageability. *See* Chhabria Civil Standing Order, paragraph 55 (June 26, 2026).

systems and Plaintiff's own testimony (showing unique liability theories) and data. The motion concludes that "the same type of time records exist for all class members" without any citation to such records. Plaintiff cannot rest on allegations and conjecture.

## VI. PLAINTIFF CANNOT ESTABLISH COMMONALITY OR PREDOMINANCE

As an initial matter, Plaintiff's Notice is unclear as to relief sought.[2] Plaintiff seeks certification of one class of 16 job classifications in unnamed and unspecified facilities, described only as facilities with some undefined "security screening process," untethered to any particular claim. Notice, Dkt. 50, p. 2. It further seeks certification under Fed. R. Civ. P. Rules 23(a) and 23(b)(3) "or, in the alternative," 23(c)(4). *Id.* Yet nothing in the Notice details the issues and nothing in the memorandum mentions Rule 23(c)(4). As such, Plaintiff's Notice is inadequate.

### A. Plaintiff Did Not Establish a Common Unlawful Policy

Plaintiff contends that "[c]ertification of claims by employees working at multiple facilities operated by a single employer is appropriate when claims are predicated on a common employer policy," relying on decisions where "there [were] not relevant distinctions between the worksites." Mot. 18:15-20. However, Plaintiff has not submitted any evidence from other employees at Visalia or any other UPS facility showing her theories can be certified. Where a plaintiff seeks class certification on the theory that the defendant employed a uniform unlawful policy or practice, the Court must consider whether the plaintiff provided substantial evidence "that the entire class was subject to the same allegedly [unlawful] practice." *Valencia v. VF Outdoor, LLC*, 2022 WL 4397084, *9 (E.D. Cal. Sept. 23, 2022); *Ellis*, 657 F. 3d at 983. "[W]here no substantial evidence points to a uniform, companywide policy, and proof of off-the-clock liability would have … to continue in an employee-by-employee fashion, class certification is inappropriate." *Howard v. CVS Caremark Corp.*, 2014 WL 11497793, at *10 (C.D. Cal. Dec. 19, 2014), aff'd, 628 F. App'x 537 (9th Cir. 2016) (quoting *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1052 (2012)) (internal quotation marks omitted).

Here, UPS's policy is lawful: it prohibits off the clock work and provides legally compliant meal periods of at least 30 minutes and rest breaks of at least 10 minutes. Brown Decl.,

[2] Plaintiff conflates commonality under Rule 23(a) with predominance under 23(b)(3).

Ex. 5, 25:6-11; 27:1-10, Ex. 3. Employees are relieved of duty during their meals and breaks – and are free to stay or exit the facility. *Id*. Plaintiff submitted no evidence reflecting the length of security screening at **any** facility, including her own – evidence that is necessary for Plaintiff's theory that UPS does not provide compliant meal periods. Nor has Plaintiff submitted any evidence of the meal and rest break practices at other facilities with respect to security screening, the experiences of any other putative class members, or location of time clocks at other facilities.

Plaintiff repeatedly cites the testimony of Matt Cota regarding the fact that the belts at Visalia shut down for 30 minutes during meals. But that testimony does not support the proposition for which Plaintiff offers it. Cota was not designated as a corporate representative regarding meal period practices, and his percipient testimony concerned only the belt shutdown on the Preload sort at Visalia. It does not establish that employees' meals were limited to 30 minutes or that security screening deprived any employee of a compliant meal period.

- Matt Cota was designated to testify as a corporate representative **only as to** Plaintiff's own "job duties and how job duties are to be performed." Brown Decl., Ex. 4, 9:6-17. He was not designated to testify as to any other location, employee, or topic. *Id*.
- Cota testified generally in his capacity as a Preload Manager for one facility – Visalia. Brown Decl., Ex. 4, 4:18-23. His testimony regarding meals related solely to preload in Visalia as well. *Id*. 68:20-69:5.
- Cota *did not* testify that Plaintiff was only provided 30 minutes for lunches. His individual (not corporate) testimony, only related to the fact that the belts in the Visalia facility for the preload sort stopped for 30 minutes on those occasions when meal breaks are scheduled. Brown Decl., Ex. 4, 69:6-19. Cota further testified that in scheduling the meals, the Visalia preload followed the CBA, employees were relieved of all their job duties, and could take their meals wherever they wanted, including leaving the building. *Id*. 49:15-50:7; 51:9-19; 54:5-8.

In her motion, Plaintiff presents only her own testimony regarding the estimated duration of security checks, and no testimony actual duration of lunches, or actual duration of rest breaks – in Visalia or otherwise. Nor did she supply evidence of lunch practices on any other sort in Visalia or in any other facility. The evidence Plaintiff omitted from her motion demonstrates why

certification is improper: employees' actual experiences vary as to whether they left the facility, how long security took, and whether they received a compliant break. *See* Section II. B-E *supra*.

### B. Meal Periods – Common Issues Do Not Predominate

Plaintiff seeks certification of meal period claims based on purported "discouragement" by security checks and based on purportedly unrecorded meals (even on shifts where no meal was required). Neither theory is viable and neither can be established on a classwide basis.

#### 1. Whether Any Employee Felt "Discouraged" Is an Individualized Question That Cannot Be Answered in One Stroke

##### a. Plaintiff Presents No Evidence of Uniform Policy

*Brinker* instructs that UPS has satisfied its duties with respect to meal breaks if it "relieves its employees of all duty, relinquishes control over their activities and permits them a **reasonable opportunity** to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. What will suffice may vary from industry to industry…." *Brinker*, 53 Cal. 4th at 1040 (emphasis added).[3] Using this guidance, courts have found that employers interfere with meals where they require or leave employees no choice but to work during that time – a finding that cannot be made here on a classwide basis. *See e.g., Carter v. Jai-Put Enterprise Inc.,* 2022 WL 1637212, at *22-23 (N.D. Cal. May 24, 2022) (employees required to respond to work-related calls and texts during lunch), *amended in part,* 2022 WL 4371503 (N.D. Cal. Sept. 21, 2022); *United Steel v. Shell Oil Company*, 2010 WL 11508796, at *4-5 (C.D. Cal. Aug. 27, 2010) (employees required to stay in communication, respond to calls, and remain on premises).

Here, without any evidence or legal authority, Plaintiff simply recites *Brinker* and claims that, for all employees working over 5 hours in a day, the mere existence of security "discourages" employees from leaving the premises during meal periods.[4] Plaintiff submits the following evidence to certify her meal period claim: (1) her own declaration; (2) limited testimony of her former manager that belts shut down on the preload shift in Visalia; and (3)

[3] The legislature has drawn the line at 30 minutes. Plaintiff invites the Court to draw another line.

[4] Plaintiff's brief conflates two distinct theories: that security screening discourages employees from leaving and that it interrupts their meal periods. Because the motion develops no separate interruption theory, UPS addresses the claim principally as one of alleged discouragement.

testimony from UPS's corporate representative that the 39 facilities have some level of security.

As an initial matter, this is not even evidence that UPS had a security process **at Visalia** that uniformly discouraged employees from taking meals. Indeed, as others at Visalia testified, not every sort shut down for lunch and employees certainly did not point to security as the reason for not leaving the facility. Brown Decl. Ex. 33, Facts 55-59, 62-68, 72 . Nor has Plaintiff submitted evidence as to any other facility. Here, UPS presents evidence showing that often security takes no time at all, with employees simply walking through, and that frequently employees took more than 30 minutes for lunch. *See* Sections II. B-G supra. Indeed, Plaintiff herself testified that on some days, she took a 30-minute meal period and sometimes left the property. Brown Decl., Ex. 1, 36:23-37:1.

**b. Security Checks Do Not Impede or Discourage Employees**

UPS has presented compliant policy, data, videos, photographs, and employee declarations confirming that employees were permitted to leave the premises during meal periods (and breaks). *See* Section II.E-G supra. Videos of employees walking straight through metal detectors without delay or briefly opening up their bags for a security guard to peer into fly in the face of the discouragement theory. Whether some security measures were so onerous as to impede the exit and entrance in a way that deprived class members, including class members working full-time and scheduled for an hour-long lunch, is a highly individualized inquiry. It depends on myriad factors that vary, at minimum, (1) by individual; (2) by facility and by day, such as time of day/night when employees leave, impacting available stores and restaurants; (3) by employee preference on whether to sleep or relax during the break; (4) by the amount of time employees take for lunch or breaks; (5) by security protocols; and (6) by lunch waivers.

**c. *Hamilton v. Wal-Mart* Does Not Require Certification**

Plaintiff suggests that certification on this theory is mandated by the Ninth Circuit's decision in *Hamilton v. Wal-Mart Stores, Inc.*, 2022 WL 2374445, at *3 (9th Cir. June 30, 2022). Not so. As an initial matter, the *Hamiton* decision is unpublished and, while citable, is not precedential. *Id.* at n.2 ("This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3."). Further, to the extent that *Hamilton* holds a

plaintiff simply needs to allege a uniform policy and claim – without substantial evidence (*id*. at *4) – it is contrary to United States Supreme Court's precedent. *Dukes*, 564 U.S. at 350 (holding that the questions must be susceptible to the same *answer* for all class members). Finally, *Hamilton* itself points to Ninth Circuit precedent holding that analysis of control during breaks is a "'**case-specific approach [which] focuses on the level of the employer's control on employees**[,]' not on whether every employee wants to use their break in an unauthorized way." *Hamilton*, 2022 WL 2374445, at *3, quoting *Ridgeway v. Walmart Inc*., 946 F. 3d 1066, 1079 (9th Cir. 2020) (emphasis added). Here, Plaintiff submits no evidence regarding the level of control in security checks.

The theory certified by the district court in *Hamilton* revolved around employees working **over 6 hours**, who by law cannot waive a meal break with a written waiver. *Hamilton v. Wal-Mart Stores, Inc*., 2018 WL 4813082, at *5 (C.D. Cal. Aug. 21, 2018). In the predominance discussion, the court **further limited** it to employees who left the facility and did not receive a net 30-minute meal. *Id*. at *12 ("Who left the facility during their meal period and how much time they were deprived of are questions that can presumably be determined from records or video surveillance."). By contrast, that same court refused to certify a class of employees working between 10 and 12 hours who executed second meal period waivers because it determined that there was no commonality as to why employees chose not to take their second meals. *Id.* at *7.

Here, unlike *Hamilton*, Plaintiff does not claim that security checks were unpaid, does not limit her motion to the issue certified in *Hamilton* (*i.e.*, no net 30 minutes for first lunch over 6 hours for employees who left the facility), and does not present classwide evidence of employees leaving the facility, which *Hamilton* found necessary. Instead, Plaintiff moves to certify a meal period theory that includes employees who work **fewer than 6 hours,** who signed meal period waivers, who did not leave the premises, who left the premises and took more than 30 minutes, and who did not want to leave the premises. Given the significant differences between Plaintiff's theory and that advanced by the plaintiff in *Hamilton*, the non-precedential Ninth Circuit opinion does not apply or, at most, supports the denial of class certification.

//

### d. Courts Post-*Hamilton* Have Rejected Plaintiff's Theory

Multiple courts throughout California that have examined this issue squarely reject Plaintiff's position. This Court, the Honorable Trina Thompson presiding, considered this very question in a 2024 case in which the plaintiff advanced the same theory of meal period interference due to security checks at FedEx warehouses. *Depina v. FedEx Ground Package System, Inc.*, 2024 WL 5430193 (N.D. Cal. Nov. 8, 2024). Judge Thompson denied certification, finding that plaintiff, despite presenting vastly more evidence than Plaintiff did here, had not established either commonality or predominance. Evaluating commonality, Judge Thompson first noted that "**while most employees must undergo security screening to leave the facility to take their meal periods or rest breaks, there is no evidence that this is in violation of California law**." *Id.* at *7 (emphasis added). She specifically noted that the question of the impact of security screening "d[id] not apply to every putative class member because many of them stay on the premises during their meal and rest breaks." *Id*. As to those employees who did leave, Judge Thompson found that even for them, there was no commonality because for some the security did not cut into their meal breaks and because time undergoing security was paid. *Id*. Next, Judge Thompson concluded that plaintiff failed to establish predominance because of the **variation in motivation** behind employees' decisions whether to leave, the differences in actual security procedures, and the differences in time that purportedly "cut" into the meals. *Id*. at *12.

In *Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1232695, at *5 (N.D. Cal. Mar. 30, 2021), then Chief Judge Richard Seeborg refused to certify a meal period class premised on security checks even in the face of some declarants claiming that security checks cut into their ability to take a 30-minute lunch. Judge Seeborg found that some employees could take 30 minutes and, "[a]s a matter of basic arithmetic, the bag check process therefore does not serve as common evidence of [the defendant's] uniform failure to provide workers with 30-minute lunch breaks."

The Eastern District of California came to the same conclusion in *Valencia*, 2022 WL 4397084. The court denied certification of a meal period subclass because of evidence that employees could take longer than 30-minute meals and 10-minute breaks. The Court noted that "it is difficult for the Court to conclude that the security check procedures … resulted in a

**uniform denial** of uninterrupted 30-minute meal periods" and noted that resolution would "require individualized inquiries into each member's rest period experiences." *Id*. at *12-14 (emphasis added). In *Morand-Doxzon v. Delaware North Companies Sportservice, Inc*., 2021 WL 5979267, at *10 (S.D. Cal. Sept. 9, 2021), the Honorable Dana Sabraw denied certification because "individualized questions about (1) the actual duration of each employee's individual meal and rest periods, (2) how long it took each employee to undergo security screening upon reentering the ballpark during break times, and (3) whether employees were disciplined for breaks exceeding ten- and thirty-minute durations predominate."

Similar to these cases, which did not find "uniform denial" of meals, no evidence of such uniform denial exists here. Plaintiff has not established commonality or predominance.

**2. Class Treatment Is Not Proper for "No Lunches Recorded" Theory**

Plaintiff next attempts a meal period theory that, relying on the *Donohue* presumption, claims that failure to record a meal period means classwide violations. In the words of the Honorable Vince Chhabria, "it's wrong." *Hale*, 765 F. Supp. 3d at 907.

In seeking to certify claims of employees working more than 5 hours, Plaintiff ignores her own first meal period waiver and presents no evidence as to whether others may have signed similar waivers. Under California law, an employee may, by mutual agreement with the employer, waive the first meal period if he or she works more than 5 but fewer than 6 hours. Cal. Labor Code § 512. Plaintiff has signed such a waiver  and does not challenge its validity. Brown Decl., Ex. 1, 59:12-60:24; 62:19-22; 63:25-64:3, Ex. 6. Waivers are presented to employees during onboarding, and employees routinely sign them. Existence of waivers will impact whether failure to record a meal on a shift of less than 6 hours constitutes a potential violation of California law, rendering the question of liability not certifiable based solely on the records Plaintiff presents to the Court – *i.e.*, records of missing lunches on shifts over 5 hours.

Moreover, even if Plaintiff, notwithstanding her own waiver, had argued that the employees she seeks to represent did not sign valid first meal period waivers, individualized issues would still preclude certification. "The question of whether a missed meal break was due to the employer's failure to allow it or from the employee's voluntary choice not to take it requires

an individualized inquiry." *Lampe v. Queen of the Valley Med. Ctr.*, 19 Cal. App. 5th 832, 848 (2018) (affirming denial of class certification). Existence of the *Donohue*[5] presumption, on which Plaintiff relies exclusively, does not result in certification. *Hale*, 765 F. Supp. 3d at 913 ("If the time records suggest that the presumption will apply for the class, is this enough on its own to support class certification? **It is not**.") (emphasis added).

In *Hale*, the court concluded that analysis of whether the employer denied class members a "reasonable opportunity for unpaid meal breaks" or whether "class members voluntarily decline unpaid meal breaks despite [that] opportunity" – is inherently individualized and not amenable to class certification. *Id*. at 914. Existence of individualized issues is supported by Plaintiff's own testimony. When asked about the single day when she worked more than 6 hours without recording a lunch, Plaintiff testified that she did not know whether she actually took a lunch that day and simply failed to record it. Brown Decl., Ex. 2, 228:17-229:8.

**3. Plaintiff's Own Meal Period Claim Is Not Typical of the Class**

While she now advances the foregoing two theories, Plaintiff herself testified to an entirely different theory of meal period liability – that a supervisor did not allow her to take lunch before she worked 6 hours, sending her home instead. Brown Decl., Ex. 1, 34:25-35:10 ("Q: Okay. And your testimony is that – with respect to meal breaks is that your supervisor would avoid giving you a 30-minute meal break by sending you home before the sixth hour of work; is that correct? A: Yes."). This further forecloses typicality outright, and adequacy, commonality and predominance as well.

Plaintiff tried to fix her testimony via a declaration. Setting aside law which prohibits such corrections, when questioned on her declaration, Plaintiff admitted that she did not know what "impede" even meant. Brown Decl., Ex. 2, 192:14-20. And as for "discouragement," Plaintiff explained that it was simply "inconvenient" to leave and it took a long time to walk to the car. Brown Decl., Ex. 2, 197:18-199:18. The law does not require UPS to make lunches "convenient." It requires UPS to give Plaintiff a "reasonable opportunity" to take a duty-free 30 minute lunch. Plaintiff's attempt to claim that security "searched" her bag is further not credible in light of

[5] *Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58, 77 (2021).

UPS's policy at Visalia that security cannot physically inspect the inside of bags. Savage Decl., ¶8. *See also* Brown Decl., Ex. 33, Facts 19-25. And it renders her atypical.

**C. <u>Rest Breaks – Common Issues Do Not Predominate</u>**

Plaintiff's rest break theories are that the mere presence of security checks renders all rest breaks noncompliant and that every shift over 3.5 hours denied employees rest breaks. These theories cannot be certified either. Putative class members testified they were never deprived of rest breaks. Brown Decl., Ex. 33, Facts 75-83 . And Plaintiff herself testified that she always received her first rest break. Brown Decl., Ex. 1, 133:14-18.[6] During her rest breaks, Plaintiff ate a snack in the facility and did not go to her car because she did not want to walk there. *Id.* 129:22-24; 130:3-11. Notably, Plaintiff *did not* claim in her deposition that security checks prevented or discouraged her from leaving. *Id.* 130:3-11. Rather, she said it was the size of the facility. By contrast, Plaintiff's motion states: "[i]mportantly, it is Defendant's screening policy, not the size of its facilities, that confines Class members during rest breaks." Mot. 23:12-13.

None of the cases Plaintiff cites in her Motion address security checks. *Godfrey v. Oakland Port Servs. Corp.*, 230 Cal. App. 4th 1267 (2014) (no meal or rest break policy; drivers were told to take breaks on the job); *Campbell v. Vitran Express Inc.*, 2015 WL 7176110 (C.D. Cal. Nov. 12, 2015) (drivers were threatened into falsifying their records; manager testified he did not provide opportunity for breaks); *Stewart v. Quest Diagnostics Clinical Laboratories, Inc.*, 2022 WL 5236821 (S.D. Cal. Oct. 5, 2022) (productivity goals and requirement to see patients impeded rest breaks); *Villalpando v. Exel Direct Inc.*, 2016 WL 1598663 (N.D. Cal. Apr. 21, 2016) (drivers required to stay with delivery vehicles during breaks to protect property). By contrast, cases which have examined security and rest breaks deny certification.

In *Valencia*, the Eastern District analyzed and declined to recommend certification of the very theory Plaintiff advances here – that security checks render rest breaks noncompliant. 2022 WL 4397084, at *13-14. Relying on Northern District of California decision in *Figueroa* (which likewise rejected certification of rest breaks due to security checks), the court in *Valencia*

---

[6] Plaintiff's testimony about her second rest break is a red herring; Plaintiff was not entitled to a second rest break under the law. *See* Crandall Decl., ¶33, fn.36.

concluded that "**there is nothing facially unlawful about a policy of requiring employees to stay on the premises during a rest break, much less permitting employees to exit the premises, albeit with a security check**." *Id.* at *14 (emphasis added). *See also Figueroa*, 2021 WL 1232695, at *6 (emphasis in original) (rejecting plaintiff's argument that "California workers are entitled to 10-minute rest breaks *outside* the workplace" and noting that, "[t]his is not the law"); *Augustus v. ABM Sec. Servs., Inc*. 2 Cal. 5th 257, 270 (2016) (finding that the "constraint" of remaining on site or nearby is "common to all rest periods" and is "not sufficient to establish employer control").

Plaintiff does not dispute that rest breaks are often 15 minutes long and that even with security, employees are likely to net 10 minutes. As discussed in Section II.B-G supra, the timing and duration of security checks is highly individualized. UPS's liability, therefore, would "require individualized inquiries into each member's rest period experiences, and as such common questions do not predominate." *Valencia*, 2022 WL 4397084, at *14.

### D. Off the Clock Theory – Common Issues Do Not Predominate

Plaintiff anchors her minimum wage and overtime wage theories on the same contention – that UPS did not compensate for "walk time" between security screenings and time clocks and between time clocks and work areas. As with her other theories, Plaintiff presents *no evidence* of such uncompensated time for any of the 62,000-plus putative class members.

#### 1. California Law Does Not Mandate Pay for all Time on Premises

Plaintiff's claim for walk time is predicated on a fundamental misunderstanding of the state of California law regarding on-premises time. In *Huerta v. CSI Electrical Contractors*, the California Supreme Court analyzed whether (1) time spent undergoing security checks while in an employee's personal vehicle and (2) time spent driving approximately 10-15 minutes between the security check and the parking lot was compensable. 15 Cal. 5th 908 (2024). The California Supreme Court rejected the very proposition Plaintiff advances and held that travel time on employer premises, even when subject to employer rules, was not compensable. *Id.* at 916.

> CSI appears correct that **Huerta's position** "has no limiting principle" and **would invite claims of unpaid wages from "any employee who uses a time clock" because "[e]mployees always spend some amount of time navigating towards**

> **a time clock or their workspace before a shift and away from the same area after a shift, in their cars on employer property or walking across employer hallways or sidewalks."** Because workplaces are regulated environments, adopting Huerta's position would mean that whenever an employee is traveling on an employer's premises, including before or after a work shift, the time is compensable as "hours worked." **We are not aware of any authority that has construed employer control so expansively**.

*Huerta*, 15 Cal. 5th at 928-930 (emphasis added).

Plaintiff invokes *Huerta*'s holding regarding compensable security-screening time, but that is not the time at issue here. UPS already pays employees for undergoing and waiting for security screening, and Plaintiff does not contend otherwise. Her claim instead concerns travel between security, time clocks, and work areas, which *Huerta* analyzed separately.[7]

**2. Walking Not Amenable to Classwide Analysis of Liability or Damages**

*Huerta* forecloses Plaintiff's theory that all travel on UPS property is compensable. But the Court need not resolve the claim on that ground to deny certification. Plaintiff otherwise presents no classwide evidence regarding whether the time between security checks, time clocks, and work areas should be compensated as hours worked. In the absence of such classwide proof, individualized issues predominate. To determine if any of the time at issue is compensable, the Court will first need to examine whether each class member, during the times that Plaintiff argues are compensable, "[w]as subject to the control of [UPS]." 8 Cal. Code Regs. § 11070, subd. 2(H); *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000). As explained in *Morillion*, the mere fact that a job might require an employee to engage in a particular activity before work does not automatically transform that time into "hours worked" under California law. *See Morillion*, 22 Cal. 4th at 586-87. Where such pre-shift or post-shift activity is required, "[t]he level of the employer's control over its employees, rather than the mere fact that the employer require[d] the employees' activity is determinative." *Id.* at 587. Plaintiff did not (and cannot) show that the question of UPS's "control" over its employees while walking is susceptible to common proof.

Plaintiff presents no evidence regarding the location of time clocks in any facility or the

---

[7] Plaintiff also mentions "walk time" as a field in GTS without sufficient context. That category of time is not applicable or relevant to Plaintiff's Motion because the "walk time" field in GTS measures the time those employees who switch job functions (and therefore cost centers) spend traveling from one location in a facility to another. Brown Decl., Ex. 3, 23:21-25:8.

activities employees perform as they walk to time clocks or to work areas, and whether UPS controls any of those activities (it does not). As noted above, at some UPS facilities, security checks take place inside the warehouse, right next to time clocks. Brown Decl. Ex. 33, Facts 13, 14, 26-29. While Plaintiff's work area was "in the back corner" of a facility (Brown Decl., Ex. 2, 218:24-219:4), others worked in other locations nearer to the entrance in Visalia. Brown Decl., Ex. 2, 252:12-15. In some UPS locations, there are dozens of time clocks; in others there are just a few. Brown Decl. Ex. 33, Facts 29-30. UPS does not control when employees arrive at work or when they leave after their shift is completed. Brown Decl. Ex. 33, Facts 32-44. Nor does UPS control what they do while they are on premises but not on the clock working. *Id*. The only way to determine whether time on premises after security checks is compensable will be on a person-by-person, day-by-day analysis.

Further, Plaintiff does not identify any common method for distinguishing walk time that is compensable because it is subject to the employer's control, from time when it is not. Employees may take different routes or stop along the way to talk with coworkers, use the restroom, obtain water, or take a nap in the break area. Plaintiff's own testimony reflects that she sometimes engaged in personal activities while walking through the facility. Brown Decl., Ex. 1, 110:16-111:12. Plaintiff's expert confirmed that he could not account for such differences:

> Q: If the finder of fact concluded that you must exclude anybody who is sleeping in the break room for the time period between actual punch-in time and scheduled start time, how would you go about excluding those people?
>
> [objection omitted]
>
> A: **I don't know**.

Brown Decl., Ex. 39, 130:10-131:22 (emphasis added). That inability to distinguish controlled, potentially compensable time from personal or otherwise non-compensable time prevents Plaintiff's proposed methodology from establishing liability or damages through common proof.

### 3. Affirmative Defense of Offset Creates Individualized Issues

Plaintiff's Motion does not address whether common proof exists as to potential excess payment (thus liability determination) and offset (damages). SCAR time calculation for security checks rounds up; employees arrive after scheduled start time and begin to get paid immediately

upon clocking in; and CBA guarantees of both minimum wage and overtime more generous than California laws. *See* Brown Decl., Ex. 34. These factors all raise additional individualized issues of ascertainability, liability and damages. Plaintiff's Motion does not even mention, let alone account, for these issues. Courts have held that person-by-person analysis of the offset defense defeats certification. *Brown v. Google, LLC*, 2022 WL 17961497, at *18 (N.D. Cal. Dec. 12, 2022).

### E. Common Issues Do Not Predominate for Plaintiff's Derivative Claims

Plaintiff's remaining claims are entirely derivative of her main theories. Mot. 27-28. As such, class certification should be denied.

## VII. PLAINTIFF HAS NOT ESTABLISHED MANAGEABILITY OR SUPERIORITY

In the last two pages of her brief, Plaintiff states – without reference to any evidence – that liability can be determined by common proof. But Plaintiff does not explain how that purported common proof would resolve the material differences among 62,000 employees working in over 16 full-time and part-time job codes at 39 facilities.

Plaintiff fares no better on damages. Even her own expert conceded that he could not explain how to account for employees who received compliant meal periods, were not discouraged from leaving the facility, or engaged in personal activities after clocking in but before beginning work. *See* Section II.B-G *supra*. Further, neither Plaintiff nor her expert proposes how to deal with missing or incomplete badge records, even though Plaintiff is "anchored" to that data. Mot. 29:23-25. These employee- and shift-specific inquiries render the proposed class unmanageable and defeat predominance and superiority.[8]

## VIII. CONCLUSION

UPS respectfully submits that Plaintiff's motion should be denied in its entirety.

DATED: September 14, 2026

GBG LLP

BY: /s/ Elizabeth A. Brown
ELIZABETH A. BROWN
Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

---

[8] Multiple courts have denied class certification in similar wage/hour claims against UPS. See RJN Exs. 1 and 2.