ELIZABETH A. BROWN (SB# 235429)
JENNIFER SVANFELDT (SB# 233248)
MICHELLE T. McGUINNESS (SB# 257151)
RYAN C. KING (SB# 351149)
lisabrown@gbgllp.com
jensvanfeldt@gbgllp.com
michellemcguinness@gbgllp.com
ryanking@gbgllp.com
GBG LLP
601 Montgomery Street, Suite 840
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MANDY SAECHAO, an individual, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

UNITED PARCEL SERVICE, INC.; and DOES 1 through 10, inclusive,

Defendant.

Case No. 3:25-cv-02431-RFL

**DECLARATION OF ROBERT W. CRANDALL, MBA IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

| | |
|---|---|
| Date: | November 19, 2026 |
| Time: | 10:00 a.m. |
| Judge: | Hon. Rita F. Lin |
| Courtroom: | 4 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANDY SAECHAO, an individual on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC,; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:25-cv-02662-RFL<br><br>**<u>CLASS ACTION</u>**<br><br>**DECLARATION OF ROBERT W. CRANDALL, MBA IN SUPPORT OF DEFENDANT UNITED PARCEL SERVICE, INC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:<br>Time:<br>Courtroom: |

# TABLE OF CONTENTS


Page

I. QUALIFICATIONS ..... 1

II. ASSIGNMENT ..... 2

III. AVAILABLE DATA AND DOCUMENTS ..... 2

IV. SUMMARY OF OPINIONS ..... 4

V. INTRODUCTION ..... 7

- A. Discussion of Security Related Meal and Rest Break Claims ..... 8
- B. Discussion of Plaintiff's Traditional Meal and Rest Break Claims ..... 16
- C. Unpaid Time Claims ..... 19
- D. Trial Plan Issues ..... 21

VI. ANALYSIS OF MEAL BREAK BEHAVIOR ..... 23

- A. For the Instances of SCAR Data with a Badge Swipe for Starting and Ending the Security Check Process, 8.4% of Trips Through Security were 10 Seconds or Less and 17.1% were 15 Seconds or Less ..... 24
- B. Of the 74,149 meal eligible shifts in the GTS and GTS activity data only 2.8% have a recorded non-compliant meal break after taking meal premiums into account ..... 29
- C. Of the 54,704 recorded first meal breaks in the data, 14.1% were greater than 30 minutes and 13.1% were greater than 40 minutes ..... 31
- D. Of the shifts from the GTS data, 19.2% have badge swipes that indicate the employee left the facility during their shifts ..... 33

VII. ANALYSIS OF EXCESS PAID TIME ..... 37

- A. Employees are Being Paid For Time Spent in Security Under a Round-Up System ..... 37
- B. There is Guaranteed Time Included in the CBA that Employees are Paid Regardless of Their Shift Length ..... 40

VIII. ANALYSIS OF THE NAMED PLAINTIFF'S DATA ..... 44

- A. A review of individual days at the Visalia facility shows that meal break times for employees working in the same job title as Ms. Saechao varied ..... 45

# DECLARATION OF ROBERT W. CRANDALL, MBA

## I. QUALIFICATIONS

1. I am a Partner at Resolution Economics LLC, a firm whose activities include conducting labor studies, performing economic and statistical analyses, and providing complex data analysis in connection with litigation and non-litigation issues. I have been retained in an expert or consulting capacity in more than 500 class-action and collective matters alleging wage and hour violations under the FLSA and analogous state laws. I am the author of the Wage and Hour chapter of the Litigation Services Handbook, which is the only practitioner's guide to performing litigation consulting and expert witness testimony.

2. In connection with my wage and hour work, I have been involved in numerous projects where the objective was collecting and analyzing data related to how business operations impact how and when work tasks are performed, how work requirements are communicated to employees, how work is delegated and allocated among employees, and how work is supervised to ensure productivity metrics are achieved and corporate standards are met. I have performed numerous forensic data studies in warehouse and transport hubs where I have analyzed operations, the flow of work, the allocation of work between employees, and staffing and scheduling practices. I have also led numerous time and motion video observation studies where I have examined security check processes and procedures to determine how employees interact with security, what items they bring, and the duration of the security check process and have previously conducted a video study of the security process at UPS warehouses in California. I also comment upon the surveys and time and motion studies conducted by other experts. Finally, I provide wage and hour auditing services and assist employers with developing wage and hour compliance systems outside of the litigation context.

3. I hold an M.B.A. from Loyola Marymount University, and a B.A. degree in History from the University of Southern California. I have been qualified as an expert witness in both Federal

and State Courts. My resume is attached to this report as Attachment A. My hourly rate is $895 per hour, which is the rate I customarily charge for both consulting work and expert testimony.

## II. ASSIGNMENT

4. I have been retained by counsel for United Parcel Service, Inc. ("UPS") to analyze a variety of data related to Plaintiff's meal break, rest break, and off-the-clock theories that are articulated in Plaintiff's Motion for Class Certification ("Plaintiff's Motion") and to respond and rebut the opinions presented by Plaintiff's expert, Justin Regus. More specifically, I will address Plaintiff's contentions that the security screening process to enter and exit the building resulted in a failure to provide the opportunity for a 30-minute meal break and failure to authorize and permit 10-minute rest breaks from the perspective of what information the currently available data provides and what additional scientifically representative information may need to be collected. In connection with Plaintiff's "regular" meal break claims, I will respond to Mr. Regus' analysis of the Named Plaintiff Ms. Saechao's timekeeping data, as well as a broader sample of timekeeping, Badge, SCAR, and payroll data while discussing UPS's system of compliance. Finally, I will discuss Mr. Regus's failure to produce a trial plan, discuss what the available records and what information they contain, what information is missing and needs to be collected.

## III. AVAILABLE DATA AND DOCUMENTS

5. In connection with this assignment, I have received and analyzed Global Time System ("GTS") timekeeping, payroll, badge swipe, and SCAR (security check point activity record) data, as well as case filings, deposition transcripts, and employee declarations.[1]

6. **Class List** – The class list provided contains a list of 62,529 employees believed to be identified as relevant hourly, non-exempt employees working at the 39 California UPS facilities. The

[1] A complete list of data and documents reviewed is provided as an attachment to this declaration.

relevant fields include employee id, employee name, job codes, and facility codes. This list is used to restrict the analysis to the pool of relevant UPS employees.[2]

7. **GTS Data** – The GTS data provided contains timekeeping information for the putative class members – hourly, non-exempt employees working at the UPS facilities in California. Received in three different formats[3], the relevant fields include employee ID, facility, job title, clock-in times, and clock-out times. After removing anomalous records, duplicate records, and records outside of the putative class population and period, the GTS timekeeping data provided contains timekeeping information for 11,168 unique employees and 1,504,950 shifts ranging from 03/29/2022 to 02/21/2026. GTS Activity data includes detailed records regarding the shift including time punch records for meal breaks. At present, GTS activity data is available for a subset of 684,121 shifts and 3,260 employees over a period from 03/29/2022 to 05/28/2025. There is also GTS for the period from 05/25/2025 to 02/21/2026 that does not have corresponding GTS activity data. This data is referred to throughout this report as "GTS DIRDA" data. The GTS DIRDA data contains a total of 820,829 shifts for 8,816 employees and runs from 05/25/2025 to 02/21/2026.

8. **Payroll Data** – The payroll data contains paycheck information related to earnings and the associated hours for the relevant hourly, non-exempt employees at UPS locations in California. The payroll data generally includes other information such as the employee ID, department, job title, pay period end date, check date, check number, pay codes, earnings descriptions, hours, and amounts paid. After removing anomalous records, duplicate records, and records outside of the class period, the payroll data reviewed includes pay period end dates ranging from 03/29/2022 through 06/21/2025[4] and contains 54,692 unique employee IDs and 3,059,021 employee pay periods. The payroll data shows records for 507,497 meal premiums paid to 29,254 employees.

---

[2] It is my understanding that the relevant period for the class claims is 3/29/2022 to present after accounting for the previous settlement.

[3] The GTS timekeeping formats include GTS, GTS Activity, GTS DIRDA.

[4] Payroll data for 53 employees have productive data that continues through 1/24/2026, however for the rest of the payroll class members, relevant productive data stops 6/21/2025.

9. **Badge data –** The badge data received contains information on employee security badge swipes. The badge data included relevant fields such as employee ID, badge scan time, badge reader description, and facility. The original data shows 14,245,759 employee days but, after dropping 671,040 days for employees not included in the class and a further 2,510,913 days not included within the SOL, the data spans 03/29/2022 to 03/30/2026 and contains records for 45,162 employees for 11,063,806 employee days.

10. **SCAR data –** The SCAR data received contains information on employee security durations for UPS employees. The SCAR data included relevant fields such as employee id, badge internal timestamp, badge external timestamp, activity duration, activity duration calculation, badge scan missing location, and facility. The original SCAR data shows 13,645,382 employee days but, after dropping 777,638 days for employees not included in the class and a further 2,013,066 days not included within the SOL, the data spans 03/29/2022 to 03/30/2026 and contains records for 44,425 employees for 10,854,678 employee days.

## IV. SUMMARY OF OPINIONS

11. Plaintiff alleges that class members: (1) were not paid for time worked before their scheduled start times; (2) should be compensated for time spent traveling between the security area and time clocks; (3) experienced meal and rest break interruptions, discouragement, or were prevented from taking their breaks as a result of security procedures; (4) were not provided legally compliant meal periods and were not systematically paid meal-period premiums; (5) were not provided legally compliant rest breaks; and (6) should be paid for the time segment between their clock-in and the scheduled shift start time. Based on my review of the available data, documents, deposition testimony, and the report of Mr. Regus, my conclusions include, but are not limited to, the following:

a) Plaintiff's contention that the security process interrupted breaks or discouraged employees from leaving the facility during meal and rest breaks is not consistent with the data analyzed. Among GTS shifts reviewed, 19.2% included mid-shift badge activity indicating employees left the facility during their shifts. In addition, 52.0% of recorded security transits lasted 30 seconds or less, indicating that employees frequently exited the facility and that security procedures generally involved minimal recorded transit times.

b) To the extent Plaintiff's off-the-clock theory depends on the occurrence, duration, or nature of security interactions, Plaintiff has not identified a reliable methodology to determine whether a particular transit involved a security inspection (bag check), some other activity involving interaction with security personnel, or a walk through nor a methodology to identify whether any measured duration was attributable to security personnel as opposed to other causes.

c) The SCAR data demonstrates variability in recorded security area durations. Specifically, 8.4% of complete security transits lasted 10 seconds or less, 17.1% lasted 15 seconds or less, and 52.0% lasted 30 seconds or less. By comparison, 9.2% exceeded one minute and only 2.8% exceeded 90 seconds. The data therefore does not show that employees uniformly experienced the same amount of time in the security area during each transit.

d) Plaintiff has failed to identify what work related activities were performed during the segment between clock-in and the “sort” team meeting that occurs at shift start before the belts start moving.

e) The existing records do not establish that employee experiences were uniform across employees, facilities, or time periods. An analysis based solely on facial time-record exceptions or badge-swipe intervals would not reliably identify which employees experienced an

interruption due to interacting with security or the duration of the interaction with security personnel (likely seconds).

f) Regardless of the reason for time spent in the security area, UPS compensated employees for that time under its timekeeping practices. Further, the SCAR-recorded durations were rounded upward, such that even very short durations of time in the security area resulted in compensable paid time. For example, 10 seconds is rounded up to 1 minute. Analysis of the SCAR data shows that employees in the proposed class received approximately 89,206 hours of paid time attributable to the rounding up of SCAR-recorded security checkpoint durations during the period spanning March 29, 2022 through June 21, 2025.

g) Any evaluation of alleged unpaid time should also consider compensation provided through the guaranteed-hours and excess pay provisions of the collective bargaining agreement ("CBA"). During the period March 29, 2022 through June 21, 2025, 9,896 employees received guaranteed-time payments totaling approximately $3,290,095.75, representing 122,441.49 excess paid hours.

h) Plaintiff contends that security-related delays caused meal periods to be shorter than 30 minutes. However, among the 54,704 first meal periods recorded in the data, 14.1% exceeded 30 minutes and 13.1% exceeded 40 minutes. Further, among meal periods involving a badge-out event, 32.2% lasted more than 30 minutes, 28.0% lasted more than 35 minutes, and 23.9% lasted 40 minutes or longer.

i) The frequency of meal-period premium payments is consistent with UPS monitoring meal-period compliance and paying premiums in many instances where a non-compliant meal period was recorded. The available payroll data reflects 507,497 meal-period premiums paid to employees in the job categories identified by Plaintiff during the proposed class period. After accounting for premiums paid, the data reflects a compliance rate of approximately 97.2%.

j) To the extent that a facial meal break issue remains unresolved by a premium payment, it is likely that there are person-specific and shift-specific factors that resulted in non-payment.

k) A review of preloader shifts at the Visalia facility shows instances where employees recorded non-compliant meal periods while other employees working the sort on the same shift recorded compliant meal periods. These observations suggest that the existence of a recorded non-compliant meal period does not, by itself, establish that an employee was not provided with the opportunity to take a compliant meal period. The available records do not indicate whether the employee failed to record a meal period, voluntarily chose not to take a meal period, or was denied an opportunity to do so.

## V. INTRODUCTION

12. It is my understanding that Plaintiff seeks to certify a class of employees who work under terms and conditions collectively bargained for by the Teamsters Union and are in positions that are primarily responsible for package handling duties.[5] The duties these employees perform involve the unloading of arriving trucks, to the sorting of the day's packages, and then loading packages on departing trucks at one of the 39 UPS warehouse facilities in California with a security check process over the period spanning January 24, 2021, to present.[6] However, if the class dates were tied to facts, the security process related claims can be assumed to start on August 1, 2021 and not on January 24, 2021. Further, UPS contends that the settlement in the *Navarro* case would push the start of the statute of limitations forward to March 29, 2022. Thus, the analytical results presented herein are limited to March 29, 2022 forward.

[5] Plaintiff Motion for Class Certification ("Plaintiff's Motion") identifies the following job classifications: Loader/Unloader – Hub (H345); Preloader (O340); Loader/Unloader AM (0365); Loader/Unloader PM (0360); Art 22 Combo Ins/Ins (O473); Revenue Recovery Clerk (F452); PE Porter (M375); Hub Sorter (H325); Pickoff (H340); Sorter AM (O345); Primary Sorter (H330); Sorter PM (O350); Hub Porter (H375); HVD/LVD Sorter (H337); Package Center Specialist (O500); and Art 22.3 Porter/Helper (M310).

[6] Plaintiff's Notice of Motion and Motion for Class Certification, p. 9.

13. Plaintiff seeks certification of several claims that purportedly can be evaluated from a data perspective and by examining what information is available, as well as what additional information would need to be collected to assess those claims. A central component of Plaintiff's theory concerns the security-screening process, which varies across the 39 facilities with respect to both the nature of the screening procedures and the amount of time required to complete them.[7] According to Plaintiff, the security process gives rise to several claims, including: (1) an unpaid-time claim alleging that the workday begins at the security checkpoint, such that the time spent walking between the security area and the time clock constitutes compensable work time; (2) an "interrupted" or "short" meal-period class based on security screenings occurring during meal periods; (3) an interrupted rest-break class based on security screenings occurring during rest periods. In addition, Plaintiff alleges (4) a "regular" meal-period class which alleges that contrary to policy and the CBA, UPS failed to provide the opportunity for meal breaks; (5) a "regular" rest-break class that alleges that contrary to policy and the CBA, UPS failed to provide rest breaks; and (6) an unpaid-time claim related to time spent on the clock before the employee's scheduled shift start time.[8]

**A. Discussion of Security Related Meal and Rest Break Claims**

14. Plaintiff's Motion for Class Certification describes her security check meal and rest break theories as:

> "This confinement and control caused by Defendant's security process gives rise to several wage violations. With respect to meal breaks, Defendant's security screening process preventing Class members from leaving UPS' premises unless they interrupt their break by going through the security check process, twice, to get in and out."[9]
>
> "Likewise, for rest breaks, under California law, employees may not have policies that impede a duty-free break, including leaving the premises. Defendant's screening policy requires Class members to undergo ***two*** security screenings to leave for a rest break."[10]

---

[7] Deposition of Jeff Savage p. 12 L11-21.
[8] Plaintiff's Notice of Motion and Motion for Class Certification, p. 8-13.
[9] Plaintiff's Notice of Motion and Motion for Class Certification, p. 8.
[10] Plaintiff's Notice of Motion and Motion for Class Certification, p. 8.

15. From a data analysis perspective, Plaintiff's security-related meal- and rest-break theories present several factual and measurement questions. A threshold question is whether an employee was subjected to a bag check at all, as opposed to merely badging in and walking through a metal detector or other security related access-control approach, and then badging out. Other questions involve the duration of time in the security area and whether the employee interacted with security personnel and how much time the employee spent in the security area if they failed to badge in or out or there is no badge record at all. With regards to bag checks, the available evidence indicates that the decision to carry a bag subject to inspection is employee-specific and reflects an individual choice rather than a uniform job requirement.[11] As a result of this choice, employees entering or leaving the facility may experience materially different security-screening processes during the same time period.

16. An employee's security transit experience generally falls into one of two categories. First, an employee may badge in and walk through the security area without a bag check or other interaction with security personnel. In such circumstances, the employee simply transits the security area and experiences little to no measurable security-related delay.[12] Second, an employee may enter or exit the facility while carrying a bag subject to inspection. In those instances, the employee may undergo a bag check before proceeding through the security area. Based on my experience conducting numerous observation studies that have, in the aggregate, measured tens of thousands of bag checks, the physical process of conducting a bag check is typically measured in a few seconds and not everyone carries a bag. Here, many of UPS's declarants testified that security transit times generally took seconds and bag checks take a second when they occur. As examples,

[11] Plaintiff's Motion and Mr. Regus's expert report fail to describe any job-related reasons or requirements for an employee to enter or exit while carrying a bag.

[12] A "walk-through" refers to a security-area transit for which there is no indication of interaction with security personnel. At many facilities, security area transits involve an employee badging upon entrance into the security area, passing through a metal detector, and then badging again upon exit from the security area. However, badge-swipe data and SCAR data indicate that employees did not consistently badge at all entry and exit points. As a result, the available records do not reliably identify all movements through the security area. Further, badge activity alone cannot be used to determine whether a particular transit involved interaction with security personnel.

- "On average it only takes me around 10 seconds to get through security, including the turnstile, bag check, and metal detector. If there is a line, and that is rare, it takes 1 to 2 minutes at most."[13]

- "If I leave the facility for my break or lunch, I pass through security. It doesn't take much time - a few seconds."[14]

- "I just walk through. The security process takes about 3 to 5 seconds"[15]

- "It usually doesn't take more than a couple seconds for the security guard to quickly look through my backpack."[16]

17. These factual distinctions related to time spent and what occurred in the security area are important when evaluating Plaintiff's theories of "interruption" and "confinement". An employee who badges and walks through the metal detector and proceeds through the security area without any inspection, delay, or interaction with security personnel has a materially different experience from an employee who undergoes a bag check. Indeed, for an employee who simply badges through security, there may be little practical difference between the time required to traverse the security area and the time that would be required to traverse the same area in the absence of any security process. Consequently, determining whether a meal period or rest break was interrupted by security screening cannot be answered by merely establishing that a security checkpoint existed at a facility. Rather, the analysis requires consideration of whether a particular employee was subject to a security-related interaction and, if so, the nature and duration of that interaction. The presence of a bag is the likely indicator of a security interaction occurring. However, some of UPS's declarants have testified that they transited the security area or observed others transiting the security area with a clear bag that was not checked or they brought a regular bag through security that was not checked. Examples of the declaration testimony include:

---

[13] Declaration of Casas, Jessie Andrew p. 2 paragraph 11.
[14] Declaration of Burns, Levi p. 2 paragraph 12.
[15] Declaration of Leos, Alejandro p. 2 paragraph 12.
[16] Declaration of McCombs, Benjamin p. 2 paragraph 10.

- "On occasion as a preloader, I have brought a bag to work. Every day is different, but when I bring a bag, my bag is not checked by the guard."[17]

- "I've never personally brought a bag to work. I've seen other employees bring bags and go through security. They typically bring clear plastic or drawstring bags so they can just hold it up to the guard for a quick look and continue walking through."[18]

- "On occasion as a preloader I have brought a bag to work. Because l have a clear bag, the guard does not touch my bag."[19]

18. Empirically, security area transit times measured using badge swipe data are often only a matter of seconds. These observations do not appear consistent with a substantial barrier to entering or exiting the facility, let alone with Plaintiff's assertion that employees were effectively "confined". To the extent that the possibility of a security-related delay could influence an employee's decision whether to leave the facility during a meal or rest break, the impact of that possibility is inherently person-specific.

19. The subjective nature of alleged discouragement further demonstrates the person-specific nature of Plaintiff's theory which is based on employees' feelings. The same workplace conditions may cause some employees to feel discouraged from leaving the facility during meal or rest periods, while other employees may not be concerned by those conditions at all.[20] Although Plaintiff Saechao testified that security procedures and other factors discouraged her from leaving the facility during breaks, she also testified that she left the facility and went to her car during meal periods and could not recall whether she left the facility during rest breaks.[21] Thus, even with respect to Plaintiff herself, the alleged discouragement did not prevent her from leaving the facility during meal periods and may not have prevented her from leaving during rest periods. Plaintiff also testified that she observed other UPS employees leaving the facility during meal periods.[22] This testimony is consistent

[17] Declaration of Morgan, Bryan p. 2 paragraph 14.
[18] Declaration of Ramirez, Aaron p. 3 paragraph 14.
[19] Declaration of Keene, Gina p. 2 paragraph 13.
[20] Declaration of Burns, Levi p. 2 paragraph 12; Casas, Jessie Andrew p. 2 paragraph 12; Medina, Juan p. 3 paragraph 20.
[21] Deposition of Mandy Saechao Volume 2 p. 192 L1-6, p. 200 L1-13 and p. 206 L3-18.
[22] Deposition of Mandy Saechao p. 127 L15-17 and 128 L15-17.

with the proposition that employees reacted differently to the same workplace conditions and that any alleged discouragement depended on the perceptions and choices of individual employees rather than on a single perception shared by all employees.

20. Finally, Plaintiff testified that she was unaware of other employees who told her they felt discouraged from leaving the facility because of security procedures.[23] Accordingly, determining whether any particular employee felt discouraged from leaving the facility, whether that level of discouragement affected the employee's behavior, and whether the employee in fact remained on the premises because of security procedures would require collecting person-specific information related to each employee's experiences, perceptions, and decisions on each shift.

21. Plaintiff's security time rest-break theory depends in part on assumptions regarding the duration of rest breaks provided by UPS relative to the 10 minutes standard under California law. However, UPS's written policy provides that employees are entitled to rest breaks of "<u>at least 10 minutes</u> during the first four hours of work"[24] and many declarants testified that the “house rules” for rest breaks at their location is 15-minute rest breaks.[25] The phrase "at least" is significant because it establishes a minimum duration, not a maximum duration. The policy language is therefore inconsistent with the assumption that employees were limited to exactly ten minutes of rest break time. If employees were permitted to take rest breaks longer than ten minutes, then the mere existence of an

[23] Deposition of Mandy Saechao Volume 2 p. 197 L10-17.
[24] UPS001373.
[25] See Declaration of Andrade, Adrian p. 3 paragraph 19; Declaration of Burns, Levi p. 3 paragraph 21; Declaration of Casas, Jessie Andrew p. 3 paragraph 21; Declaration of Castro, Jesus p.3 paragraph 21; Declaration of Hay, Angela p. 3 paragraph 21; Declaration of Islas, Rauol p. 3 paragraph 18; Declaration of Jefferson, Kevin p. 3 paragraph 19; Declaration of Keene, Gina p. 3 paragraph 20; Declaration of Leos, Alejandro p. 3 paragraph 20; Declaration of Lopez, Alejandro p. 3 paragraph 21; Declaration of Lozano, Juan p. 2 paragraph 16; Declaration of McElmurry, Max p. 3 paragraph 25; Declaration of Medina, Juan p. 3 paragraph 25; Declaration of Montero, Adrana p. 3 paragraph 21; Declaration of Morgan, Bryan p. 3 paragraph 22; Declaration of Newton, Matt p. 3 paragraph 20; Declaration of Ortega, Edward p. 3 paragraph 22; Declaration of Rosas, Ana p. 3 paragraph 20; Declaration of Sanchez, Diane p. 3 paragraph 23; Declaration of Sanchez, Jr, Michael Anthony p. 3 paragraph 22; Declaration of Sanchez, Steve p. 3 paragraph 21; Declaration of Torres, Joshua p. 3 paragraph 20.

alleged interruption would not necessarily establish that an employee failed to receive ten minutes of uninterrupted rest time. For example, an employee could experience an interruption at some point during a break and nevertheless receive ten uninterrupted minutes of break time before returning to work. Plaintiff's Motion does not address how such circumstances would be identified or evaluated.

22. The existence of transits in which employees pass through the security area without interacting with security personnel is also relevant to Plaintiff's meal period claims. Plaintiff contends that passing through security either constitutes an interruption of a meal period or, alternatively, that UPS's meal-period policy provides employees with only 30 minutes and that any time spent in the security area necessarily reduces the meal period below 30 minutes. More specifically, Plaintiff's expert Mr. Regus opines:

> "Defendant testified through its Person Most Knowledgeable, Matt Cota, that for preloaders at the Visalia facility (CAVSI in the list above), the meal period began when the belts shut off and ended when the belts resumed operation exactly thirty minutes after the stoppage.2 Thus, any time spent going through security screenings would have reduced the effective meal period to less than thirty minutes."[26]

For Mr. Regus' theory to be true, then every meal break would be 30 minutes or less because under his assumption, the belts move with incredible precision, every day, exactly 30 minutes. However, 14.1% of recorded meal periods exceed 30 minutes in duration. This finding is inconsistent with Plaintiff's theory, but is consistent with UPS's policy language of:

> "First Meal period requirement – you are entitled to a first meal period <u>lasting a **minimum** of 30, uninterrupted minutes</u> when you work more than 5 hours. The first meal period must begin before you have worked past five hours. If you work more than 5 hours, but less than or equal to 6, you may voluntarily elect to waive your meal period in writing." (emphasis added)[27]

The claim that meal breaks are strictly limited to 30 minutes also is inconsistent with the CBA. For example, Article 19 Section 3 of the CBA states:

---

[26] Declaration of Justin Regus p. 2-3 paragraph 7.

[27] Lab. Code §§ 512(a).

> "The lunch period shall not be less than one-half (1/2) hour or more than one (1) hour in duration. The lunch period shall commence not less than four (4) hours after the employee starts work, and shall be completed no later than six (6) hours after the commencement of the employee's work. If the employee is directed to take a one-half (1/2) hour lunch, the remaining one-half (1/2) hour will be paid at the over-time rate."[28] (emphasis added).

23. This issue also raises additional methodological questions. Neither Plaintiff's Motion nor ***Plaintiff's expert report identifies a method for determining whether an employee who allegedly experienced an interruption nevertheless received at least ten minutes of uninterrupted rest time or thirty minutes of meal time or how this collection of unique person-specific/shift-specific events at a particular location translates into something that happened to all employees, at all locations, all the time.*** Further, neither Plaintiff's Motion nor Plaintiff's expert report explains how purported interruptions would be distinguished from ordinary employee choices made during a break period. An employee may voluntarily exit and re-enter a break area during an otherwise uninterrupted break. Plaintiff has not identified any methodology capable of determining whether such activity reflects an interruption attributable to Defendant, an employee's voluntary conduct, or no interruption at all.

24. Plaintiff also has not described a methodology that accounts for what may be material differences in employees' interactions with the security process. Some employees could badge through an access point and pass through a turnstile without any interaction with security personnel and without any measurable delay. Plaintiff has not addressed whether such circumstances would nevertheless be classified as an interruption. Furthermore, to the extent employees sometimes transit the security area without interacting with security personnel, the mere fact that an employee entered or exited through the security area does not establish that the employee experienced any inspection-related delay during the meal period. As a result, the methodology does not provide a common means of determining whether an employee was delayed, whether any delay was attributable to security procedures, or whether a legally relevant interruption occurred during a break period. These questions would require collecting detailed facts and data into the circumstances of each employee's break experiences.

---

[28] UPS000432.

25. If the factual distinction between being delayed by a security inspection and merely walking through the security area is legally relevant, the currently available data and information are insufficient to make that determination. Although the badge swipe data provides information regarding the amount of time employees spent in the security area, it does not identify which employees presented a bag for inspection and interacted with security personnel versus which employees simply badged through the turnstile without any interaction. What can be determined from the badge swipe data is the transit time through the security area when an employee badged at both doors during the same transit event.[29] As discussed below, restricting the analysis to such badge-pair transits demonstrates that, for numerous transits, employees spent only a few seconds in the security area.

26. Finally, it is important to note that the badge swipe data also has several important limitations. First, it cannot be used to determine whether an employee carried a bag on any particular shift. Second, the data does not show how many times, if any, an employee carried a bag while transiting security during the day. For example, an employee may carry a bag into the facility and be subject to a bag check upon entry but later exit through the turnstile without a bag and without any interaction with security personnel. Conversely, an employee may leave the facility with a bag at the end of the workday and potentially be subject to an inspection upon exit. Third, the badge swipe data also does not identify the reason for any time spent in the security area. Accordingly, the data cannot distinguish between time attributable to the security process and time attributable to personal choices, such as waiting for a coworker or engaging in a personal conversation. Consequently, badge swipe data alone cannot determine whether an employee was actually delayed by a security inspection. Regardless of the underlying cause of the time spent in the security area, UPS compensated employees for that time. Under UPS's timekeeping practices, measured durations were rounded upward, such that even a transit lasting only a few seconds resulted in compensable recorded time. Also, it is important to note

---

[29] Possible reasons why employees might not record a badge swipe is that they “tailgate” another employee and transit security without badging the door or the door is propped open where no badging is required.

that not all employees actually badge through security and there are many instances where the badge record is not a complete pair, or the employee clocks-in and out for the day in timekeeping, but there are no badge records for that day.

**B. Discussion of Plaintiff's Traditional Meal and Rest Break Claims**

27. Plaintiff also has a more traditional meal break theory where she alleges facial meal break issues (late, missed, or short) that are unresolved by meal premiums paid.[30] For example, Mr. Regus determined that Plaintiff Ms. Saechao worked 6.25 hours on December 7, 2024, did not record a meal break, and that she was not paid a meal break premium. While Plaintiff's payroll data does not show a meal break premium paid, there are questions of whether the *opportunity* for a meal break was *provided.* Visalia preload manager Matt Cota testified that when the building is working more than 6 hours, the whole building will "turn off" and a meal break is announced at the 4th hour.

> A. "When they're planned to work more than six we take it as a collective building. So the building will turn off, the radios, the announcement will all simultaneously let them know on the fourth hour."[31]

28. What is particularly notable about Plaintiff's December 7, 2024 shift at the Visalia facility is that she remained on the clock approximately 21 minutes (0.35 hours) after the last other employee working the same pre-load sort had clocked out. Among employees who began work at the same time as Plaintiff, the longest recorded shift was approximately 5.9 hours, and the clocking patterns of the remaining employees are consistent with the sort having concluded at or about that time. Plaintiff has not identified any productive work she performed during the additional 21 minutes, nor has she explained why she remained on the clock after every other employee working the sort had left. If

---

[30] After accounting for the applicable meal break waivers, it is my understanding that employees are entitled to an uninterrupted 30-minute meal break that commences by 5th hour on shifts that are greater than 6 hours in duration. A facially "late" meal break is a break that commences after the 5th hour, a facially "short" meal break is a break that is less than 30 minutes, and if no meal break is recorded then the shift is facially 'missed." It is important to note the difference between *Brinker* standard of *provide* the *opportunity* for a compliant break and a shift where the time records show facial non-compliance.

[31] Deposition of Matt Cota p. 51 L15-19.

Plaintiff was not performing compensable work during that period, then her actual time worked would have been less than six hours. In that circumstance, she would not have been eligible for a second meal break and could have validly waived her first meal break pursuant to California law applicable to shifts of six hours or less. Thus, Plaintiff's claim that she worked a meal-break-eligible shift on December 7, 2024 depends on the premise that she was performing compensable work during a period when the sort had otherwise concluded and all other employees performing the same work had already clocked out.

29. UPS PMK Ashley Felsing described UPS meal break compliance system which includes a daily meal break compliance report. In her deposition, she described the report as follows:

> "Q. And what does the meal compliance report email contain in addition to this policy?
>
> A. So this report that comes out is -- it's a report if we have any employees who either missed their meal break or maybe did not take a long enough meal break or did not take it between the correct hours. We receive the report, and although we receive it every day, it is -- it's a weekly --it's a running weekly report for us to see. And we can also see any employee that does not have a waiver on file."[32]

Ms. Felsing's deposition describes a process in which she and management review shifts that present an apparent meal break issue, investigate whether the issue is attributable to a clocking error or other circumstance, and determine whether a meal break premium is owed. The available data suggest that this process is generally effective. Specifically, analysis of the subset of GTS records containing detailed activity data and meal break punches indicates that approximately 98% of shifts exceeding six hours are compliant after accounting for meal break premiums paid. Thus, only about 2% of shifts remain with a potential meal break issue that is not resolved through the payment of a meal break premium. These shifts represent exceptions to the general practice of identifying and correcting late, missed, or short meal break issues through premium pay and likely have unique circumstances.

30. Consider again the one shift Mr. Regus identified (December 7, 2024) where the Plaintiff worked 6.25 hours but did not record a meal break and was not paid a premium. One potential

[32] Deposition of Ashley Felsing p. 26 L9-17.

explanation why a premium was not paid on this shift is that after the review process was complete, the reviewer determined that the opportunity for a compliant meal break was *provided* and therefore no premium was owed.[33] The alternative explanation is that somehow there was an error in the review process and a meal break premium was owed. Finally, what the timekeeping data shows is that something odd happened on that shift which resulted in the Plaintiff clocking out 21 minutes after the last colleague on the sort crew clocked out. Among this group on that day, the late clock out was unique to her because she was the only member of the sort crew who stayed on the clock. What was she doing after the belts stopped?

31. Mr. Regus opines that the named Plaintiff was not paid any meal break premiums. However, it certainly is not the case that UPS had a general practice of not paying meal break premiums when owed. Indeed, the available payroll data provided shows that UPS paid at least 507,497 meal break premiums to employees in the job categories that Plaintiff has identified over the proposed class period.[34] Thus, there is no analytical support for the contentions that UPS systematically fails to pay meal break premiums when owed.

32. Mr. Regus also states that he did not see any recorded rest breaks when he studied Ms. Saechao's timekeeping data. Therefore, he determined that he should calculate a rest break premium on every shift of more than 3.5 hours. More specifically, Mr. Regus's report states:

> "In my review of Plaintiff's time records, I did not find any recorded rest periods. I found that 22 out of the 30 shifts that Plaintiff worked (73.3%) were more than 3.5 hours in length, and therefore Defendant was required to provide at least one rest period for all of those shifts."[35]

33. However, had Mr. Regus reviewed Ms. Saechao's deposition testimony, he would have known that his methodology of looking for recorded rest breaks in timekeeping is not reliable because

---

[33] For example, one explanation why a premium was not paid could be that the building was shutdown for a meal break, but the Plaintiff failed to clock out.
[34] The payroll data received contains the 54,692 class members from 03/29/2022 through 06/21/2025.
[35] Regus report p. 4 paragraph 12.

she testified that she was provided and actually took her rest breaks. More specifically, when asked about rest breaks, Plaintiff Saechao testified:

> "Q Yeah. Were you provided an opportunity to take a rest period of at least ten minutes within the first -- first four hours of your work shift?
>
> MR. MIKAYELYAN: Same objections.
>
> THE WITNESS: Yes."[36]

> "Q Okay. So let me start over then. So you were always -- UPS always provided the first rest break; is that correct?
>
> A Yes."[37]

Thus, there is a discrepancy between Mr. Regus's assumption that the Plaintiff never took a rest break because it was not recorded in timekeeping and Plaintiff's testimony that she took rest breaks.[38] Further, this discrepancy indicates that Mr. Regus's rest break methodology is unreliable. Finally, numerous UPS declarants testified that they took rest breaks but did not record them.

### C. Unpaid Time Claims

34. Plaintiff's unpaid-time allegations appear to involve two distinct theories. First, Plaintiff alleges that employees should be compensated for time spent walking between the security area and the time clock at the beginning of the shift, and between the time clock and the security area at the end of the shift. UPS contends that this walk time is not compensable. To the extent Plaintiff's theory depends on the nature, duration, or occurrence of security interactions, Plaintiff has not identified a reliable methodology to determine when a particular transit involved an inspection, when it involved only a badge scan or walk-through, or when any delay was attributable to security personnel rather than other causes. As discussed above, the badge swipe data identifies only the timing of entry and exit through the security area and cannot distinguish between employees who interacted with security personnel and those who simply passed through without inspection. Accordingly, the available data do

---

[36] Deposition of Mandy Saechao p. 133 L14-18.
[37] Deposition of Mandy Saechao p. 142 L1-4.
[38] The Plaintiff did testify that she did not receive second rest breaks because the work was completed in less than 6 hours and no second rest break was needed.

not permit a determination of when, if at all, activities occurring in the security area allegedly transformed otherwise ordinary travel time into compensable time. In addition, employees "tailgating" other employees who badged can enter or exit the security area without swiping their badge.

35. Second, Plaintiff alleges that employees should be compensated for time occurring between clock-in and the commencement of the pre-shift meeting that takes place before the belts begin running. However, the available records do not establish what individual employees were doing during the interval between clock-in and the meeting that occurs at start of the shift before the belts start moving. Moreover, UPS's policy instructs employees not to perform any work-related activities during this time interval. More specifically, the policy states:

> "UPS does not encourage or permit unpaid work. Employees should never perform any work before their start time, during a meal period, or after clocking out, unless a manager or supervisor specifically instructs them to do so. If instructed, the employee should clock in and will be paid for that work.
>
> "Work" includes all job-related tasks, including: trainings; PCMs; waiting to start work if the person reported to work on time; reviewing manifests; rearranging loads; sorting, loading/unloading, scanning, delivering packages; travel after reporting to work; picking up or dropping off items from UPS site at the start or end of a shift."[39]

36. Given the policy language, determining whether this time was compensable would require an assessment of what activities employees performed during the period in question rather than merely measuring the duration of the interval itself. However, Plaintiff's expert has not identified a methodology to determine whether employees were performing job-related tasks during this time segment, whether employees were free to engage in personal activities, or whether all employees performed the alleged work activities during this time segment or just some of the people some of the time.

[39] UPS001377.

37. Finally, Plaintiff's expert Mr. Regus' failed to discuss that the CBA provides guaranteed minimum pay of at least 3.5 hours per shift, and overtime pay when the shift exceeds 5 hours. As a result of the pay practices in the CBA, the Plaintiff was paid excess overtime on shifts where she did not work enough hours to be eligible for overtime in California (8 hours).

38. Putting aside the possibility that the Plaintiff performed no job-related tasks during this time segment, the excess paid time due to the guarantee may offset those minutes between clock-in and shift start. Furthermore, on this day the Plaintiff worked 6.25 hours. Given the CBA calls for overtime pay after 5 hours, she was paid the equivalent of 6.875 straight time hours, which is the equivalent of an additional 37.5 minutes. Finally, Article 19 Section 3 of the CBA states that UPS pays employees for the time difference between a 30-minute meal break and 1 hour.[40]

**D. Trial Plan Issues**

39. As discussed above, Plaintiff's claims cannot be assessed from the available records alone. Yet neither Plaintiff nor Plaintiff's expert has proposed a methodology to collect the additional information necessary to evaluate employees' practices regarding bringing bags or other items to work and their experiences when passing through security. As a result, whether an employee experienced a security-related interaction is, at least in part, person-specific. Further, for employees whose bags or belongings were inspected, the nature and duration of the inspection become additional issues requiring individualized determination. The record also indicates that security layouts and procedures varied across facilities.[41] Consequently, the relevant security conditions are not only employee-specific but may also be location-specific.

40. The available records do not provide the information necessary to determine whether a particular employee experienced a security-related delay involving an interaction with security

[40] UPS000432.

[41] I have received and reviewed a limited amount of video for 8 locations which is consistent with the badge swipe and SCAR data which shows that employees can transit security in seconds without interaction with the security personnel. See Deposition of Jeff Savage p. 12 L11-21.

personnel during a meal or rest period on a given day. The badge and timekeeping records do not show whether an employee interacted with security before the start of a shift, during a break, or after the shift ended. Although badge-swipe data may identify certain entry and exit events and, in some circumstances, provide an elapsed transit interval between access points, it does not identify whether the employee carried a bag or other item subject to inspection, whether a security inspection actually occurred, the nature or duration of any inspection, whether any delay was attributable to security rather than ordinary employee movement, or whether the transit occurred during a meal or rest period. The available data also does not reliably capture employees who entered or exited by following another employee through an access point without swiping their own badge. Consequently, any analysis that treats all badge-pair intervals, facility transits, or security-area entries and exits as equivalent would combine materially different circumstances and would not measure a common security-related delay.

41. A statistically reliable approach would require a defined sampling frame and a probability-based sampling method capable of representing the relevant facilities, job classifications, shifts, time periods, and security configurations. It would also require an observation or data-collection protocol designed to measure the facts that are absent from the electronic records. At a minimum, such a protocol would need to determine whether the sampled employee actually interacted with security personnel, whether the employee carried an item that was inspected, the tasks associated with the inspection, the amount of delay attributable to the inspection process, and whether the event occurred during a meal or rest period. The methodology would also need to account for facility-specific differences in security layouts and procedures, including circumstances in which employees can badge through an access point without interacting with security personnel.

42. Neither Plaintiff nor Plaintiff's expert, Mr. Regus, has identified such a sampling design, observation protocol, coding methodology, or procedure for determining whether any resulting findings could be extrapolated to the proposed statewide class. Without these elements, any aggregate estimate would necessarily depend on untested assumptions regarding the frequency of bag inspections, the

duration of actual inspections, the treatment of ordinary walk-through transits, and the relationship between a recorded badge event and an allegedly interrupted break. ***Those assumptions cannot be evaluated using the available badge and timekeeping data alone. Nor do the existing records establish that employee experiences were uniform across employees, facilities, or time periods. In my opinion, an analysis based solely on facial time-record exceptions or badge-swipe intervals would not reliably identify which employees experienced an interruption due to interacting with security, the amount of any resulting lost break time, or damages attributable to the challenged security practices.***

43. Plaintiff's "regular" meal break and rest break claims have similar issues. For the small fraction of shifts with facial meal break issues that remain unresolved by meal break premiums, there could be shift-specific and person-specific explanations for why the individuals responsible for researching shifts with identified facial meal break issues chose not to pay the premium given that premiums were paid for a vast majority of instances where the records show facial non-compliance.

## VI. Analysis of Meal Break Behavior

44. Plaintiff's theory assumes that employees who passed through security experienced a common interruption that prevented them from receiving compliant meal periods. The available data do not support that assumption. The SCAR data show variation in recorded security durations, with 8.4% of complete security transits lasting ten seconds or less and 17.1% lasting fifteen seconds or less, and 52.0% lasting 30 seconds or less. While the expected time to transit security varies with the set-up at each facility, the brevity of the duration the employee is in the security area may indicate walk-throughs with no interaction with security personnel.

45. Meanwhile, the GTS and GTS Activity data indicate that only 2.8% of meal-eligible shifts remained non-compliant after accounting for meal premiums. Additionally, 14.1% of recorded meal periods exceeded thirty minutes and 13.1% exceeded forty minutes. The existence of meal periods longer than thirty minutes demonstrates that any analysis of alleged security-related

interruptions must account for the actual length of the recorded meal period rather than assume that any security transit necessarily reduced the employee's meal period below thirty minutes. Plaintiffs have not proposed a methodology for performing that analysis.

46. Finally, ***badge-swipe activity reflects that employees exited and reentered secured areas during their shifts at every location.*** These findings demonstrate variation in both employee experiences and recorded outcomes and underscore the need for a methodology capable of identifying which employees, if any, experienced an interruption attributable to the security process. In addition, the existence of numerous mid-shift badge swipes is inconsistent with a uniform claim that employees were unable to leave the facility during breaks or were uniformly "discouraged". Rather, the badge-swipe data empirically demonstrates that at least some employees exited and reentered secured areas during their shifts, suggesting that employee experiences were not uniform across facilities or within the same facility. Finally, the fact that employees left the facility for their breaks indicates they were not "confined" like Plaintiffs claim.[42]

### A. For the Instances of SCAR Data with a Badge Swipe for Starting and Ending the Security Check Process, 8.4% of Trips Through Security were 10 Seconds or Less and 17.1% were 15 Seconds or Less

47. As part of the compensable security check process that UPS implemented at its California facilities in August 2021, badge readers were installed at the beginning and end of the security screening area to record the amount of time employees spent traversing that area. Although many employees did not consistently use both badge readers, the subset of records containing complete entry and exit badge swipes can be used to measure the total amount of time spent in the security area. Exhibit 1 presents the distribution of recorded security durations for these complete SCAR records. As shown in Exhibit 1, 8.4% of recorded security transits were ten seconds or less, 17.1% were fifteen seconds or less, 27.3% were 20 seconds or less and ***52.0% were 30 seconds or less***.[43] Conversely, only

[42] Plaintiff's Notice of Motion and Motion for Class Certification, p. 20.

[43] This analysis is limited to the 11,398,647 complete punches out of the total 20,149,494 SCAR entries belonging to members of the class during the SOL.

9.2% exceeded one minute and 2.8% exceeded 90 seconds. These data demonstrate variation in recorded security durations and indicate that employees did not uniformly experience the same amount of time in the security area during each transit. Moreover, the existence of a large number of very short-duration transits suggests that many recorded security events may have involved little or no measurable delay or interaction with security. Neither Plaintiffs nor Mr. Regus have identified a methodology for distinguishing between transits that involved a meaningful delay and those that did not or how to identify whether any recorded transit occurred during a meal or rest break resulted in an interaction with security personnel.

**Exhibit 1: Frequency Distribution of Security Check Times**




48. Additionally, there is variation in recorded security durations across the 38 California facilities for which SCAR data was available.[44] Exhibit 2 below presents summary statistics for security durations by facility and overall using the available SCAR data, including the 10th percentile,

[44] There are 38 locations available in the SCAR data and 39 locations in the Badge data.

25th percentile, median, 75th percentile, and 90th percentile values.[45,46] As shown in the exhibit, the statistical distributions for security durations differ across locations. For example, the 10th percentile value ranges from 2 seconds at CABAY to 30 seconds at CAFRE, with 19 of the 38 facilities having a 10th percentile value of less than 10 seconds.

49. The existence of these short-duration transits demonstrates that employees who worked at the same facilities did not have uniform experiences in terms of the amount of time in the security area. More broadly, the variation reflected in Exhibit 2 indicates that employees' experiences differed both within and across facilities. However, the SCAR data does not identify whether a particular transit involved an inspection, whether an employee paused during the transit, whether any delay occurred, the amount of time attributable to any inspection, or whether the transit occurred during a meal or rest period.

50. The issue is further complicated by variation in facility layouts and security procedures which could impact time spent in the security area. As discussed below, the physical configuration of security areas differs across facilities. Consequently, the same recorded security duration may reflect different underlying circumstances depending on the location. A recorded duration that may indicate little or no interruption at one facility may reflect different conditions at another. Determining whether a particular transit involved a compensable interruption would therefore require consideration of facility-specific circumstances in addition to employee-specific circumstances.

---

[45] Percentiles indicate where a particular observation falls within the overall distribution. For example, if the 10th percentile security duration is 10 seconds, this means that 10% of recorded security transits lasted 10 seconds or less and 90% lasted longer. Whereas, if the 90th percentile is 58 seconds, then 90% of the measured transits are 58 seconds or less. Finally, the median (50th percentile) is where half the observations are above and half are below.

[46] Security time calculations are limited to security events in which both an internal and external security badge swipe was recorded in the SCAR data. Auto calculated security event times for incomplete badge swipe information are excluded from analysis.

51. Finally, the variation reflected in the SCAR data is inconsistent with the assumption that all employees experienced a common delay each time they passed through security. Rather, any determination regarding whether a particular employee experienced a delay, the duration of any such delay, and whether that delay occurred during a meal or rest period would require collecting person-specific / shift-specific facts for which Plaintiffs have proposed no reliable methodology. Exhibit 2 below shows the percentile distribution of complete security check times across facilities in the SCAR data. Each percentile represents the percent of security check times less than or equal to the seconds identified. For example, a value of 18.0 under the 25th percentile security duration would indicate that 25% of all recorded and complete security durations are 18 seconds or less. A value of 29.0 under the Median (50th percentile) security duration would indicate that 50% of all recorded, complete security durations are 29 seconds or less, and correspondingly the 90th percentile means that only 10% of observation are greater 58 seconds.

**Exhibit 2: Univariate of Security Check Times by Facility and Overall**

| Location | Number of Punches | 10th Percentile Security Duration | 25th Percentile Security Duration | Median Security Duration | 75th Percentile Security Duration | 90th Percentile Security Duration |
|---|---|---|---|---|---|---|
| **Total** | **11,398,647** | **10.0** | **18.0** | **29.0** | **41.0** | **58.0** |
| CAONA | 1,975,225 | 24.0 | 30.0 | 39.0 | 51.0 | 68.0 |
| CARVE | 1,140,024 | 23.0 | 27.0 | 33.0 | 40.0 | 49.0 |
| CALAH | 1,039,811 | 18.0 | 25.0 | 37.0 | 55.0 | 81.0 |
| CALMD | 914,267 | 14.0 | 18.0 | 23.0 | 30.0 | 38.0 |
| CAEJS | 734,742 | 24.0 | 31.0 | 41.0 | 52.0 | 67.0 |
| **CAVSI** | **530,363** | **16.0** | **20.0** | **26.0** | **35.0** | **46.0** |
| CASFR | 483,635 | 9.0 | 12.0 | 26.0 | 39.0 | 56.0 |
| CAANA | 402,970 | 6.0 | 9.0 | 15.0 | 24.0 | 36.0 |
| CAGVS | 378,489 | 18.0 | 23.0 | 31.0 | 41.0 | 53.0 |
| CAVAN | 336,266 | 5.0 | 7.0 | 11.0 | 20.0 | 33.0 |
| CALAG | 302,079 | 6.0 | 8.0 | 12.0 | 19.0 | 27.0 |
| CABLL | 291,684 | 14.0 | 18.0 | 24.0 | 35.0 | 48.0 |
| CACER | 268,017 | 7.0 | 9.0 | 14.0 | 20.0 | 28.0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| CACHV | 256,712 | 17.0 | 25.0 | 39.0 | 64.0 | 119.0 |
| CACPT | 252,019 | 11.0 | 15.0 | 21.0 | 29.0 | 40.0 |
| CASDI | 225,753 | 6.0 | 8.0 | 12.0 | 21.0 | 34.0 |
| CARMD | 223,412 | 17.0 | 23.0 | 31.0 | 41.0 | 54.0 |
| CAMNS | 217,925 | 17.0 | 24.0 | 34.0 | 48.0 | 69.0 |
| CAGAR | 206,309 | 6.0 | 9.0 | 15.0 | 25.0 | 37.0 |
| CAOLY | 167,101 | 10.0 | 13.0 | 18.0 | 27.0 | 38.0 |
| CASGA | 158,223 | 9.0 | 13.0 | 22.0 | 33.0 | 54.0 |
| CAOAK | 123,932 | 15.0 | 21.0 | 30.0 | 45.0 | 67.0 |
| CANEW | 115,262 | 4.0 | 5.0 | 7.0 | 10.0 | 17.0 |
| CASBR | 99,891 | 6.0 | 8.0 | 12.0 | 17.0 | 25.0 |
| CASAN | 91,271 | 9.0 | 13.0 | 21.0 | 36.0 | 59.0 |
| CASUN | 78,049 | 5.0 | 6.0 | 10.0 | 19.0 | 33.0 |
| CASMT | 59,280 | 7.0 | 9.0 | 15.0 | 24.0 | 35.0 |
| CAPER | 59,232 | 9.0 | 11.0 | 16.0 | 24.0 | 35.0 |
| CAOCS | 56,263 | 25.0 | 32.0 | 42.0 | 54.0 | 70.0 |
| CAOAR | 48,749 | 17.0 | 22.0 | 31.0 | 45.0 | 66.0 |
| CASAC | 43,592 | 6.0 | 11.0 | 18.0 | 33.0 | 56.0 |
| CAJOS | 31,247 | 6.0 | 8.0 | 13.0 | 23.0 | 41.0 |
| CAVNN | 29,563 | 3.0 | 4.0 | 7.0 | 12.0 | 23.0 |
| CALEL | 25,413 | 14.0 | 23.0 | 37.0 | 53.0 | 68.0 |
| CASEB | 21,841 | 15.0 | 21.0 | 29.0 | 42.0 | 59.0 |
| CALBE | 4,689 | 3.0 | 4.0 | 8.0 | 12.0 | 18.0 |
| CABAY | 4,451 | 2.0 | 3.0 | 4.0 | 5.0 | 15.0 |
| CAFRE | 896 | 30.0 | 39.0 | 53.0 | 73.0 | 105.0 |

52. Finally, although the discussion in this section has focused on the implications of the security-check process for Plaintiffs' meal-break claim, the same considerations apply to Plaintiffs' rest-break and unpaid walking-time claims. If a particular security transit did not involve a measurable delay, that fact bears directly on whether the employee experienced an interruption attributable to the security process during a meal or rest period. Likewise, to the extent Plaintiffs' unpaid walking-time theory depends on time allegedly attributable to delays associated with security screening, identifying whether a delay actually occurred becomes a necessary component of the analysis. As discussed above, neither Plaintiffs nor Mr. Regus has proposed a methodology for distinguishing between transits that involved an interaction with security and those that did not. Accordingly, the same person-specific and

shift-specific factors that arise with respect to Plaintiffs' meal-break theory also arise with respect to their rest-break and unpaid walking-time theories.

**B. Of the 74,149 meal eligible shifts in the GTS and GTS activity data only 2.8% have a recorded non-compliant meal break after taking meal premiums into account**

53. After the initial cleaning and processing of the GTS datasets, the total employee shifts identified in the GTS timekeeping is 4,663,995. After limiting to employees found on the class list, a total of 2,522,237 (54.1%) of shifts are dropped associated with non-class list UPS employees. Limiting these remaining 2,141,758 shifts to shifts in the SOL, another 284,434 shifts are removed from the GTS timekeeping set. For the 1,857,324 shifts remaining, after dropping 49,949 shifts that appear to have punch errors, 1,807,375 analyzable shifts remain. Further, GTS timekeeping has granular job information within its data; 302,425 shifts where the role of "Driver" were identified and removed from the analyzed pool of shifts leaving 1,504,950 meal analyzable shifts. This is the base timekeeping analytical set used for calculation of shifts worked and shift length metrics.

54. Because payroll data is only available through June 21, 2025, most of the GTS DIRDA records do not have corresponding payroll data from which meal break premiums can be identified. As a result, the post-premium meal period analysis is limited to shifts for which both GTS timekeeping data and detailed GTS activity data are available through May 28, 2025. After excluding the 820,829 shifts associated with the DIRDA dataset, the final meal period analysis includes 3,260 employees and 684,121 shifts. Accordingly, the results are limited to those employees and shifts. Nonetheless, the data demonstrates the existence of a process for identifying and reviewing facial meal break issues and then paying meal period premiums.

55. The recorded meal-break outcomes in the data and the frequency with which meal-period premiums were paid are consistent with UPS monitoring meal-break compliance and paying premiums in many instances where a non-compliant meal period was recorded. Exhibit 3 summarizes

meal-break outcomes for the shifts analyzed in the GTS data[47]. Of the 684,121 shifts analyzed, only 74,149 (10.8%) exceeded six hours and therefore would be expected to require a meal period assuming first meal break waivers are in place. Of those 74,149 shifts, 51,560 (69.5%) contained a recorded compliant meal period. The remaining 22,589 shifts (30.5%) reflected a recorded non-compliant meal period. However, 20,502 of those shifts (90.8%) also received a meal-break premium, leaving only 2,087 shifts, or 2.8% of meal-eligible shifts, with a recorded non-compliant meal period that did not also receive a premium payment.[48] As noted above, meal eligible shifts with unresolved meal break issues are exceptions to the rule, likely the result of unique facts. It should also be noted that the meal break non-compliance reported in the table below does not mean that the employees who recorded non-compliant shifts without a premium paid were not provided by UPS with the opportunity to take a compliant meal break.

**Exhibit 3: Meal Break Facial Compliance Summary for Analyzed GTS Shifts**

| Category | Counts | Percent of Shifts |
|---|---|---|
| Total Shifts | 684,121 | |
| **First Meal** | | |
| Shifts Over 6 Hours | 74,149 | 10.8% |
| Missing First Meal | 20,075 | 27.1% |
| Late First Meal | 2,097 | 2.8% |
| Short First Meal | 250 | 0.3% |
| Short and Late First Meal | 81 | 0.1% |
| Non-Compliant First Meal | 22,503 | 30.3% |
| **Second Meal** | | |
| Shifts Over 12 Hours | 427 | 0.1% |

[47] Meal break analysis is limited to GTS and GTS activity data. GTS DIRDA data is excluded from this analysis as payroll does not exist during the period we have DIRDA. The meal analysis spans 3,260 employees for 684,121 shifts over a period from 03/29/2022 to 05/28/2025.

[48] When examining meal break compliance on the full GTS data including DIRDA, we see a similar facial non-compliance rate of 30.9% before accounting for meal premiums. For the DIRDA data that does not have meal break punches because it is missing the activity reports, the "unpaid hours" seen in the DIRDA data is used as a proxy for compliant meal length. The corresponding payroll data for the DIRDA period has not been produced; thus, I cannot assess the number of meal premiums paid to this group of shifts.

| | | |
|---|---|---|
| Missing Second Meal | 206 | 48.2% |
| Late Second Meal | 22 | 5.2% |
| Short Second Meal | 8 | 1.9% |
| Short and Late Second Meal | 3 | 0.7% |
| Non-Compliant Second Meal | 239 | 56.0% |
| **Overall** | | |
| Non-Compliant First Meal Only | 22,350 | 30.1% |
| Non-Compliant Second Meal Only | 86 | 0.1% |
| Non-Compliant First and Second Meals | 153 | 0.2% |
| **Non-Compliant Shifts** | **22,589** | **30.5%** |
| Meal Premiums Applied | 20,502 | - |
| **Non-Compliant Shifts - Post Premiums** | **2,087** | **2.8%**[49] |

56. As shown in Exhibit 3, the number of recorded non-compliant meal breaks decreases when meal break premium payments are taken into account. The number premiums paid in the payroll data analysis is limited to shifts for which both GTS Activity data (which includes meal break punches) and corresponding payroll data are available. When not limited to the overlapping period, the full payroll data show that UPS paid 507,497 meal-break premiums to class members between March 29, 2022 and June 21, 2025. The prevalence of meal-break premium payments, together with the reduction in recorded non-compliance after those payments are considered, is consistent with a process by which meal-break issues are reviewed and premium payments are issued when issues are identified. These data also demonstrate that a facial meal-break issue does not necessarily correspond to an uncompensated meal-break violation because many facially non-compliant shifts were associated with a meal-break premium payment.

### C. Of the 54,704 recorded first meal breaks in the data, 14.1% were greater than 30 minutes and 13.1% were greater than 40 minutes

57. Plaintiffs contend that delays associated with the security-check process resulted in meal breaks that were shorter than thirty minutes. However, the recorded meal-break data show that many

[49] After account for meal break premiums, 86.3% of employees in the GTS data analyzed do not have any potential meal break issues.

employees recorded meal breaks exceeded thirty minutes in duration. The lengths of recorded first meal breaks for the shifts analyzed in the GTS data show that 85.3% were thirty minutes in length, but 14.1% of recorded meal periods exceeded 30 minutes and 13.1% exceeded forty minutes.

58. Furthermore, the SCAR data[50] shows 32.2% of breaks where an employee badge records indicate that the duration between their badge out at the exit and badge in at the entrance out of the facility for 30 minutes or greater outside the facility. An additional 28.0% were more than 35 and 23.9% were 40 minutes or more. Thus, Plaintiff's theory that employee meal breaks were limited to "exactly 30 minutes" is both empirically untrue and inconsistent with UPS's policy and the CBA. Further, the extended break time indicates that even if an employee experienced security-related interruptions, it is still possible that they were provided at least 30 minutes of uninterrupted meal break time.

59. The SCAR data also show that employees spend more than thirty minutes outside of the secured work area during their breaks. Specifically, 32.2% of identified breaks reflected at least thirty minutes between an employee's badge-out at the facility exit and the corresponding badge-in at the facility entrance. An additional 28.0% exceeded thirty-five minutes, and 23.9% exceeded forty minutes. These findings are inconsistent with Mr. Regus's 30-minute theory that relies on an assumption that all employees must return to work in exactly 30 minutes. Rather, the data demonstrates that of the employees who left the facility for breaks, a many spent more than thirty minutes outside the secured work area. Thus, the mere existence of a security transit does not establish that an employee was not provided the opportunity to take at least a 30-minute meal break. Even if an employee experienced some amount of time passing through security, the employee may nevertheless have received a meal break that exceeded thirty minutes. Determining whether any particular employee was provided the opportunity for a compliant meal break would require employee-specific and break-

[50] The original SCAR data limited to the class list and SOL consists of 10,854,678 days, of which we analyzed the 44,495 days with at least two badge in and two badge out punch pairs.

specific factual inquiries, including the employee's actual break duration, the timing and duration of any security-related activity, and whether any such activity reduced the employee's uninterrupted meal break time below 30 minutes.

**D. Of the shifts from the GTS data, 19.2% have badge swipes that indicate the employee left the facility during their shifts**

60. As noted above, there is a contradiction between Ms. Saechao's testimony that employees were allegedly "discouraged" from leaving the facility during breaks and her testimony that she in fact left the facility during meal periods and observed other employees doing the same. The electronic data similarly do not support the assumption that employees uniformly remain within the facility during breaks. Specifically, a comparison of the badge-swipe data and the analyzed GTS timekeeping data shows numerous badge-swipe events occurring after the start of employees' shifts and before the end of those shifts. Exhibit 4 presents the percentage of shifts for which a badge swipe occurred more than fifteen minutes after shift start and prior to shift end. As shown in the exhibit, employees at numerous facilities had mid-shift badge-swipe activity.[51] For example, at Visalia (CAVSI), the facility where the named Plaintiff worked, 22.5% of shifts were associated with at least one such badge swipe.[52]

61. While the badge-swipe data does not identify the purpose of a particular transit, the prevalence of mid-shift badge activity is inconsistent with the assumption that all employees remain continuously within the facility throughout their breaks. More broadly, the data and other evidence indicate that employee experiences were not uniform. Some employees may have remained within the facility by choice, others may have exited secure areas during their shifts, and still others may have done so only on certain occasions. The variation across employees indicates that claims that all

---

[51] For this analysis we include the GTS DIRDA data and limit to only GTS shifts over 6 hours where badge data is available, whether that be during, pre, or post shift.

[52] A mid-shift badge swipe is defined as a badge swipe occurring at least 15 minutes after the first shift clock in punch and before the last clock out punch of that shift.

employees were systematically discouraged from exiting the facility during meal or rest breaks is untrue.

**Exhibit 4: Mid-Shift Security Transits**[53]

| Location Name | Number of Shifts | Percent of Shifts with Security Transits Mid-Shift |
|---|---|---|
| **Total** | **203,690** | **19.2%** |
| CAIEB | 392 | 99.5% |
| CAEJS | 494 | 59.5% |
| CASAN | 7,862 | 44.4% |
| CAVAN | 4,997 | 39.1% |
| CARMD | 7,516 | 38.6% |
| CASEB | 10,831 | 36.3% |
| CALMD | 4,158 | 36.1% |
| CANEW | 2,222 | 31.3% |
| CAJOS | 1,176 | 30.6% |
| CAMNS | 3,258 | 29.4% |
| CAVNN | 681 | 29.4% |
| CAPER | 766 | 28.3% |
| CAGVS | 33 | 27.3% |
| CASBR | 2,605 | 25.5% |
| CALSB | 668 | 25.3% |
| CASAC | 1,048 | 25.1% |
| CAVSI | 9,694 | 22.5% |
| CASMT | 1,223 | 22.2% |
| CACPT | 9,984 | 21.5% |
| CAOAK | 9,132 | 21.5% |
| CACER | 3,524 | 20.5% |
| CASFR | 4,851 | 19.5% |
| CALAH | 9,362 | 17.1% |
| CARVE | 19,468 | 16.1% |
| CAFRE | 310 | 16.1% |
| CACHV | 9,820 | 12.8% |
| CASDI | 7,302 | 12.2% |
| CASUN | 1,704 | 11.7% |
| CAOLY | 11,221 | 11.1% |
| CASGA | 2,050 | 10.9% |
| CALAG | 10,514 | 8.7% |
| CAONA | 30,212 | 8.0% |
| CAGAR | 7,536 | 7.4% |

[53] For this analysis we include the GTS DIRDA data and limit to only GTS shifts over 6 hours where we badge data is available, whether that be during, pre, or post shift.

| | | |
|---|---|---|
| CABAY | 85 | 7.1% |
| CAANA | 6,974 | 4.6% |
| CARIV | 4 | 0.0% |
| CAOAR | 11 | 0.0% |
| CABLL | 2 | 0.0% |

62. Furthermore, even when looking at shifts 4 hours or less in Exhibit 5, we see variability in the percent of shifts with security transits mid-shift. For example, the total percent of shifts across all locations with security transits is 5.8% but in select locations like CAIEB, CABLL, and CALSB the percent is 63.6%, 49.6%, and 49.4% respectively.

**Exhibit 5: Mid-Shift Security Transits For Shifts 4 Hours or Less**

| Location Name | Number of Shifts | Percent of Shifts with Security Transits Mid-Shift |
|---|---|---|
| **Total** | **309,262** | **5.8%** |
| CAIEB | 33 | 63.6% |
| CABLL | 797 | 49.6% |
| CALSB | 334 | 49.4% |
| CASAN | 7,452 | 35.6% |
| CASEB | 6,063 | 30.6% |
| CAGVS | 136 | 23.5% |
| CAEJS | 3,468 | 22.3% |
| CACPT | 18,778 | 17.4% |
| CAOAK | 11,110 | 12.8% |
| CAVAN | 12,715 | 10.4% |
| CALAH | 14,158 | 8.5% |
| CARIV | 745 | 6.8% |
| CASBR | 7,160 | 6.7% |
| CASDI | 4,337 | 4.4% |
| CABAY | 721 | 3.6% |
| CASAC | 1,924 | 3.4% |
| CARMD | 8,880 | 3.3% |
| CALMD | 31,188 | 3.3% |
| CAONA | 13,383 | 2.9% |
| CAOLY | 4,809 | 2.6% |
| CARVE | 28,706 | 2.4% |
| CAFRE | 618 | 2.3% |
| CAVSI | 20,049 | 2.2% |

| | | |
|---|---|---|
| CASGA | 2,861 | 1.8% |
| CASUN | 2,382 | 1.8% |
| CAGAR | 3,343 | 1.7% |
| CAMNS | 7,433 | 1.1% |
| CASFR | 11,557 | 1.1% |
| CACER | 24,210 | 0.9% |
| CANEW | 7,785 | 0.8% |
| CAVNN | 4,132 | 0.8% |
| CASMT | 2,725 | 0.8% |
| CACHV | 13,747 | 0.6% |
| CALAG | 15,068 | 0.5% |
| CAPER | 3,374 | 0.5% |
| CAANA | 10,675 | 0.4% |
| CAJOS | 2,343 | 0.3% |
| CALEL | 63 | 0.0% |

63. In summary, neither the testimonial evidence nor the electronic data support Plaintiff's contention that employees were uniformly discouraged from leaving UPS facilities during meal breaks or rest breaks. Ms. Saechao testified that she left the facility during her meal breaks and observed other employees doing the same, and multiple declarants similarly reported leaving company property during breaks for personal reasons. The badge-swipe data presented in Exhibits 4 and 5 are consistent with this testimony, in that it shows numerous mid-shift security transits across many facilities, including the Visalia location where Plaintiff worked. The data further demonstrate significant variation across facilities and shifts, with some locations exhibiting higher rates of mid-shift transits than others. Taken together, the evidence indicates that employee experiences differed considerably with respect to whether, when, and how often employees exited secured areas during breaks. These findings indicate that determining whether any particular employee was restricted, discouraged, or prevented from leaving the facility during a meal break or rest break would require collecting person-specific, location-specific, and shift-specific facts and data.

## VII. Analysis of Excess Paid Time

64. Plaintiff's Motion alleges that employees should be compensated for the time spent walking between the security area and the time clock and for time spent between clock-in and shift start. As noted above, UPS contends that walk time is not compensable that the per policy employees are not to begin work before the meeting that occurs at shift start and that generally the belts do not run until after the meeting so there are no job-related activities that employees could perform during this time period.

65. In addition to the questions of whether the walk-time and pre-shift start time were compensable, any evaluation of an unpaid time claim should also consider the excess compensation employees are provided based on the SCAR data and under the CBA.[54] First, employees are compensated for recorded security time through the SCAR process, where the security time measured in seconds is rounded up to the nearest minute when credited to employees. Second, employees are compensated pursuant to provisions of the applicable collective bargaining agreement, including guaranteed daily pay provisions and overtime provisions that may result in employees receiving compensation in excess of their actual recorded working time on a given shift.

### A. Employees are Being Paid For Time Spent in Security Under a Round-Up System

66. Employees are compensated for time associated with the security-check process through the SCAR system.[55] The amount of security time credited to employees is then incorporated into their compensation. However, the compensation associated with SCAR time is not necessarily limited to the precise recorded duration of each security transit. Based on my understanding of the process, when an employee records both a starting and ending badge swipe, the recorded security durations are accumulated throughout the day and the resulting total is rounded up to the nearest minute.[56] When an

[54] It does not appear that Mr. Regus reviewed the CBA and that Ms. Saechao appears to have benefitted from the excess overtime provision in the CBA.
[55] Deposition of Jeff Savage p.30 L8-17.
[56] Deposition of Jeff Savage p. 29 L13-19.

employee records only a single badge swipe, a facility-specific average generally from that same day is incorporated into the calculation. When an employee records no badge swipes, a weekly facility average is applied and incorporated into the employee's credited security time. Exhibit 6 presents the distribution of daily SCAR time before rounding to the nearest minute.[57]

67. Because the daily SCAR total is rounded to the nearest minute and, in certain circumstances, estimated durations are used in place of actual recorded durations, employees may receive compensation for security-related time that exceeds their actual recorded security-transit time on a given day. Accordingly, any assessment of allegedly unpaid walking time should account for compensation already paid through the SCAR process rather than assuming that all time between the security area and the time clock was uncompensated. Furthermore, Exhibit 7 shows that after accounting for the overpayments due to security checkpoint time being rounded up, the SCAR data shows 56.3% of employee work weeks have excess paid time of 2 minutes or more relative to their actual badge time.[58] Taken collectively, there are 89,206 excess paid hours due to SCAR round-up over the SOL studied.

**Exhibit 6: Frequency Distribution of Daily SCAR Time before Rounding to Nearest Minute**

[57] Deposition of Keith Cheung p. 47-53 and p. 89-90.

[58] Of the 10,854,678 employee days in the SCAR data, 2,591,439 only see one punch pair. In order to estimate the payment for leaving a facility, the "Building Standard" time was added, which is the average security checkpoint time for a given facility in a given week. This time was taken from the "BUILDING STANDARD" or "BS" code from the data where possible, but manually computed by taking that building's average security time for a given week and, where there were no complete punches for a given week, the overall building average is used.




**<u>Exhibit 7: Frequency Distribution of Excess Daily and Weekly SCAR Time</u>**




**B. There is Guaranteed Time Included in the CBA that Employees are Paid Regardless of Their Shift Length**

68. As discussed above, it is my understanding that the applicable collective bargaining agreement contains provisions under which employees may receive compensation in excess of their actual recorded working time on a particular shift. For example, the Named Plaintiff worked in a classification that provided union members with a guaranteed daily minimum of 3.5 hours of pay regardless of the actual length of the shift. In addition, certain employees become eligible for overtime compensation after working more than five hours in a shift. Exhibit 8 presents the distribution of shift lengths for the analyzed shifts.[59] As shown in the exhibit, 20.1% of shifts were less than 3.5 hours in duration and therefore may have been subject to guaranteed-minimum-pay provisions. In addition, 26.7% of shifts exceeded five hours in duration and therefore may have been compensated, in part, at

[59] Exhibit 8 presents shift length distribution for all available GTS data including GTS DIRDA.

an overtime rate. As a result, there are circumstances in which employees may receive compensation that exceeds their actual recorded working time.

**Exhibit 8: Frequency Distribution of Shift Length**




69. In addition to assuming guaranteed time, there is also a variable in the payroll data[60] called "GUARANTEE" that appears to represent this guaranteed time specified by the CBA. Exhibit 9 presents a the number of guaranteed hours and pay throughout the time period analyzed with a higher volume of payments and hours occurring in November and January. However, the highest volume of guaranteed pay and hours occurs in April 2024. A total of 9,896 employees received guaranteed time, totaling $3,290,095.75 and 122,441.49 hours for the period from 3/29/2022 to 6/21/2025.

**Exhibit 9: Guarantee Pay and Hours Over Time**

[60] The payroll data is restricted to employees in the class list and pay periods within the statute of limitations (3/29/2022) and payroll data exists through 6/21/2025.




70. Exhibit 10 provides a distribution of the guaranteed time hours among the employee pay periods that received the "GUARANTE" variable in the payroll from 3/29/2022 to 6/21/2025. Specifically, 46.2% of pay periods were received between 31 minutes and 3 hours of guaranteed time and an additional 11.5% pay periods received between 3.01 and 6 hours of guaranteed time.

**Exhibit 10: Frequency Distribution of Guaranteed Time Hours**




71. Exhibit 11 presents the timekeeping and payroll data for the employee (ID: 6383218) for the pay period of 6/1/2025 through 6/7/2025. During the pay period, this employee works less than 3.5 hours for one shift on 6/2/2025. In the payroll, we see 2.9 hours appearing under the "GUARANTEE" or guaranteed time pay code which appear to correspond to the non-worked time difference between 3.5 hours and their actual shift length on 6/2/2025. This would indicate this employee received an extra 2.9 hours of paid time for time not actually spent worked.

**<u>Exhibit 11: Employee ID 6383218– Pay Period 6/1/2025 – 6/7/2025</u>**

| Payroll Data | | | | | |
|---|---|---|---|---|---|
| **Employee ID** | **Pay Period Start** | **Pay Period End** | **Earnings Code** | **Amount Paid** | **Hours** |
| 6383218 | 6/1/2025 | 6/7/2025 | REGULAR | $490.25 | 22.54 |
| 6383218 | 6/1/2025 | 6/7/2025 | OVERTIME | $212.72 | 6.52 |
| 6383218 | 6/1/2025 | 6/7/2025 | GUARANTE | $63.08 | 2.9 |
| 6383218 | 6/1/2025 | 6/7/2025 | CAL MEAL | $47.84 | 2 |
| **Total Productive Hours + Guarantee Time** | | | | | **31.96** |

72. Mr. Regus's methodology does not account for the excess compensation provided through guaranteed minimum pay provisions, overtime compensation, security-time payments, or other CBA-related pay practices that result in excess pay relative what is necessary under California law. However, even if one were to assume that Plaintiffs theories are correct and walk-time and/or clocked time pre-shift are compensable, then one would still have to evaluate excess paid time before concluding any additional compensation is owed.

## VIII. Analysis of the Named Plaintiff's Data

73. In his report, Mr. Regus only identified one shift where Ms. Saechao worked more than 6 hours and did not record a compliant meal break or receive a meal break premium. In total, Ms. Saechao worked 29 shifts in the relevant time period. Of these shifts, only 3 were greater than six hours and required UPS to provide the opportunity to have a meal break. Further, a review of her data shows that on 57.1% of Ms. Saechao's shifts she clocked in after her scheduled start time.[61] It also appears that Ms. Saechao did not always badge when leaving the facility at the beginning and end of her shift or for meal breaks. For example, she only has days with two complete badge records that would indicate she entered and left the facility, but zero days with four complete badge records that would show she left the facility for lunch, as she testified.[62]

74. Additionally, certain allegations in Plaintiff's Motion regarding Ms. Saechao's experiences are inconsistent with the data for her facility. First, Plaintiff contends that employees at Ms. Saechao's facility could not take compliant meal breaks because insufficient time existed between when the line shut down and when it restarted.[63] Second, Plaintiff asserts that employees could not and did not leave the facility during their breaks.[64] However, the available data and Ms. Saechao's own testimony are inconsistent with this latter assertion. As discussed above, the data show employees

[61] Scheduled shift start assumed to be nearest 15-minute mark to clock-in time.
[62] Deposition of Mandy Saechao Vol 2 pg. 199 L19-25.
[63] Plaintiff's Notice of Motion and Motion for Class Certification, p. 13.
[64] Plaintiff's Notice of Motion and Motion for Class Certification, p. 8.

taking breaks at different times throughout their shifts rather than during a single, facility-wide shutdown period. The variation in break timing is consistent with employees having the opportunity to take breaks independent of any common line shutdown. Further, the badge and SCAR data demonstrate that employees left the facility during their breaks, directly contradicting the claim that employees could not leave the premises.

### A. A review of individual days at the Visalia facility shows that meal break times for employees working in the same job title as Ms. Saechao varied

75. There is no disagreement between Mr. Regus and me that Ms. Saechao recorded one non-compliant meal break during her employment with UPS, occurring on December 7, 2024. However, whereas Mr. Regus appears to treat the time records for that shift at face value, the available data indicates that alternative explanations are possible. Exhibit 12 below shows all Preloader shifts at the Visalia facility on December 7, 2024. As shown, Ms. Saechao (Employee ID 8716538) recorded a shift of approximately 6.3 hours. However, no other Preloader at the facility who worked the same sort shift recorded a shift of comparable duration. Indeed, the next highest shift duration was only 5.9 hours. Thus, Ms. Saechao's shift appears anomalous relative to the experience of her coworkers performing the same job at the same facility on the same day. This is significant because it implies that the “sort” ended and the belts stopped moving but Ms. Saechao remained on the clock until she was past 6 hours. The unusually large difference between her recorded time and the recorded time of the other employees who worked the same sort shift raises questions regarding whether all of her recorded time reflects active work or whether some portion of that time may have been attributable to non-working activities like she forgot to clock out. Accordingly, the existence of a recorded meal break issue on this single shift does not, by itself, establish that Ms. Saechao was denied the opportunity to take a compliant meal break because she may have ceased working before the shift became eligible for a meal break at 6 hours.

**Exhibit 12: All Preloader Shifts Worked at the Visalia Location on 12/7/2024**




76. Exhibit 13 below shows all the shifts for Preloaders at the Visalia location on December 17, 2024 and demonstrates what time records look like when a group break occurs, which in this case was a group break for Preloaders from approximately 12:00pm to 12:30pm. However, there is one Preloader who did not record a meal break on this shift. This raises the question about why this one employee did not record a non-compliant meal break while all the other Preloaders who worked the same sort shift on the same data were able to do so. Did this employee simply not punch out but took a meal break? Or did they choose not to take a break even though they were likely provided with the opportunity to do so?

**Exhibit 13: All Preloader Shifts Worked at the Visalia Location on 12/17/2024**




77. In addition to the possibility of employees being provided with the opportunity for breaks even when they recorded non-compliant shifts, a review of the data for Visalia also shows that on some shifts employee meal breaks are divided into two group breaks. Exhibit 14 below shows all of the Preloader shifts worked at the Visalia location on December 11, 2024. As can be seen on this exhibit, unlike Exhibit 13 above, not all meal breaks started and ended around the same time. The first group of 5 employees took their meal break from approximately 4:00 AM to 4:30 AM while the second group of 13 employees took a group break from approximately 4:30 AM to 5:00 AM. Finally, there was a single employee who recorded a break from approximately 5:00 AM to 5:30 AM and 3 employees who recorded shifts of 5.4 hours in duration and did not record a meal break. Thus, it is not always the case that a full building shutdown occurs. Further, none of these recorded breaks were less than 30 minutes. Since the timeclock is not at the workstation, the finding that employees were

punched out for at least 30 minutes these contradicts Ms. Saechao's claims that all employees at the Visalia location were unable to take a full 30-minute lunch break because they had to get back to their workstations before the line started again.

**Exhibit 14: All Preloader Shifts Worked at the Visalia Location on 12/11/2024**



I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. This declaration was executed on September 14, 2026 in Los Angeles, California.

ROBERT CRANDALL, MBA

**Documents Reviewed and Relied Upon**

- Plaintiff's Notice of Motion and Motion for Class Certification
- Amended Class Action Complaint

**Depositions:**

- Deposition of Keith Cheung
- Deposition of Matt Cota
- Deposition of Ashley Felsing
- Deposition of Mandy Saechao
- Deposition of Mandy Saechao Volume 2
- Deposition of Jeff Savage
- Deposition of Veronica Terpening
- Deposition of Justin Regus

**Declarations:**

- Declaration of Mandy Saechao
- Declaration of Joshua H. Haffner
- Declaration of Adrian Andrade
- Declaration of Levi Burns
- Declaration of Jessie Andrew Casas
- Declaration of Jesus Castro
- Declaration of Tammy Hardie
- Declaration of Angela Hay
- Declaration of Rauol Islas
- Declaration of Kevin Jefferson
- Declaration of Gina Keene
- Declaration of Alejandro Leos

- Declaration of Alejandro Lopez
- Declaration of Juan Lozano
- Declaration of Benjamin McCombs
- Declaration of Max McElmurry
- Declaration of Juan Medina
- Declaration of Adriana Montero
- Declaration of Bryan Morgan
- Declaration of Matt Newton
- Declaration of Edward Ortega
- Declaration of Aaron Ramirez
- Declaration of Ana Rosas
- Declaration of Diane Sanchez
- Declaration of Michael Anthony Sanchez, Jr
- Declaration of Steve Sanchez
- Declaration of Joshua Torres
- Declaration of Justin Regus
- Declaration of Jeff Savage

**Supplemental Documents**

- CBA's [UPS000001 - UPS001206].pdf
- Meal & Rest Break Procedures.pdf
- Secure Facility List - UPS001400.pdf
- 1 - Hub Entrance Photos - Combined.pdf
- Saechao v. UPS - California Employee Entrances Doc. Prod. Index.pdf
- Saechao v. UPS - Proof of Service of Defts Confidential Document Production.pdf
- Saechao v. UPS - Updated California Employee Entrances Doc. Prod. Index.pdf
- CONFIDENTIAL - UPS001245.pdf – CONFIDENTIAL - UPS001251.pdf

- UPS001402 - UPS001416.pdf

**Class List:**

- Saechao Class Update 2026.03.29 (1).csv
- extract1_employeelist.csv – extract63_ employeelist.csv

**Job Codes Key:**

- Saechao-UPS - job codes at secured facilities(89154280.1)-CA job codes at secured facilit.xlsx
- UPS-SAECHAO - job titles for meet and confer efforts(89148862.1)-Sheet1.xlsx

**Pay Codes Key:**

- Pay Codes in PDM.xls
- Payroll Codes - Work Activities.xls

**Payroll Data:**

- SAECHAO1.TXT – SAECHAO6.TXT

**GTS Timekeeping Data:**

- GTS Timecard_pt1.csv – GTS Timecard_pt18.CSV
- GTSActivity_pt1.csv – GTSActivity_pt8.csv
- GTS Timecards 1.xlsx – GTS Timecards 4.xlsx

**Badge Data:**

- export_2021-01.csv – export_2026-03.csv
- extract1_badge_activity.csv – extract63_badge_activity.csv

**SCAR Data:**

- extract1_badge_checkpoint.csv – extract63_badge_ checkpoint.csv
- 2021 SCAR Data.xlsx – 2026 SCAR Data.xlsx
- 2022 SCAR Data 1.xlsx – 2025 SCAR Data 1.xlsx
- 2022 SCAR Data 2.xlsx – 2025 SCAR Data 2.xlsx
- SCAR_PT1.csv – SCAR_PT3.csv

**Named Plaintiff Saechao Data:**

- Mouang C Saechao PDM Payroll History.pdf
- Saechao - Meal Waiver.pdf
- 3888_1607_CLEMP2025113013_MANDY_GTS Activity Detail.xlsx
- 3888_1607_CLEMP2025113013_MANDY_GTS Timecard.xlsx
- Payroll Hours History 8716538 Mouang Saechao.xlsx
- 3888_1607_CLEMP2025113013_MANDY_PkgCtr Timecard..xlsx
- Mouang C Saechao Hours History.xlsx
- 3888_BIADM WebTools_Data Request_1607_CLEMP2025113013_ MANDY_Security Point Check GTS.xlsx
- Mouang C Saechao Emp Gross and Net.csv
- Mouang C Saechao Deductions.csv
- Mouang C Saechao Earnings.csv

**Video Data:**

- 006. Employee Entrance Interior View-2026-08-19_09h28min29s000ms.mp4
- 006. Employee Entrance Interior View-2026-08-19_09h28min52s000ms.mp4
- 006. Employee Entrance Interior View-2026-08-19_10h01min00s000ms.mp4
- 006. Employee Entrance Interior View-2026-08-19_10h08min41s000ms.mp4
- 044. Complex A Breakroom-2026-08-05_04h39min00s000ms.mp4
- 044. Complex A Breakroom-2026-08-07_22h19min00s000ms.mp4

- 044. Complex A Breakroom-2026-08-10_19h25min30s000ms.mp4
- 049. Complex A North Emp Ent X Ray-2026-08-06_10h28min20s000ms.mp4
- 049. Complex A North Emp Ent X Ray-2026-08-06_21h18min25s000ms.mp4
- 077. D Complex  Breakroom-2026-08-12_13h31min00s000ms.mp4
- 083. E Complex Breakroom-2026-08-17_08h39min00s000ms.mp4
- 091. Employee Entry Outbound-2026-08-17_08h33min00s000ms.mp4
- 091. Employee Entry Outbound-2026-08-18_02h02min00s000ms.mp4
- 091. Employee Entry Outbound-2026-08-20_12h42min15s000ms.mp4
- 1. CA Video CAOAK.mp4
- 1. CA Video CARMD.mp4
- 2. CA Video CAOAK.mp4
- 2. CA Video CARMD.mp4
- 201. Rosecran Guard - Interior East End-2026-08-03_19h32min45s000ms.mp4
- 201. Rosecran Guard - Interior East End-2026-08-03_19h33min44s000ms.mp4
- 3. CA Video CAOAK.mp4
- 3. CA Video CARMD.mp4
- 310. INSIDE SECURITY GUARDHOUSE -2026-08-03_06h54min01s113ms (Visalia).mp4
- 310. INSIDE SECURITY GUARDHOUSE -2026-08-11_09h19min56s000ms (Visalia).mp4
- 310. INSIDE SECURITY GUARDHOUSE -2026-08-18_08h49min38s000ms (Visalia).mp4
- 601.Breakroom-2026-08-03_06h53min10s000ms (Visalia).mp4
- 601.Breakroom-2026-08-07_06h48min00s000ms (Visalia).mp4
- 716 G COMPLEX BREAK AREA-2026-08-18_05h01min36s977ms.mp4
- 716 G COMPLEX BREAK AREA-2026-08-18_13h58min07s073ms_1.mp4
- 716 G COMPLEX BREAK AREA-2026-08-18_18h07min57s893ms.mp4
- 780. Guard Shack E-Complex_Employee Entrance-2026-08-19_09h31min00s000ms.mp4
- 780. Guard Shack E-Complex_Employee Entrance-2026-08-19_09h32min30s000ms.mp4
- 780. Guard Shack E-Complex_Employee Entrance-2026-08-19_09h32min50s000ms.mp4

resolution economics LLC

1925 Century Park East
15th Floor
Los Angeles, CA 90067
Office.310.275.9137
Fax.310.275.9086
RCrandall@resecon.com

# ROBERT W. CRANDALL, PARTNER

Robert W. Crandall is a Partner in the litigation consulting practice of Resolution Economics LLC. He has a M.B.A. from Loyola Marymount University and a B.A. in History from the University of Southern California. Prior to the formation of Resolution Economics, Mr. Crandall was with the Dispute Consulting Group at Deloitte & Touche, the Economics & Litigation Services Group at Altschuler, Melvoin & Glasser, and the Dispute Analysis & Corporate Recovery Group at Price Waterhouse.

Mr. Crandall provides consulting services and expert witness testimony related to a variety of practice areas. He has provided expert testimony in deposition, trial, arbitration, and other forums. He specializes in estimating damages, evaluating business issues and business operations, designing and conducting observation studies and surveys related to work activities, assessing economic and statistical approaches to litigation issues, and performing forensic programming and analysis of large complex databases. Mr. Crandall has significant experience in analyzing complex data for the purpose of assisting counsel in evaluating class certification and liability. He is frequently asked to present findings related to class certification, merits, and economic exposure for alternative dispute resolution forums such as mediation, settlement conferences, and arbitration.

## Professional Experience

Mr. Crandall has considerable experience in providing economic and/or statistical analyses related to employment litigation matters. Also, he performs general damages analysis, forensic accounting, business valuations, and statistical analysis in a broad range of matters where the underlying issues are: breach of contract, antitrust, intellectual property, environmental claims, and insurance coverage. In addition, Mr. Crandall has considerable expertise in financial modeling, creating large databases from paper records and diverse data sources, designing, implementing, and analyzing surveys, and conducting statistical analysis related to complex data intensive litigation assignments. Finally, Mr. Crandall is experienced in analyzing job duties and content and business operations.

## Employment Discrimination Liability Analysis

Mr. Crandall has performed numerous statistical analyses of liability related to class action, multi-plaintiff, and single plaintiff claims of employment discrimination. He is experienced at analyzing claims alleging discrimination in hiring, promotion, placement, termination, discipline, and pay equity. Assignments representative of Mr. Crandall's experience in employment discrimination include the following:

- Provided consulting services to defense counsel in a class action matter alleging racial discrimination in the officer disciplinary process at a very large police department. Services included statistical analysis of data to test plaintiffs' allegations and work related to rebutting analysis proffered by plaintiffs' expert.

- Provided consulting services to defense counsel in a class action matter, brought by the EEOC, alleging discrimination in recruiting, hiring and placement at a hotel. Created an applicant database, and performed SAS programming and statistical analysis related all three issues. Analyzed opposing expert analysis and assisted counsel in developing cross-examination.

- Provided consulting services to defense counsel in a class-action matter brought by the EEOC alleging age discrimination in terminations at a major law firm. Services included building analytical databases from multiple sources of information, performing statistical analysis related to the discrimination claim, estimating economic exposure for mediation/ settlement discussions.

- Provided consulting services to defense counsel in multi-plaintiff action alleging age discrimination at a major clothing retailer. Services included researching external labor market characteristics for individuals with the plaintiff's occupation. Created financial models to calculate damages under a variety of offset scenarios.

- Provided consulting services to defense counsel in multi-plaintiff action alleging racial discrimination in work assignments at a government agency. Services included performing statistical analysis to determine if minority workers received a disproportionate share of unfavorable work assignments.

- Provided consulting services to defense counsel in a multi-plaintiff action alleging gender discrimination in promotions at a large city police department. Services included performing statistical analysis of promotions and placements into coveted positions.

- Provided consulting services to defense counsel in multi-plaintiff action alleging age discrimination following a reduction of force at a hospital. Services included performing statistical analysis of liability and critiquing the analyses proffered by plaintiffs' expert.

- Provided consulting services to defense counsel in a large national class action employment dispute alleging gender discrimination at a warehouse style home and garden center retailer. Performed SAS programming and statistical analyses related to hiring, initial placement, and initial pay of applicants. Performed statistical analyses of female availability in the external labor market. Provided deposition support to counsel including drafting questions for the deposition of the opposing expert witness.

- Provided consulting services to defense counsel in a class action employment matter brought by the EEOC. Constructed a damage model that placed minority applicants in jobs awarded to White employees through analysis of the difference between actual and expected hires based on various flexible assumptions. Developed a random placement model testing both minority and non-minority placements. After placing the minority applicants at an appropriate rate during the damages period, the model calculated the damages of the applicants based on the time of their placement and other labor market factors.

- Provided consulting services to defense counsel in a single plaintiff action alleging age discrimination by a large international food company. Performed SAS programming and statistical analysis of terminations. Analyzed the work product of opposing expert. Assisted in drafting questions for use at deposition.

- Provided consulting services to defense counsel in a class action matter alleging age discrimination at a major drug store chain. Performed statistical analysis related to terminations of store managers and assistant managers, reviewed and critiqued analysis of opposing experts.

- Provided consulting services to defense counsel in a single plaintiff matter alleging age discrimination in terminations resulting from a reduction in force. Services included performing statistical analysis of termination claims.

- Provided consulting services to defense counsel in a multi-plaintiff matter alleging national origin discrimination at a waste management company. Performed statistical analyses to test plaintiffs' claims. Developed external labor market benchmarks.

- Provided consulting services to outside counsel in connection to performing statistical analysis of proposed workforce reductions at a publishing company. Tested various reductions in force scenarios for statistical significance. Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Provided consulting services to outside counsel in connection to performing statistical analysis of proposed workforce reductions at a medical supply manufacturing company. Tested various reductions in force scenarios for statistical significance. Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Provided consulting services to defense counsel in a wrongful termination matter alleging racial discrimination at a major defense contractor. Examined workforce composition in response to allegations of systematic discrimination based on race. Analyzed external labor market availability to determine minority representation in the industry by job classification. Created a visual representation of results to be used as exhibits in trial. Calculated loss of earnings related to the termination. Drafted cross-examination questions for the examination of plaintiff's expert.

## Class Action Wage and Hour Claims

Mr. Crandall has been involved in more than 500 class action wage and hour matters. He is highly experienced in analyzing liability, damages, and class-member commonality related to wage and hour claims. He is experienced in designing, implementing, and analyzing surveys and time-in-motion studies and performing forensic data analysis related to job content, exempt / non-exempt status, independent contractor / employee status, hours worked, uncompensated time, meal and rest breaks, improper pay calculations, and other issues. Finally, Mr. Crandall has significant experience in assisting counsel at mediation where he presents findings related to class certification and merits issues, evaluates economic exposure under a variety of legal theories, and assists in structuring the settlement terms. In this role, Mr. Crandall has worked for a party or as a neutral expert. Assignments representative of Mr. Crandall's wage and hour experience include:

- Provided consulting services to defense counsel in a national class-action wage and hour matter alleging that several thousand loan originators at a large banking institution were misclassified under FLSA. Conducted statistical analyses of hours worked records, compensation data, plaintiffs' declarations, and other data to determine if select groups of plaintiffs would be representative of class. Assisted counsel in developing an approach for trial, estimating economic damages, and critiquing plaintiff's trial plan and damages analyses.

- Provided consulting services and expert services to defense counsel in a class action wage and hour matter alleging several hundred insurance sales originators at a call center were misclassified as exempt workers. Services included analyzing phone system data containing over 5.5 million records and computer login / logout data containing over 250,000 records to estimate overtime hours worked each workweek and the number of missed meal and rest periods. Analyzed compensation data and estimated economic damages for the class.

- Provided consulting services to defense counsel in a wage and hour matter alleging that several hundred loan originators were misclassified as exempt workers. Services included analyzing phone system data containing over 5.3 million records and over 1 million door swipe records to estimate overtime hours worked and the number of missed meals and rest periods each workweek. Analyzed compensation data and estimated damages and penalties for the class for mediation. Also, developed an economic model that estimated exposure based on the probability and economic consequences associated with winning or losing a variety of legal rulings.

- Provided consulting services to defense counsel in a wage and hour matter alleging that several thousand General Managers and Assistant Managers at a large office supply retailer were misclassified as exempt employees. Services included designing and conducting a survey to examine whether class members were appropriately classified, analyzing the company's labor model and human resources data, and conducting statistical analysis related to a variety of class certification issues.

- Provided consulting services and expert witness testimony to defense counsel in a matter alleging hourly workers at a large chain of convenience stores were denied meal and rest periods, that all workers lost vacation pay, and that the employer placed employees on unpaid leave prior to termination to avoid waiting time penalties. Services included data and statistical analysis of over 25 million time clock records in order to examine a variety of issues related to shift duration and break opportunities, analysis of vacation data to determine the number employees impacted by the policy, and analysis of termination records to demonstrate that there was no systematic practice of placing employees on LOA status prior to termination.

- Provided consulting services to defense counsel in a wage and hours matter alleging store managers and assistant store managers at a chain of retail discount stores were misclassified. Services included creating and implementing a survey to examine whether class members were classified appropriately and conducting statistical analysis related to commonality of class-members and other class certification issues. Also, analyzed and critiqued a survey conducted by plaintiffs, assisted counsel in opposing expert depositions, and estimated economic damages for mediation.

- Provided consulting services to defense counsel in a wage and hours matter alleging store managers at a chain of convenience stores were misclassified. Services included creating and implementing a survey to examine whether class members were classified appropriately, analyzing labor models, conducting statistical analysis related to commonality of class-members, assisting counsel in estimating damages for mediation.

- Provided consulting services to defense counsel in a class-action wage and hour matter alleging uncompensated meal periods and breaks, unpaid overtime wages, and minimum wage violations at a field maintenance company. Services included creating a database of hours worked from paper and electronic records, and then providing damages estimates based on a variety of assumptions and legal theories.

- Provided consulting services to defense counsel in a multi-plaintiff wage and hour matter alleging that the defendant employer failed to compensate security guards for uniform changing time and other claims of off-the-clock work. Services included designing and conducting an observation study to measure time associated with various activities and estimating damages for mediation.

- Provided consulting services to defense counsel in a wage and hours matter alleging store managers and assistant store managers at a chain of clothing retail stores were misclassified. Services included creating and implementing a survey to examine whether class members were classified appropriately and conducting statistical analysis related to commonality of class-members and other class certification issues.

- Provided consulting services to defense counsel in a class action matter alleging a variety of wage and hour violations for hourly workers at chain of warehouse stores. Services included analyzing over 5.5 million time clock records and payroll data to evaluate allegations of improper time adjustments, missed meal and rest periods, uncompensated split shifts, reporting time violations, overtime and regular rate issues, and off-the-clock work. Also, estimated damages for mediation.

- Provided consulting services to defense counsel in a class action matter alleging a variety of wage and hour violations related to time spent donning and doffing at a food factory. Services included designing a statistical sampling approach, conducting a time and motion study to measure donning and doffing time, and estimating economic damages related to various claims.

- Provided consulting services to defense counsel in a class action wage and hour matter alleging meal and rest period violations for hourly workers at chain of disabled adult services centers. Services included designing and conducting an observation study to estimate breaks taken and break opportunities. Also, assisted counsel in examining class certification issues and the representativeness of the name plaintiffs' claims.

- Provided consulting services to defense counsel in a national class action wage and hour matter alleging off-the-clock work at a storage company. Services included analyzing company hours data to test plaintiffs' legal theory, reviewing, analyzing, and critiquing a survey conducted by plaintiffs, conducting statistical analyses related to class certification, designing a conducting a survey related to management and timekeeping practices, and estimating economic damages for mediation.

- Provided consulting services to defense counsel in a class action wage and hour matter alleging that several hundred managers were misclassified as exempt workers by a large restaurant chain. Analyzed data and assisted counsel in developing approaches to class certification.

- Provided consulting services to defense counsel in a wage and hour class action matter alleging that the defendant grocery store chain misclassified several hundred non-exempt assistant managers as exempt workers. Services included creating database of hours worked, designing a flexible financial model, and computing damages under a variety of counsel specified scenarios for the purposes of mediation.

- Provided consulting services to defense counsel in several wage and hour matters alleging that police officers should be compensated for donning and doffing and other tasks. Services included analyzing survey data and time clock data to determine class certification issues for other off-the-clock tasks and constructed measures of donning and doffing time.

- Provided consulting services to defense counsel in a class action matter alleging failure to pay overtime wages to independent sales and service representatives for a large national tool franchiser. Services included designing and implementing an hours survey to determine whether the additional hours worked claimed by some plaintiffs was representative of the additional hours worked by the class as a whole. Determined that the problem were isolated to certain geographic areas rather than nationwide.

- Provided consulting services to defense counsel in a matter alleging that a class of several hundred independent contractors were misclassified employees. Services included designing a sampling scheme, building and analyzing a database of business expenses, analyzing the business model, and performing business valuations related to a number of businesses.

- Provided consulting services and expert witness testimony to defense counsel in a NLRB matter alleging that independent contractors package delivery drivers were misclassified employees. Services included analyzing the business model, productivity data, and other business records, and performing business valuations related to several businesses.

- Provided consulting services to defense counsel in a class action matter alleging that independent contractors and their employees/ workers were misclassified employees of the defendant and a large national hardware chain. Services included analysis of the business model to evaluate whether the business model meets the criteria for a business.

- Provided consulting services to defense counsel in a multi-district class action matter alleging that independent contractors in the package delivery business were misclassified employees. Services included analyzing the business model, conducting a variety of surveys, and responding to the class certification report of plaintiffs' expert.

- Provided consulting services to defense counsel in a matter alleging uncompensated time for donning and doffing at a chain of quick oil lube establishments. Services included designing and conducting a time and motion study to estimate total time spent donning and doffing and designing a survey to determine uniform practices to assess class certification and de minimis issues.

- Provided consulting services to defense counsel in a class action matter alleging that product marketing testers performed off-the-clock work and were denied meals and rest periods. Services included designing and conducting an online survey to evaluate commonality issues.

## Employment Damages Analysis

Mr. Crandall has assisted counsel in estimating employment related economic damages in more than 100 cases. He has expertise in evaluating but-for earnings, job search efforts, mitigation opportunities, and losses related to stock options and other forms of equity. Assignments representative of Mr. Crandall's experience estimating economic damages include the following:

- Provided consulting services to defense counsel in numerous matters alleging to wrongful termination of police officers, failure to promote police officers, and failure to hire police officers from a variety of police agencies. Services included analyzing labor market opportunities for police officers and creating economic models to estimate economic damages under a variety of career paths and/or retirement scenarios and critiquing the analyses of opposing experts.

- Provided consulting services to defense counsel in numerous matters alleging wrongful termination, or failure to promote government employees at a variety of city level agencies. Services included creating economic models to estimate damages under a variety of career paths and retirement scenarios.

- Provided consulting services to defense counsel in numerous matters alleging wrongful termination in the grocery industry. Services included creating models to estimate economic damages, analyzing mitigation opportunities, and critiquing the work of opposing experts.

- Provided consulting services to defense counsel in numerous matters alleging wrongful termination in the retail industry. Services included creating models to estimate economic damages, analyzing mitigation opportunities, and critiquing the work of opposing experts.

- Provided consulting services to defense counsel where the underlying issue was a class action failure to hire complaint brought by the EEOC. Services included creating financial models for estimating damages for the ten named plaintiffs, as well as, estimating potential damages for the class.

- Provided consulting services to defense counsel in a breach of contract matter where the underlying issue was related to an alleged failure to deliver stock options to an executive in the high-tech industry. Analyzed options value under a variety of trading strategies.

- Provided consulting services to plaintiff counsel in a National Labor Relations Act right to work case. Services included calculating the economic losses suffered by twenty-five plaintiffs due to alleged illegal acts by their union.

- Provided consulting services to defense counsel in a multi-plaintiff action alleging wrongful terminations by an aerospace and defense contractor. Evaluated plaintiff's expert report, and developed cross-examination questions for deposition and trial. Also, provided a rebuttal analysis of economic damages.

- Provided consulting services to plaintiff's counsel in a matter alleging wrongful termination and breach of contract for a high-ranking executive at a health care company. Evaluated labor market earnings potential, calculated economic damages, reviewed defendant's expert analyses, and drafted a report of findings and a rebuttal report.

- Provided consulting services to plaintiff's counsel in a matter alleging wrongful termination and breach of contract for a highly compensated sales employee in the high-tech industry. Evaluated labor market earnings potential, calculated economic damages, created exhibits for use at mediation, and created trial exhibits.

- Provided consulting services to defense counsel in a wrongful termination matter that alleged discrimination based on national origin brought by a former project manager at a large engineering corporation. Analyzed mitigation factors and calculated loss of earnings.

## Insurance Coverage/Environment/Statistics

Assignments representative of Mr. Crandall's experience in related to insurance converge, environmental claims, and other statistical matters include:

- Provided consulting services to defense counsel in connection with a Department of Justice investigation regarding allegations of racial profiling by a large city police department. Analyzed departmental data related to over 130,000 traffic stops, pedestrian stops, and other types of police contacts that occurred in four selected weeks in 1997 and four selected weeks in 1999. Cross-referenced traffic stops data with other departmental information sources including human resources data, precinct level paper records, and the officer discipline system to test various hypotheses.

- Provided consulting services to defense counsel in a 17200 action alleging that the defendant insurer was using inappropriate condition adjustments when settling vehicle total loss claims. Services included analyzing theoretical issues related to used car pricing, conducting regression analysis to estimate coefficients for various condition adjustments, and determining the fairness of the settlements amounts for the name plaintiffs vehicles.

- Provided consulting services to coverage counsel in a CERCLA cost recovery action. Created a database of costs relating to the clean-up of several sites once used by an aerospace and defense contractor. Performed analysis to apportion clean up costs between covered and not covered.

- Provided consulting services supporting coverage counsel in a binding arbitration where the underlying issue was coverage for thousands of asbestos claims. Performed SAS programming, statistical analysis, created summary exhibits, and drafted a report of findings.

- Provided consulting services to coverage counsel in a class action matter alleging overcharging in workman's compensation insurance. Analyzed the difference in aggregate premium paid and the economic impact of reclassifying certain medical and legal costs.

- Provided consulting services to coverage counsel for an underlying class action case alleging damages from exposure to asbestos. Analyzed through SAS programming defense and settlement costs for over 100,000 claims. Constructed a model to apportion costs between various insurers and covered and not covered claims.

- Provided consulting services to defense counsel in a class action ADA matter brought against a government transit agency. Created databases from hard copy paper records, analyzed internal agency data, and merged all data to develop a comprehensive database of access failures. Assisted in the design of a statistical sampling scheme for future monitoring of access to the disabled.

## Forensic Accounting/Business Valuations/Commercial Damages

Assignments representative of Mr. Crandall's experience related to general damages analysis, forensic accounting, finance, and antitrust include:

- Provided consulting services and expert witness testimony to defense counsel in a breach of contract matter. Services included analyzing financial records, estimating damages, and performing a valuation analysis of the plaintiff's business.

- Provided consulting services to defense counsel in a breach of contract matter where the underlying issue was fraudulent inducement of employment. Services included analyzing financial records to determine the value of shareholder equity at various points in time, creating financial models related to economic losses, analysis of financial performance of an unrelated third party to assess but-for opportunity.

- Provided consulting services to plaintiffs' counsel in class-action matter where the underlying issue was fraudulent overcharges of California consumers. Services included estimating the range of potential damages under a variety of scenarios. Filed declaration.

- Provided consulting services to plaintiff's counsel in lender liability arbitration involving a complex financial transaction. Created a financial model that demonstrated the feasibility of the transaction under various interest rate and market return scenarios.

- Provided consulting services to defense counsel in a class action matter alleging unfair business practices related to gift certificate redemptions at a major national retailer. Services included creating survey to determine redemption patterns and analysis of company data.

- Provided consulting services to plaintiff's counsel in a breach of contract matter related to the testing of an innovative dental implant product. Analyzed plaintiff's sales, products, marketing, and sales of plaintiff's competitors, analyzed the products, marketing, and sales of potential market entrants, and developed damages analyses based on a market share approach.

- Provided consulting services to defense counsel in a case alleging usury and fraud. Analyzed accounting records and other data, determined the appropriate interest charges, and quantified overcharge.

- Provided consulting services to plaintiffs and cross-defense counsel in a tort matter alleging interference with recruiting for high-tech salespeople. Analyzed labor markets and internal recruiting data, and developed damages theory and analyses related to the expected economic return on investments in human capital. Drafted declaration and provided deposition and strategy support.

- Provided consulting services to plaintiff's counsel in a breach of contract matter related to financing sub-prime equipment leases. Reviewed financial records of plaintiff's business, industry data, and cohort data, and developed a financial model projecting lost profits under a variety of default scenarios.

- Provided consulting services to defense counsel in an antitrust matter alleging anti-competitive behavior in large-scale model industry. Performed forensic accounting involving the reconstruction of sales and purchases of a multi-million dollar closely held-entity. Managed process of converting numerous paper records into computerized format and developed database to analyze sales, purchases, and gross profit margins through SAS programming. Performed accounting to determine if the plaintiff was committing fraudulent practices. Provided deposition support including drafting questions for counsel in the depositions of several fact and expert witnesses.

- Provided consulting services to plaintiff's counsel in a breach of contract matter involving a medical device. Performed SAS programming to create a database of sales and customers. Researched the market for the product in question and developed a damages model based on a market share approach.

- Provided consulting services to defense counsel in a medical malpractice action where the underlying damages issue was valuing an income stream from a closely held cash business. Performed accounting of plaintiff's financial records to determine existence and extent of fraud. Created financial models to calculate damages under a variety of scenarios.

## Intellectual Property

Assignments representative of Mr. Crandall's experience related to intellectual property, trademark, and trade dress disputes include:

- Provided consulting services to plaintiff's counsel in a patent infringement action against a bedding manufacturer. Created database of sales of the patented product by the defendant and plaintiff. Analyzed price erosion caused by the sales of the competing product to the plaintiff's customers and the consequential damages resulting from the diminution of margins.

- Consulting to plaintiff's counsel in a trademark infringement action. Converted paper records to computerized format and created a database of sales attributed to the trademarked product. Analyzed data to calculate profits and consequential damages.

- Provided consulting services to defense counsel in a patent infringement action involving a high-end coffee cup manufacturer. Analyzed sales data and assisted counsel in determining an appropriate amount for settlement.

- Provided consulting services to defense counsel in a trademark infringement/breach of contract matter. Services included valuing the future income generated through use of the trademark and developing financial models and analyses of damages related to a breach of contract cross-complaint related to potential products that exploited the trademark.

- Provided consulting services to claimant's counsel in a matter alleging patent infringement, trademark infringement, and breach of contract claim involving a food additive. Services included evaluating the market potential for the product and estimating economic damages.

## Education

**Loyola Marymount University**
Masters of Business Administration

**University of Southern California**
Bachelor of Arts, History

## Employment History

**Resolution Economics LLC**
1998–Present: Partner, Project Manager, Senior Consultant

**Deloitte & Touche, LLP**
1998: Senior Consultant, Dispute Consulting Services (Los Angeles)

**Altschuler, Melvoin and Glasser LLP**
1996-1998: Staff and Senior Consultant and Marketing Manager, Economics and Litigation Services (Los Angeles)

**Price Waterhouse LLP**
1993-1996: Marketing Manager, Dispute Analysis and Corporate Recovery Group (Los Angeles)

## Publications

"Surveys Can Help Court Decide Issues of Commonality", *Los Angeles Daily Journal*, January 28, 2004, Robert W. Crandall and Karyn Model

"Pros and Cons of Anonymous Surveys", December 2011, Richard Goldberg and Robert W. Crandall

"Wage and Hour Litigation", chapter in Litigation Services Handbook, ed. by Roman Weil, et al., 2012

## Memberships

Los Angeles County Bar Association – Labor and Employment Section

Society for Human Resources Management

**Robert W. Crandall, M.B.A.**
**Attachment to Resume**

**TESTIMONY AND AFFIDAVITS PRESENTED (2021-2026)**

In the matter of Valerie Alberts, et al. v. Aurora Behavioral Health Care et al., Case No: BC419340, related to data analysis of labor code violation claims and class certification issues, Declaration filed December 5, 2012. Deposition testimony March 19, 2013. Rebuttal report filed February 28, 2018. Deposition testimony April 19, 2018. Declaration filed July 17, 2023.

In the matter of Nate Booker, et. al., v. Tanintco, Inc., et al., Case No: BC 349267, And related cases: BC351252, BC354230, related to statistical analysis of data, rebuttal of plaintiffs' expert report, and response to plaintiffs' trial plan. Report filed June 9, 2015. Deposition testimony July 14, 2015. Report filed October 20, 2017. Report filed July 27, 2018. Report filed September 10, 2019. Deposition testimony September 13, 2019. Trial testimony February 7, 2020, February 10, 2020, and February 11, 2020. Report filed related to new trial plan issues October 21, 2024. Supplemental report filed on trial plan issues filed December 23, 2024. Supplemental trial plan declaration February 3, 2025. Supplemental report filed March 16, 2026. Rebuttal report filed April 6, 2026.

In the matter of Eric Bahra v. County of San Bernardino. Case No. 5:16-cv-01756-JGB-SP, related to analysis of economic damages. Report filed November 20, 2017. Trial testimony July 14, 2021.

In the matter of Ronald Pineda v. Abbot Laboratories Inc., et al. Case No: CV18-3395 SVW (RAOx). Related to analysis of economic damages. Report filed November 1, 2018. Rebuttal report filed November 16, 2018. Deposition testimony November 27, 2018. Supplemental report filed July 27, 2021. Supplemental rebuttal report filed August 4, 2021.

In the matter of Carol Lear, et al. v. Hitachi Automotive Systems, Case No: 5:17-CV-00186-JMH, related to analysis of timekeeping and payroll data with regard to exemption issues, including rebuttal to plaintiffs' expert report. Report filed March 11, 2019. Supplemental report filed June 24, 2021. Rebuttal report filed July 23, 2021. Deposition testimony August 24, 2021.

In the matter of John Utne, et. al., v. The Home Depot USA, Inc., Case No: 3:16-CV-01854-RS, related to video study of claims. Report filed October 16, 2019. Supplemental Declaration filed December 20, 2019. Rebuttal report filed April 30, 2020. Sur-rebuttal report filed December 17, 2021. Deposition testimony February 4, 2022. Deposition testimony August 23, 2022.

In the matter of re: Westamerica Wage and Hours Issues, Case No JCCP004921, related to trial plan issues. Report filed April 30, 2020. Report filed November 13, 2020. Deposition December 1, 2020. Report filed April 26, 2026.

In the matter of Audrey Heredia, et. al. v. Sunrise Senior Living, et. al., Case No: 8:18-cv-01974-JLS-JDE. Related to rebuttal of opposing expert. Report filed September 1, 2020. Deposition Testimony October 22, 2020. Supplemental declaration June 23, 2021. Supplemental declaration August 16, 2021.

In the matter of Roberto Ruiz, et al., v. Unity Courier Services, et. al., Case No: BC724435, related to statistical analysis of data in support of motion to strike. Report filed November 11, 2020. Deposition testimony February 25, 2021.

In the matter of Dean A. Robbins, et al, v. Phillips 66 Company, et al., Case No: 3:18-cv-00292-RS (consolidated Case No. 19-cv-01558-RS), related to statistical analysis of data and statistical issues associated with trial plan. Report filed December 21, 2020. Deposition testimony January 15, 2021. Supplemental report filed February 16, 2024.

In the matter of Michael Lavigne, et, al. v. Herbalife Ltd., Case No: 2:18-cv-07480-JAK (MRWx), related to statistical analysis of the relationship between earnings and event attendance of Herbalife distributors. Report filed January 11, 2021. Deposition testimony February 2, 2021.

In the matter of Michelle Hinds, et, al. v. FedEx Ground Package Systems, Case No: 4:18-cv-01431-JSW (AGT), related to trial plan issues, rebuttal of opposing expert. Report filed February 5, 2021. PAGA declaration filed February 25, 2022. Deposition testimony April 8, 2022.

In the matter of Mary Jane Gonzales, et. al., v. Healthcare Services Group, Inc, et al. Case No: CGC-18-570988, related to statistical analysis of data and trial plan issues. Report filed February 11, 2021. Supplemental report filed May 30, 2021.

In the matter of Louis Ibarra, et al. v. Artisan Screen Printing, et. al., Case No: BC644708, related to statistical analysis of data in connection with class certification issues. Report filed February 19, 2021. Deposition testimony March 27, 2021.

In the matter of Victor Polina, et. al. v. Skechers USA Inc., et al., Case No: 19STCV20234, related to video observation study and statistical analysis of data in connection with suitable seating claims. Report filed March 2, 2021. Deposition testimony March 5, 2021.

In the matter of Eric Ayala, et. al., v. UPS Supply Chain Solutions, et al., Case No: 5:20-cv-00117 PSG-AFM, related to statistical analysis of data, video observation, rebuttal of opposing expert, and critique of trial plan. Report filed March 15, 2021. Deposition testimony April 7, 2021.

In the matter of John Elmy, et. al. v. Western Express, et. al., Case No: 3:17-CV-01199, related to statistical analysis of data related to class certification issues. Report filed March 17, 2021.

In the matter of Kevin Anderson et. al. v. Equinox Holdings Inc., et. al., Case No: 37-2018-00014364-CU-OE-CTL, related to statistical analysis of data, discussion of trial plan issues, rebuttal of opposing experts, and rebuttal of survey conducted by opposing counsel. Report filed April 2, 2021.

In the mater of Michelle Frey v. Creative Artists Agency, Case No: 1210037212, related to analysis of economic damages. Declaration filed April 20, 2021. Arbitration testimony May 13, 2021.

In the matter of Herman Overpeck, et. al. v. FedEx Corporation, et. al., Case No: 4:18-cv-07553-PJH (DMR), related to statistical analysis of data and rebuttal of opposing expert. Report filed June 1, 2021. Deposition testimony August 10, 2021.

In the matter of Hernan Hernandez v. Restoration Hardware, et. al., Case No: CIVDS1723322, related to statistical of data and rebuttal of opposing expert. Report filed June 4, 2021. Deposition testimony June 18, 2021. Supplemental report filed September 2, 2021.

In the matter of Ronald Held, et. al. v. Hitachi Automotive Systems Americas, et. al., Case No: 18-CI-00294, related to statistical analysis of data. Report filed June 28, 2021. Rebuttal report filed July 23, 2021. Deposition testimony August 24, 2021.

In the matter of Randy Salinas, et. al. v. The Cornwell Quality Tools Company, et al., Case No: 5:19-cv-02275-FLA-SP, related to statistical analysis of data and discussion of business model issues. Report filed July 2, 2021. Deposition testimony July 20, 2021.

In the matter of Christine Crump, et al. v. Hyatt Corporation, et. al., Case No: 4:20-cv-00295-HSG, related to statistical analysis of data, critique of opposing experts, and trial plan. Report filed July 15, 2021.

In the matter of Marvin Nash, et. al. v. Horizon Freight System Inc., et. al., Case No: 3:19-cv-01833-VC, related to rebuttal of opposing experts survey and data study. Report filed July 23, 2021. Rebuttal report filed September 10, 2021.

In the matter of Earnest Cuadra, et. al. v. FedEx Ground Package System, et. al., Case No: 2:20-cv-10719-JFW (SKx), related to rebuttal of opposing expert's survey. Report filed July 26, 2021. Deposition testimony July 27, 2021. Supplemental report filed August 16, 2021.

In the matter of Natalie Haaverson, et al. vs. Tavistock Freebirds LLC et al., Case No: RG19030716, related to analysis of restaurant operations. Report filed August 16, 2021. Supplemental report filed September 20, 2021.

In the matter of Claudia Alvarado, et. al. v. Wal-Mart Associates Inc., et. al, Case No: 2:20-cv-01926-AB-KK, related to analysis of class certification issues and critique of opposing expert. Report filed August 16, 2021. Deposition testimony September 23, 2021.

In the matter of Kathleen Williams and Michael Hill v. City of Long Beach, et al, Case No: 2:18-cv-01069-AB-JC, related to discussion of data and racial profiling claims. Report filed August 20, 2021. Rebuttal report filed September 17, 2021. Deposition testimony October 8, 2021.

In the matter of Yolanda Bennett v. AT&T Services Inc., Case No: 4:20-cv-03581-JST, related to analysis of economic damages. Report filed August 31, 2021. Rebuttal report filed September 30, 2021.

In the matter of Sherman Garnett v. County of San Bernardino, et al., Case No: CIVDS1938394, related to analysis of economic damages. Deposition testimony September 3, 2021. Trial testimony October 2, 2023.

In the matter of Elsie Romero, et. al. v. Select Employment Services, et al., Case No: 2:19-cv-06369-AB-AGR, related to statistical analysis of data and trial plan issues. Report filed September 10, 2021.

In the matter of Valerie Sampson, et. al. v. Knight Transportation, et. al., Case No: 2:17-cv-00028 JCC, related to statistical analysis of data and labor market benchmarking. Report filed October 12, 2021. Rebuttal report filed October 29, 2021. Supplemental declaration December 22, 2021.

In the matter of Brian Dittman, et. al. v. Medical Solutions Inc., Case No: 2:17-cv- 01851-MCE-CKD, related to statistical analysis of data and labor market benchmarking. Report filed October 14, 2021.

In the matter of Marlea Dell Anno v. City of San Diego, Case No: 37-2017-00000118-CU-OE-CTL, related to analysis of economic damages. Report filed October 15, 2021. Deposition testimony October 20, 2021. Trial testimony March 15, 2022.

In the matter of Donna Preston v. Lyft, AAA Action No. 01-20-0005-0881, related to data analysis, independent contractor status, and damages. Report filed October 19, 2020.

In the matter of Joseph Kennedy v. Lyft, AAA Action No. 01-20-0005-0613, related to data analysis, independent contractor status, and damages. Report filed October 19, 2020.

In the matter of Daniel McCoy v. Lyft, AAA Action No. 01-20-0005-0878, related to data analysis, independent contractor status, and damages. Report filed October 19, 2020.

In the matter of Camille Green, et. al. v. Cornerstone Services Inc., et al., Case No: 1:20-cv-00706-MWM, related to statistical analysis of data. Report filed October 22, 2021.

In the matter of Stephen Kohr v. ULINE Inc., et. al., Case No: CIVIDS1912069, related to statistical analysis of data. Report filed October 25, 2021. Deposition testimony November 4, 2021.

In the matter Julian Vargas, et. a. v. Quest Diagnostics Clinical Laboratories Inc., et. al., Case No: 2:19-cv-08108-DMG, related to statistical issues and trial management plan. Report filed November 1, 2021. Deposition testimony November 15, 2021.

In the matter of Anthony Mostajo, et. al. v. Nationwide Mutual Insurance, et. al., Case No: 2:17-CV-00350-JAM-AC, related to statistical analysis of data and rebuttal of survey. Report filed November 5, 2021.

In the matter of Giuliana Mendiola v. Regents of the University of California, et. al., Case No: 5:20-cv-00832-ODW-KK, related to analysis of economic damages. Report filed December 24, 2021.

In the matter of George Stickles, et. al. v. Atria Senior Living, et al., Case No: 3:20-cv-09220-WHA, related to statistical analysis of data and rebuttal of opposing expert. Report filed December 31, 2021.

In the matter of Karen Hartstein, et. al. v. Hyatt Corporation, et. al., Case No: 2:20-cv-04874-DSF-JPR, related to rebuttal of opposing experts. Report filed January 7, 2022.

In the matter of Frank Fodera, et. al. v. Equinox Holdings Inc., et al., Case No: 3:19-cv-05072-WHO, related to statistical analysis of data and rebuttal of opposing experts. Report filed February 4, 2022. Rebuttal report filed February 23, 2022. Supplemental report filed August 3, 2022.

In the matter of Sharey Thomas, et. al. v. Maximus Inc., Case No: 3:21-cv-00498-DJN, related to statistical analysis of data. Report filed February 10, 2022. Supplemental report filed March 1, 2022.

In the matter of Harjus Birk v. The Regents of the University of California, Case No: 37-2020-00007663-CUWT-CTL, related to analysis of economic damages. Report filed March 4, 2022.

In the matter of Brian Koos v. The Regents of the University of California, Case No: 18STCV00470, related to analysis of economic damages. Report filed March 7, 2022.

In the matter of Verna Clarke, et. al. v. AMN Services Inc., Case No:. 2:16-cv-4132 DSF (KSx), related to statistical analysis of data. Report filed March 8, 2022.

In the matter of Farzin Morena v. Tesla Inc. Jams Arbitration No: 1240023994, related to economic damages. Report filed March 11, 2022. Supplemental report filed April 24, 2022. Deposition testimony April 26, 2022.

In the matter of Hekmatollah Yosifi v. The Regents of the University of California, Case No: BC724191, related to economic damages. Deposition testimony March 14, 2022.

In the matter of Alfredo Martinez and Justin Page v. Southern California Edison, et. al., Case No: BC670461, related to analysis of economic damages. Deposition testimony March 17, 2022. Trial testimony May 24, 2022.

In the matter of George Chacon, et al. v. Express Fashion Operations LLC, et al.., Case No: 8:19-CV-00564 JLS (DFMx), related to statistical analysis of data. Report filed March 24, 2022. Deposition testimony April 18, 2022 and April 28, 2022.

In the matter of Maurice Frank, et. al. v. Golden Gate Bell, et. al., Case No: RG18913275, related to statistical analysis of data. Report filed March 25, 2022.

In the matter of Dawn Winship v. PruCo Securities, FINRA Case No: 19-00083, related to analysis of economic damages and rebuttal of opposing expert. Report filed March 24, 2022. Arbitration testimony March 30, 2022.

In the matter of Racklin v. Zeta Global Corp, United States District Court for the Eastern District of Virginia – Alexandria Division, Civil Action No: 1:21-cv-01035-AJT-JFA related to analysis of economic damages. Co-authored with Richard Goldberg. Report filed on April 13, 2022.

In the matter of Todd Hearn v. Pacific Gas & Electric Company, Case No: 20CV000391, related to analysis of economic damages and rebuttal of opposing expert. Deposition testimony April 21, 2022. Trial testimony October 3, 2022.

In the matter of Vanna Troung v. American Red Cross, et. al., Case No: 2:21-cv-05789 GW(GJSx), related to analysis of economic damages. Report filed May 2, 2022. Rebuttal Report May 23, 2022.

In the matter of Cecilia Rodriguez, et. Al. v. Wal-Mart Associates, Inc., Case No: 2:20-cv-07045, related to rebuttal of opposing expert's proposed survey. Report filed May 10, 2022.

In the matter of Carla Sanchez, et. al. v. Sam's West Inc., et. al., Case No: 2:21-CV-05122-SVW-JC, related to rebuttal of opposing expert's proposed survey. Report filed May 11, 2022. Deposition testimony May 27, 2022. Report filed February 7, 2024. Deposition testimony February 9. 2024.

In the matter of Andres Lopez v. Giorgio Armani Corporation, Case No: BC71329, related to statistical analysis of data and rebuttal of plaintiff's trial plan. Report filed May 20, 2022. Deposition testimony November 10, 2022.

In the matter of Amanda Bowers, et. al. v. Prolink Staffing Services, et al., Case No: 21STCV22188, related to statistical analysis of data. Report filed June 1, 2022. Supplemental report filed March 29, 2023.

In the matter of Jennifer Hua v. Western Asset Management Company, et. al., Case No: 19STCV31305, related to analysis of economic damages and rebuttal of opposing expert. Deposition testimony August 25, 2022. Trial testimony November 15, 2023.

In the matter of Roberts v. TransAm, et al., Case No: 2:21-cv-02073-JWB-GEB, related to analysis of minimum wage and allegations of fraud. Declaration filed July 22, 2022. Declaration filed September 6, 2022. Deposition testimony October 27, 2022.

In the matter of Jennifer Brum, et. al. v. MarketSource Inc., et. al., Case No: 2:17–CV–00241–KJM–JDP, related to statistical analysis of data, rebuttal of opposing experts, and discussion of trial plan. Report filed August 9, 2022. Deposition testimony September 7, 2022.

In the matter of Gregory Andrews v. US Bank, Case No: 8:22-cv-00117-DOC-DF, related to analysis of economic damages. Report filed September 7, 2022. Rebuttal report filed October 7, 2022.

In the matter of Nicholas Tomaszewski v. City of Palmdale, et. al., Case No: MC026483, related to analysis of economic damages and rebuttal of opposing expert. Deposition testimony September 12, 2022.

In the matter of Michael Gonzalez, et. al. v. Charter Communications, et al., Case No: 2:20-cv-08299-SB-AS, related to statistical analysis of data. Report filed September 20, 2022. Rebuttal report filed October 10, 2022.

In the matter of Anthony Jones v. City of Alhambra, et. al., Case No: 19STCV11721, related to analysis of economic damages and rebuttal of opposing expert. Report filed September 20, 2022. Deposition testimony September 22, 2022.

In the matter of Bonnie Gawf v. City of Monterrey, Case No: 20CV003232, related to analysis of economic damages and rebuttal of opposing expert. Report filed September 20, 2022. Deposition testimony September 23, 2022.

In the matter of Kyle Walker v. Howmedica Osteonics Corp., et al., Case No: 22-cv-002640-MMA-JLB, related to analysis of economic damages. Report filed October 14, 2022. Rebuttal report filed November 4, 2022. Deposition testimony December 8, 2022.

In the matter of Julio Garcia, et. al. v. Walmart, et al., Case No: 18-cv-00500-L-MDD, related to statistical analysis of data and rebuttal of opposing expert. Report filed October 21, 2022. Rebuttal report filed December 9, 2022. Deposition testimony January 5, 2023.

In the matter of Austin Works, et. al. v. Flowers Foods Inc., et al. Case No: 3:21-cv-03567, related to analysis of data and independent contractor issues. Report filed October 17, 2022. Deposition testimony November 29, 2022.

In the matte of Desmond Augustine, et. al. v. United Parcel Service, et. al., Case No: BC636468, related to statistical analysis of data and rebuttal of opposing experts. Report filed October 24, 2022.

In the matter of Carla Janzen v. Regents of the University of California, et. al., Case No: 19STCV24840, related to analysis of economic damages and rebuttal of opposing expert. Trial testimony October 28, 2022.

In the matter of Martin J. Walsh, Secretary of Labor, et al. v. Nursing Home Care Management Inc., et. al., Case No: 21-2583-CFK. Related to analysis of potential unpaid wages and rebuttal of opposing expert. Report filed November 18, 2022.

In the matters of Stephanie Walker v. Lyft, Steven Ortega v. Lyft, Michael Foster v. Lyft, Gabriel Lopez v. Lyft, Michael Ayres v. Lyft, and Antonio Alves v. Lyft, AAA Action Nos. 01-22-0001-7556, 01-22-0001-7557, 01-22-0001-7521, 01-22-0001-7463, 01-22-0001-7402, and 01-22-0001-7417, respectively, related to data analysis, independent contractor status, and damages. Reports filed December 2, 2022.

In the matter of Lucio Lemus, et. al. v. Owens Brockway Container Glass Company, Case No: 2:21-CV-00146 FLA (AFMx), related to statistical analysis of data and rebuttal of opposing expert. Report filed December 9, 2022. Deposition testimony January 9, 2022.

In the matter of Armando Haro, et. al. v. Walmart Inc., Case No: 1:21-cv-00147, related to analysis of video data. Report filed December 14, 2022. Deposition testimony January 4, 2023.

In the matter of Nicholas Lara, et al. v. Z Golf Food & Beverage Services, et al., Case No: RIC1905177, related to statistical analysis of data and rebuttal of opposing expert. Report filed December 16, 2022. Deposition testimony January 6, 2023.

In the matter of Juan Carlos Corral, et al. v. Staples the Office Superstore LLC, Case No: 2:22-cv-01254-MCS-(PVCx), related to statistical analysis of data and rebuttal of opposing expert. Report filed January 27, 2023.

In the matter of Kathy Arrison, et al. v. Walmart Inc., et. al., Case No: CV-21-00481-PHXSMB, related to the scientific collection of data and statistical analysis of data. Report filed February 3, 2023. Deposition testimony March 16, 2023.

In the matter of Joseph Ash, et al. v. Flowers Foods Inc, et al., Case No: 1:21-CV-03566, related to analysis of independent contractor issues. Report filed February 16, 2023.

In the matter of David Padilla, et al. v. Walt Disney Parks and Resorts, et al., Case No: 2019-01077209-CU-OECXC, related to statistical analysis of data, scientific collection of data, and rebuttal of opposing expert. Report filed February 17, 2023. Deposition testimony March 24, 2023. Declaration filed June 26, 2024. Rebuttal declaration filed September 6, 2024. Supplemental declaration filed September 12, 2025.

In the matter of Edward Castillo v. Burrtec Industries, et al,. Case No: 19STCV31323, related to analysis of economic damages. Report filed March 14, 2023. Deposition testimony March 17, 2

In the matter of Antoine Richard, et al. v. Flowers Foods Inc, et al., Case No: 6:15-CV-02557, related to analysis of independent contractor issues. Report filed March 15, 2023.

In the matter of Raymond Knight, et. al, v. Flowers Foods Inc., et. al., Case No: NO. 21cv3568, related to analysis of independent contractor issues. Report filed March 16, 2023.

In the matter of Home Point Financial Corporation v. Donald Mark Lane, Candace Robertson Christopher Wilkins, and Guaranty Home Mortgage Corporation, Case No: 6:20-cv-01819-CEM-EJK, related to analysis of economic damages. Report filed March 31, 2023. Rebuttal report filed May 15, 2023. Deposition testimony June 13, 2023. Supplemental report June 15, 2023.

In the matter of Claudia Carr, et. al. v. Walmart Inc., et. al., Case No: 5:21-cv-01429-AB-KK, related to statistical analysis of data and rebuttal of opposing expert. Report filed April 7, 2023.

In the matter of Requel Martin v. Jacobs Engineering, et. al, Case No: 2:22-cv-06240-MRW, related to analysis of economic damages. Report filed April 19, 2023.

In the matter of Jerome King, et. al, v. Flowers Foods Inc., et. al., Case No: 3:21-cv-00579, related to analysis of independent contractor issues. Report filed May 1, 2023.

In the matter of Suzanne Alfonso, et. al. v. FedEx Ground Package System, Inc., Case No: 3:21-CV-1644 (SVN), related to scientific data collection and statistical analysis of data. Report filed May 15, 2023. Deposition testimony June 15, 2023. Rebuttal Report filed July 14, 2023. Deposition testimony August 4, 2023.

In the matter of Daniel Ludlow, et. al, v. Flowers Foods Inc., et. al., Case No: 3:18-cv-01190-JO-JLB, related to analysis of independent contractor issues. Report filed May 17, 2023.

In the matter of Dora Patricia Amaya et. al. v. Menzies Aviation (USA), Inc., Case No: 2:22-cv-05915-MCS-MARx, related to statistical analysis of data and rebuttal of opposing expert. Report filed June 12, 2023.

In the matter of Marlen A. Beltran Zamora, et. al. v. Overhill Farms Inc., Case No: 19STCV09405, related to statistical analysis of data and rebuttal of opposing experts in connection with class certification issues. Report filed June 30, 2023. Deposition testimony August 21, 2023. Rebuttal report filed November 22, 2023.

In the matter of Hernandez, et. al. v. Walmart Associates, Inc., Case No: 5:21-cv-00166-FLA (KKx), related to statistical analysis of data and rebuttal of opposing experts in connection with class certification issues. Report filed July 7, 2023. Deposition testimony July 26, 2023. Report filed October 22, 2024. Deposition testimony December 4, 2024.

In the matter of John Bojorquez v. Activision Publishing Inc., et al., Jams Ref Number: 5220001147, related to analysis of economic damages. Report filed August 2, 2023. Arbitration testimony October 9, 2023.

In the matter Lucas, et al. v. GiveSmart US Inc., et. al., Case No: 20STCV01437, related to statistical analysis of data and rebutting a proposed survey. Report filed August 15, 2023.

In the matter of Edward Bouissey, et. al. v. Swift Transportation Co., Case No: 2:19-cv-03203-VAP-KKx, related to statistical analysis of data and rebuttal of opposing expert's economic damages analysis. Report filed September 22, 2023. Deposition testimony October 30, 2023.

In the matter of Guillermo Palatto, et. al. v. Safeway Inc., et al., Case No: RG19020914, related to statistical analysis of data and rebuttal of opposing expert. Report filed October 20, 2023.

In the matter of David Jones, et. al. v. Flowers Foods Inc., et al. Case No: 2:21-cv-01858, related to analysis of independent contractor issues. Report filed November 6, 2023.

In the matter of Nelson Rameriz, et al. v. HV Global Management Corporation, et. al, Case No: 5:21-cv-09955-BLF. Related to statistical analysis of data and rebuttal of opposing expert. Report filed November 16, 2023.

In the matter of Sylvie Serrano v. Flowers Baking Co., et. al., Case No: 2:21-cv-02217-WBS-CKD, related to analysis of independent contractor issues. Report filed November 20, 2023. Deposition testimony February 2, 2024.

In the matter of Cesar Aguilar-Flores, et. al, v. Javier's CC LLC., et. al., Case No: 19STCV36438, related to statistical analysis of data and rebuttal of opposing expert in connection with class certification issues. Report filed November 20, 2023. Deposition testimony January 5, 2024. Rebuttal report filed January 14, 2025. Deposition testimony February 18, 2025. Trial testimony July 17, 2025.

In the matter of Shanan Guinn v. The Walt Disney Company, Case No: 2:22-cv-07770-DSF (PVCx), related to the analysis of economic damages. Report filed November 20, 2023. Rebuttal report filed December 18, 2023.

In the matter of Javier Martinez, et al. v. Pilot Travel Centers, LLC, and Pilot Corporation, Arbitration No: 01-22-0001-1610, related to hours worked and compensation composition. Report filed November 30, 2023. Deposition testimony January 15, 2024.

In the matter of Naomi Bennett, et al. v. Providence Health & Services, Case No. 21-2-13058-1 SEA, related to observation study, statistical analysis of data and rebuttal of opposing expert. Report filed December 1, 2023. Rebuttal report filed January 5, 2024. Deposition testimony January 26, 2024. Supplemental report filed February 20, 2024.

In the matter of Jason Dizon v. Western Asset Management Company, et al, Case No. 20STCV19290, related to the analysis of economic damages. Report filed December 18, 2023.

In the matter of Jenny Vonderwerth v. BB&T Insurance Services, et. al., AAA Case No: 01-23-0000-5627, Related to analysis of exempt status. Report filed January 10, 2024. Arbitration testimony February 14-16, 2024.

In the matter of Evangelina Mendoza v. Normal Life, et. al., Case No: 21 CV-0084, related to analysis of economic damages. Report filed January 12, 2024.

In the matter of Patricia Montano v. Normal Life, et al., Case No: 21CV-0037, related to analysis of damages. Report filed January 12, 2024.

In the matter of Andrew Rakowsy, et. al. v. Federal Express Corporation, Case No: 2:23-CV-02340-TLP, related to statistical analysis of data. Report filed January 30, 2024.

In the matter of Kevin Greene, et. al. v. H&K Group., Case No: 2022-23557, related to claims of prevailing wages. Report filed February 19, 2024.

In the matter of Courtney Tolbert, et. al. v. Rocket Mortgage LLC, Case No: 5:23-cv-01450-MCS-PVC, related to statistical analysis of data and rebuttal of opposing expert. Report filed February 20, 2024. Deposition testimony March 1, 2024.

In the matter of Walter Scott III, et al. v. ME&I Construction Services USA Inc., Case No: 2:23-cv-00064-MRH. Related to analysis of data and rebuttal of opposing expert. Report filed March 1, 2024.

In the matter of Grant Napier v. Bonneville International Corporation, et. al., Case No: 2:21-cv-01956-DAD-DB, related to analysis of economic damages. Report filed March 13, 2024.

In the matter of Mark Sauvao v. City of Los Angeles, et al., Case No: BC707968, related to analysis of economic damages and rebuttal of opposing expert. Report filed March 1, 2024. Deposition testimony March 6, 2024. Trial testimony March 21, 2024.

In the matter of Yolanda Callister, et. al. v. Swedish Health Services, et. al., Case No: 21-2-16148-7 SEA, related to statistical analysis of data, rebuttal of opposing expert. Report filed April 4, 2024. Rebuttal report filed May 6, 2024. Supplemental declaration filed May 13, 2024. Deposition testimony May 16, 2024. Rebuttal declaration filed October 3, 2025.

In the matter of Deion Anthony, et. al. v. Rise Services Inc., et. al., Case No: CV-22-00268-PHX-GMS, related to statistical analysis of data and rebuttal of opposing expert. Report filed May 28, 2024. Deposition testimony October 10, 2024.

In the matter of A. Cruz, et al. v. Sega of America, Inc., related to analysis of data in connection with evaluating whether mass arbitration claimants were real individuals. Declaration filed June 5, 2024.

In the matter of Jermaine Grandberry, et. al, v. Northwest Pallet Services LLC., et. al., Case No: BCV-19-101284, related to statistical analysis of data and rebuttal of opposing expert in connection with class certification issues. Report filed July 8, 2024. Deposition testimony August 6, 2024. Trial report April 8, 2025. Deposition testimony April 11, 2025. Trial testimony June 5, 2025, June 9, 2025, June 10, 2025.

In the matter of Amanda Hale, et. al. v. Brinker International Inc., et. al., Case No: 3:21-cv-09978-VC, related to statistical analysis of data and rebuttal of opposing expert. Report filed August 30, 2024. Deposition testimony October 1, 2024. Trial report December 5, 2025.

In the matter of Bernard Waithaka, et. al., v. Amazon.com, Amazon Logistics Inc., Case No: No. 2:19-cv-01320-JCC. Related to statistical analysis of data for class certification. Report filed September 2, 2024.

In the matter of Alvaro Quintero, et. al., v. Apria Healthcare LLC, et al., Case No: 20STCV42367, related to statistical analysis of data. Report filed September 11, 2024.

In the matter of MSP Recovery Claims, Series LLC v. Amgen Inc, et al., Case No: 2:23-cv-03130-MEMF-PD, related to statistical analysis of data. Report filed September 16, 2024.

In the matter of Bennie Hamilton, et. al. v. Knight Transportation, et al., Case No: 5:21-cv-01859-JWH-KK, related to statistical analysis of data and rebuttal of opposing experts. Report filed September 23, 2024.

In the matter of Hayden Gragnan, et. al. v. TGI Fridays Inc, et. al. Case No: 8:22-cv-00392-FWS-JDE, related to statistical analysis of data and rebuttal of opposing experts. Report filed September 23, 2024. Deposition testimony October 11, 2024.

In the matter of Vanessa Custode, et. al. v. Ross Stores Inc, et al., Case No: RG20060807, related to rebuttal of opposing expert's survey analysis. Report filed October 24, 2024. Deposition March 20, 2025.

In the matter of David Carlson, et. al. v. Swift Transportation Company of Arizona LLC, et al., Case No: 3:23-cv-5722-RJB, related to statistical analysis of data for class certification issues. Report filed October 25, 2024. Report filed October 2nd, 2025. Report filed November 3, 2025.

In the matter of Bernadean Rittman, et. al. v. Amazon.com Inc., et al., Case No: C16-1554-JCC, related to analysis of data for class certification. Report filed October 25, 2024.

In the matter of Arthur Little v. Regents of the University of California, et al., Case No: 20STCV26717. Related to analysis of economic damages. Report filed November 15, 2024. Deposition testimony November 20, 2024.

In the matter of Claudia Del Vecchio and Tatiana Vysotsky v. Regents of the University of California, et al., Case No: 22STCV19629. Related to analysis of economic damages. Report filed January 15, 2025. Deposition testimony January 21, 2025.

In the matter of William Taggart, et. al. v. FedEx Ground Package Systems Inc, Case No: 2:23-cv-03655, related to video observation and statistical analysis of data for class certification. Report filed January 31, 2025. Deposition testimony March 28, 2025.

In the matter of Manual Ramirez v. Burrtec Waste and Recycling Services, et. al., Case No: CVR12105879, related to economic damages. Report filed April 17, 2025. Deposition testimony April 22, 2025. Trial testimony September 23, 2025.

In the matter of Harold Wright v. ABF Freight Systems, Case No: 23STCV22910, related to analysis of economic damages and rebuttal of opposing expert. Report filed April 21, 2024. Deposition testimony April 24, 2024.

In the matter of James McGary, et al. v. Walt Disney Parks and Resorts, et. al., Case No 2019-01077209-CU-OECXC, related to statistical analysis of data and rebuttal of opposition expert. Report filed May 8. 2025. Deposition testimony July 24, 2025.

In the matter of Lizbeth Guerrero et. al, v. TruConnect Communications, et. al., Case No: BC662355, related to statistical analysis of data and rebuttal testimony. Trial testimony June 20, 2025, and June 23, 2025.

In the matter of Passion Gabourel, et al. v. Luxottica of America, Inc., et al., Case No: 21ST CV43173, related to statistical analysis of data and rebuttal of opposing experts. Report filed July 8, 2025. Deposition testimony August 8. 2025.

In the matter of Marites Perez, et al. v. It Works Marketing, Inc, et al, Case No: 3:23-cv-0489TLT, related to statistical analysis of data and rebuttal of trial plan. Report filed July 22, 2025.

In the matter of Boris Klebanov, et. al. v. Haas Automation Inc., Case No: 2023CUOE011581. Related to the fairness of a class action settlement. Report filed August 26, 2025.

In the matter of Jodi Cocagne, et. al. v. Morley Companies, Incorporated, et. al., Case No: 2:24-cv-11114, related to statistical analysis of data for class certification. Report filed September 4, 2025.

In the matter of Taylor Bondshu, et. al. v. Sephora USA, Inc., Case No: CGC-23-610622, related to statistical analysis of data for class certification issues. Report filed September 22, 2025.

In the matter of Pamela Hill, et. al. v. Stevedoring Services of America, et. al., Case No: 21STCV25967, related to rebuttal of trial plan. Report filed September 29, 2025. Deposition testimony October 23, 2025. Supplemental report filed March 12, 2026.

In the matter of Lawerence Garcia v. San Diego Gas & Electric, Arbitration No: 5220005501, related to analysis of economic damages. Report filed October 3, 2025. Arbitration testimony October 16, 2025.

In the matter of Sinnathamby Raj Selvarajah, et. al. v. World Oil Marketing Company, et. al., Case No: 20STCV15659, related to class certification issues, Report filed October 3, 2025. Report filed June 1, 2026.

In the matter of Trevor Thompson v. McDermott Will and Emory LLP, Case No: 23-CIV-00601, related to analysis of economic damages and rebuttal of opposing expert. Report filed October 10, 2025. Deposition testimony October 15, 2025.

In the matter of David Depyper, et. al. v. Roundy's Supermarkets, Inc., et. al, Case Nos: 1:20-cv-02317 and 1:22-cv-02084, related to analysis of jobs for exempt status. Report filed November 11, 2025. Rebuttal report filed December 8, 2025. Deposition testimony January 7, 2026.

In the matter of Jeremy Dyer, et. al. v. Skogen's Foodliner, Inc., d/b/a Festival Foods, Case No: 3:25-cv-00322-jdp, related to statistical analysis of data for conditional certification. Report filed November 21, 2025.

In the matter of Nathan Segerson v. Franciscan Medical Group, et al., Arbitration No: 01-24-0007-5075, related to rebuttal to economic damages. Report filed December 4, 2025.

In the matter of Grant Leger, et. al., v. Cyndor, et. al., Case No: 23STCV13742, related to statistical analysis of data, rebuttal of opposing expert, and trial plan issues. Report filed December 9, 2025.

In the matter of Jaime Lunde, et. al, v. Allstate Insurance, et. al., Case No: BC543659, related to statistical analysis of data, rebuttal of opposing expert, and analysis of damages. Report filed December 15, 2025. Deposition testimony December 18, 2025. Supplemental report filed March 13, 2026. Trial testimony June 4, 2026.

In the matter of Myriam Parker, et. al. vs. Walt Disney Parks And Resorts, Inc., et. al., Case No: 30-2022-01292239-CU-OE-CXC, related to statistical analysis of data, rebuttal of opposing expert, and trial plan issues. Report filed January 6, 2026. Deposition testimony February 27, 2026. Rebuttal declaration September 9, 2026.

In the matter of Esayas Admasu v. World Oil Marketing Company, et. al., Case No: 20STCV15659, related to rebuttal analysis of economic damages and counter-claim damages. Report filed January 9, 2026.

In the matter of Gloria Flores, et. al., v. Wal-mart Associates Inc., et. al., Case No: 268T CV01001, related to removal under CAFA. Report filed February 16, 2026.

In the matter of Danielle Officer, et. al. v. Mid Valley Providers Inc., et. al., Case No: 201036, related to trial plan statistical issues, data collection plan, and rebuttal of opposing expert. Report filed March 9, 2026.

In the matter of Mansour Shirbacheh MD v. Franciscan Medical Group, et. al. AAA No: 01-24-007-5075, related to analysis of economic damages. Report filed March 27, 2026. Deposition testimony April 17, 2026. Arbitration testimony June 10, 2026.

In the matter of Christina Zangas v. Warner Bros. Entertainment Inc., et. al., Case No: 2:24-cv-00928-MEMF-PDx, related to analysis of economic damages. Report filed April 2, 2026.

In the matter of Kimberly Dotson, et. al. v. TZ Insurance Solutions LLC, et. al., Case No: 2:25-cv-13323-BRM-MAH. Related to class certification issues. Report filed April 6, 2026.

In the matter of Shundrea Hardy, et. al. v. Airport Management Services, LLC, et al. Case No: **2:24-**cv-03945-FLA-PD, related to statistical analysis of data and rebuttal of opposing expert. Report filed May 13, 2026. Deposition testimony June 8, 2026.

In the matter of Jacqueline Ahumada, et. al. v. Giorgio Armani Corporation, et. al., Case No: 3-24-cv-01175 RSH-DEB, related to statistical analysis of data and class certification issues. Report filed April 7, 2026. Deposition testimony May 19, 2026.

In the matter of Christopher Smith v. City of Huntington Beach, et. al., Case No: 30-2024-01376230-CU-WT-CJC, related to analysis of economic damages. Report filed April 9, 2026. Deposition testimony April 13, 2026.

In the matter of James Salgado, et. al. v. Flowers Foods et al., Case No: CV-22-00420-TUC-JGZ, related to analysis of data and independent contractor issues, Report filed April 13, 2026. Deposition testimony July 1, 2026.

In the matter of Clemencia Martinez, et. al., v. Wal-mart Associates Inc., et. al., Case No: 268T CV10050, related to removal under CAFA. Report filed May 13, 2026.

In the matter of Marc Sanmarco, Reid Hinson, and James Nesbit v. Google LLC, Case No: 5:25-cv-06593-EJD, related to analysis of economic damages and rebuttal of opposing expert. Report filed July 10, 2026.

In the matter of Bradley J. Hasty, et. al., v. Hyatt Regency San Francisco, Case No: 3:25-cv-02662-RFL, related to statistical analysis of data, class certification issues, and rebuttal of opposing expert. Report filed July 24, 2026.