Joshua H. Haffner, SBN 188652
jhh@haffnerlawyers.com
Trevor Weinberg, SBN 330778
tw@haffnerlawyers.com
Samantha Salas, SBN 367563
sc@haffnerlawyers.com
**HAFFNER LAW PC**
15260 Ventura Blvd., Suite 1520
Sherman Oaks, California 91403
Telephone: (213) 514-5681
Facsimile: (213) 514-5682

Attorneys for Plaintiff MANDY SAECHAO,
on behalf of herself and all others similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MANDY SAECHAO, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:25-cv-02431-RFL<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>[Filed concurrently with: Reply Declaration of Justin Regus, CFA, CFE]<br><br>Hearing Date: November 19, 2026 Hearing Time: 10:00 a.m.<br>Courtroom: 4<br><br>(Assigned to the Hon. Rita F. Lin) |

# TABLE OF CONTENTS


Page

I. Introduction. ....1

II. UPS Never Addresses Plaintiff's Theory. 1

A. The Court Evaluates The Theory Of Liability Plaintiff Actually Advances. ....1

B. UPS Fails To Address Plaintiff's Theories of Confinement And Interruption. ....2

III. The Security Check Policy Is Common To All 39 Facilities. ....3

IV. Common Issues Predominate As To The Meal Period Claim. ....4

A. UPS's Expert Concedes The Predicate Fact: Over 85% Of Recorded Meal Periods Were 30 Minutes. ....4

B. UPS's Remaining Meal Period Arguments Are A Red Herring. ....6

C. Hamilton Supports Certification, And UPS's Cases Involve Different Theories On Different Records. ....7

D. Waiver Is UPS's Burden, And UPS's Records Resolve It. ....8

V. Common Issues Predominate As To The Rest Break Claim. ....9

VI. Common Issues Predominate As To The Unpaid Time Claims. ....10

A. Huerta Supports Plaintiff. ....10

B. The Off-The-Clock Walk Is Compensable Regardless Of Employees' Actions. ....11

C. The On-The-Clock Interval Is An Admitted Policy. ....12

D. The Union Guarantee And Overtime Threshold Are Damages Calculations. ....13

VII. UPS's Remaining Arguments Lack Merit. ....13

A. Plaintiff's Evidence Of A Common Policy Is The Best Evidence. ....13

B. Plaintiff Is Typical And Adequate. ....14

VIII. The Case Is Manageable And Class Treatment Is Superior. ....14

IX. Conclusion. ....15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013)....................................2, 4, 14, 15

*Alberts v. Aurora Behavioral Health Care*, 241 Cal.App.4th 388 (2015)........................................2

*Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314 (2005)...................................................................13

*Augustus v. ABM Sec. Servs., Inc.*, 2 Cal.5th 257 (2016)..............................................................10

*Brinker Rest. Corp. v. Superior Court*, 53 Cal.4th 1004 (2012)........................................... *passim*

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005).......................................................15

*Depina v. FedEx Ground Package System, Inc.*, 2024 WL 5430193 (N.D. Cal. Nov. 8, 2024)..........8

*Donohue v. AMN Servs., LLC*, 11 Cal.5th 58 (2021)........................................................8, 9, 10, 16

*Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1232695 (N.D. Cal. Mar. 30, 2021)...................8, 10

*Frlekin v. Apple Inc.*, 309 F.R.D. 518 (N.D. Cal. 2015)....................................................................4

*Frlekin v. Apple Inc.*, 8 Cal.5th 1038 (2020)...............................................................................2, 7

*Hamilton v. Wal-Mart Stores, Inc.*, 2022 WL 2374445 (9th Cir. June 30, 2022).................. *passim*

*Huerta v. CSI Electrical Contractors*, 15 Cal.5th 908 (2024)..............................................2, 5, 11

*Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013)............................................13, 15

*Miles v. Kirkland's Stores, Inc.*, 89 F.4th 1217 (9th Cir. 2024).....................................................10

*Morillion v. Royal Packing Co.*, 22 Cal.4th 575 (2000)..............................................................7, 11

*Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918 (9th Cir. 2019)............................6, 13

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)...................................................................13

*Valencia v. VF Outdoor, LLC*, 2022 WL 4397084 (E.D. Cal. Sept. 23, 2022).........................8, 10

**Statutes**

Cal. Lab. Code § 226.7......................................................................................................................10

Cal. Lab. Code § 512...........................................................................................................................9

**Rules**

Fed. R. Civ. P. 23.......................................................................................................14, 15, 16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Introduction.

Plaintiff's motion rests on UPS's mandatory security check, which is a common policy that controls all Class members at all 39 secured facilities and is evidenced by UPS's own records and data. UPS's opposition never engages Plaintiff's certification theory. UPS instead argues a different case: that security is quick, that employees stay inside for reasons unrelated to security, that some shifts allow longer lunches, and that Plaintiff has no class data. None of those points answers the question Plaintiff actually presents, which is whether a policy that confines employees to the premises unless they submit to two security screenings during a 30-minute break, or that leaves the walk from security to the clock unpaid, violates California law. That question is common to all Class members.

After Plaintiff filed her motion for class certification and UPS filed its opposition, UPS produced, for the first time, documents and data that it had previously withheld regarding the other class members and UPS facilities. Plaintiff's expert, Justin Regus, CFA, CFE, reviewed the new production and has supplemented his opinions regarding whether UPS's records and data could be used to calculate damages on a class-wide basis. Declaration of Justin Regus, CFA, CFE in support of Plaintiff's Reply in support of Motion for Class Certification ("Regus Reply Decl.") ¶ 3. As discussed more thoroughly below, Mr. Regus has demonstrated that Plaintiff's claims for violations of meal periods, violations of rest period requirements, and failure to pay employees for all time worked can be resolved on a class-wide basis throughout all UPS facilities. Regus Reply Decl. ¶ 3. Accordingly, Plaintiff respectfully requests that the Court grant Plaintiff's Motion.

## II. UPS Never Addresses Plaintiff's Theory.

### A. The Court Evaluates The Theory Of Liability Plaintiff Actually Advances.

Class certification turns on "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." *Brinker Rest. Corp. v. Superior Court*, 53 Cal.4th 1004, 1021 (2012). The Ninth Circuit applies the same rule. A district court abuses its discretion when it declines certification "based on the possibility that

plaintiffs would not prevail on the merits" of their theory. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013).

**B. UPS Fails To Address Plaintiff's Theories of Confinement And Interruption.**

Plaintiff's meal period theory is that employees are confined to Defendant's premises during their 30-minute meal break, unless they want to interrupt it by going through security to leave the premises. The motion says so repeatedly: UPS's screening "prevent[s] Class members from leaving UPS' premises unless they interrupt their break by going through the security check process, twice, to get in and out," and "make[s] it impossible for Class members to leave the premises during Class members' 30-minute meal break without interrupting it by going through security." Mot. 8:10-16; see also *id.* 19:20-22, 20:11-16, 20:23-21:1. UPS acknowledges this in a footnote, then announces it will not respond to Plaintiff's theory: "Because the motion develops no separate interruption theory, UPS addresses the claim principally as one of alleged discouragement." Opp. 21:27-28 n.4. That is not accurate, and it is not a defense. The motion argues interruption of the meal break extensively, and cites the law that "an employee must be relieved of all duties for an uninterrupted 30 minutes." *Alberts v. Aurora Behavioral Health Care*, 241 Cal.App.4th 388, 400 (2015); Dkt. 50 at 19-20. "Discourage" is the word the case law uses. *See Hamilton v. Wal-Mart Stores, Inc.*, 2022 WL 2374445, at *3 (9th Cir. 2022). The two are related: a requirement that employees interrupt their break to leave is itself an impediment to leaving, and UPS cannot avoid the interruption theory by relabeling it.

With respect to the confinement theory, UPS does not dispute that no employee at any of the 39 facilities can enter or exit without clearing security, that time clocks are inside the secured perimeter, or that an employee who leaves for a meal or rest period is screened on the way out and again on the way back in. Those facts establish control under *Frlekin v. Apple Inc.*, 8 Cal.5th 1038 (2020), and *Huerta v. CSI Electrical Contractors*, 15 Cal.5th 908 (2024), and they are all Plaintiff's theory requires.

///

### III. The Security Check Policy Is Common To All 39 Facilities.

UPS claims that security is not uniform at these 39 facilities due to variations in the equipment at the different locations, such as metal detectors, wands, x-rays, or some combination. Opp. 10:25-11:4. This is immaterial to Plaintiff's theories, which are based on four facts UPS concedes are true everywhere and consistent with the class data UPS has produced. Regus Reply Decl. ¶ 4.

First, every employee must clear security to enter or leave. UPS's security designee testified: "every employee's going to go through the screening process still," an employee "cannot bypass a security check and just walk directly into the facility," and cannot exit without "go[ing] through screening." Haffner Decl. (Dkt. 50-2), Ex. 4 (Savage Depo.) 27:13-28:10. Second, the badge in, screen, badge out sequence is the same at all 39 facilities and feeds one SCAR system. *Id.* 30:1-3, 33:1-34:2, 38:25-39:3. Third, an employee who leaves for a meal period "would be screened when they left for that meal period[,] [a]nd upon entering they'd be screened when they came back." *Id.* 35:18-36:11. Rest breaks follow the "same process as the meal periods." Haffner Decl., Ex. 3 (Cota Depo.) 55:15-17. Fourth, the time clocks are inside, past security, so the walk from security to the clock is off the clock and unpaid. Haffner Decl., Ex. 8 (Terpening Depo.) 42:12-17 ("Q. . . . are non-exempt workers paid for the time spent after security screening, but before they clock in? . . . THE WITNESS: No, they are not.").

UPS's own 25 class member declarations confirm each fact. Every one contains the same sentence: "If I leave the facility for my break or lunch, I pass through security." E.g., Brown Decl. (Dkt. 58), Exs. 8 (Andrade) ¶ 12, 9 (Burns) ¶ 12, 14 (Jefferson) ¶ 11, 25 (Newton) ¶ 12, 32 (Torres) ¶ 12; see also Ex. 33 (Facts 55, 59, 78). UPS's managers describe a single mandatory entrance and exit through turnstiles and metal detectors, Zielinski Decl. (Dkt. 70) ¶¶ 4-5, 8; Morales Decl. (Dkt. 65) ¶¶ 4, 9-10. UPS's written "Clean In/Clean Out Procedures," addressed "To: All Employees," require employees to empty their pockets, submit "[a]ll bags" to be "thoroughly searched," and "satisfy either the Metal Detector or the handheld wand prior to exiting the facility," on pain of "discipline up to termination." Haffner Decl., Ex. 6 [UPS001388]; see Savage Decl. (Dkt. 66) ¶ 8

(Visalia post order: "[a]ll bags need to be inspected").

UPS's observation that some facilities conduct screening "inside the facility itself, i.e., with no walking between the security are[a] and the building," Opp. 9:26-27, misstates the issue. The unpaid interval is the walk from security to the time clock, wherever the security station sits. UPS admits it does not track or pay that interval anywhere: "Does UPS track any metrics or time for the difference between when an employee who is entering a facility, the badge . . . scan at the security area . . . [and] when they first clock into work? . . . THE WITNESS: No." Haffner Decl., Ex. 9 (Cheung Depo.) 97:20-98:10. That is a common policy. *Abdullah*, 731 F.3d at 964 (where "there are no relevant distinctions between the worksites," the inquiry "would be a common one"); *Frlekin v. Apple Inc.*, 309 F.R.D. 518, 525 (N.D. Cal. 2015) (statewide policy "will serve as a common method of proof for all 52 California stores").

Indeed, Plaintiff's expert, Justin Regus reviewed the data produced by UPS across all 34 facilities and determined that the common policies for each facility created common issues for all class members. "Employees at each of the 34 facilities in the data took meal periods of exactly thirty minutes." Regus Reply Dec. ¶9. Any reduction or interruption in the meal break at any of these facilities from having to go through a security check would "result in a meal period shorter than required by California Labor Code." *Id.* Mr. Regus similarly determined that class members were widely discouraged from leaving the premises for rest breaks because across all 34 facilities, 84% of shifts lasted at least 3.5 hours. Regus Reply Dec. ¶10. Mr. Regus also discovered based off the data that for all facilities there was "a total of 250 seconds, or four minutes and ten seconds, of unpaid time spent between the security checkpoint and time clocks per typical workday", which was not compensated. Regus Reply Dec. ¶14.

## IV. Common Issues Predominate As To The Meal Period Claim.

### A. UPS's Expert Concedes The Predicate Fact: Over 85% Of Recorded Meal Periods Were 30 Minutes.

Plaintiff's first meal period theory is expressly limited to shifts on which UPS's records show a meal period of 30 minutes or less: "This theory is established by objective, common proof:

UPS's time records identify each Class member whose records reflect a meal period of 30 minutes or less . . . ." Mot. 20:25-27. UPS's expert states "[t]he lengths of recorded first meal breaks for the shifts analyzed in the GTS data show that 85.3% were thirty minutes in length, but 14.1% of recorded meal periods exceeded 30 minutes." Crandall Decl. ¶ 57; see also *id.* ¶ 11(h); Opp. 14:7-9. Adding the recorded short meals, roughly 86% of all recorded first meal periods fall within Plaintiff's theory. Plaintiff's expert, analyzing the same data, likewise found that about 80% of all recorded meal periods were exactly 30 minutes long, and that employees at each of the 34 facilities in the data took meal periods of exactly 30 minutes. Regus Reply Decl. ¶ 9. Because the meal periods were exactly thirty minutes long, any reduction in the effective duration of the meal period would result in a meal period shorter than required by the California Labor Code. *Id.*

For every one of those meal periods, the same question arises: can an employee leave the premises and still receive "an uninterrupted 30-minute break," *Brinker*, 53 Cal.4th at 1040, when leaving requires clearing security on the way out and again on the way back in? UPS argues that the screenings at its facilities are short, immaterial, and therefore do not interrupt the employees' 30-minute break. However, regardless of the amount of time spent "awaiting and undergoing," a mandatory security screening is time under the employer's control. *Huerta*, 15 Cal.5th at 915, 920-22. UPS knows this time is compensable because it pays for that time at the start and end of every shift. Opp. 11:19-24; Crandall Decl. ¶ 66. UPS cannot treat the identical screening as compensable "hours worked" at the start of a shift and as a non-event during the meal period. "California's wage and hour statutes do not incorporate the federal de minimis doctrine." *Huerta*, 15 Cal.5th at 921. Whether the recurring interruption that UPS's policy imposes on every off-premises meal period violates *Brinker* is a single question for all class members.

Indeed, UPS's own data confirms that 30 minutes is not long enough to leave. Crandall reports that among breaks where badge records show the employee left the facility, only 32.2% lasted 30 minutes or more outside the building. Crandall Decl. ¶¶ 58-59; Opp. 14:9-10. The complement is that 67.8% of employees who left came back in under 30 minutes, before counting the two security transits themselves. Crandall's transit times also understate the interruption,

because they measure only the interval between badging in and badging out at the checkpoint itself. Additionally, Crandall's separate finding that longer recorded meals correlate with leaving, Crandall Decl. ¶ 11(h), shows exactly what Plaintiff alleges: employees with more than 30 minutes could leave; employees with 30 minutes could not do so without cutting into the break.

**B. UPS's Remaining Meal Period Arguments Are A Red Herring.**

UPS argues that time in security varies, that employees stay inside for reasons completely unrelated to security, that some facilities give more than 30 minutes for lunch, and that Visalia's belts prove nothing about other facilities.

Duration is irrelevant because Plaintiff does not seek pay for time in the security line during meal periods; she seeks the premium owed when an employer's policy makes an uninterrupted, off-premises break impossible. The violation is the same whether the screening takes ten seconds or two minutes. And even if duration mattered, "the need for individual damages calculations does not, alone, defeat class certification." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 943 (9th Cir. 2019).

Employees' reasons for staying inside are irrelevant because the theory is confinement, not motive. The Ninth Circuit rejected UPS's exact argument in *Hamilton v. Wal-Mart Stores, Inc.*, 2022 WL 2374445, at *3 (9th Cir. June 30, 2022): "The gravamen of Walmart's arguments . . . is that California law requires a subjective showing that each employee felt impeded or discouraged . . . . But the *Brinker* standard focuses on the employer's obligation to provide an uninterrupted meal break free from impediment or discouragement." The inquiry is a "case-specific approach [which] focuses on the level of the employer's control on employees' not on whether every employee wants to use their break in an unauthorized way." *Id.* California law is to the same effect. "[W]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control," and "must be paid." *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 583 (2000); *Frlekin*, 8 Cal.5th at 1056 (confinement pending an "onsite employer-controlled activit[y]" is control). UPS's declarants who

chose the break room were as confined as Plaintiff, who chose her car. Haffner Decl., Ex. 16 (Saechao Depo.) 127:15-128:5; Brown Decl., Ex. 2 (Saechao Depo. Vol. II) 206:3-207:4.

Longer lunches on some sorts are irrelevant because those shifts are outside the theory by definition. A Class member whose records show a 60-minute meal period is outside the 85% whose records show 30 minutes, and UPS's own daily statewide meal compliance report, which lists "Meal Lengths, ML1, ML2, ML3" for every employee, identifies the two groups. Felsing Decl. (Dkt. 61) ¶ 6, Ex. A at UPS004980-82; Brown Decl., Ex. 5 (Felsing Depo.) 26:5-21, 28:16-21.

**C. *Hamilton* Supports Certification, And UPS's Cases Involve Different Theories On Different Records.**

UPS spends two pages on *Hamilton*, Opp. 22:23-23:27, but never confronts what it held. The Ninth Circuit affirmed certification of a meal period class whose theory was that "Walmart's standard practice—requiring employees who wanted to leave the building on their meal breaks to go through a security check after clocking out—impermissibly impeded or discouraged employees . . . from taking meal breaks." 2022 WL 2374445, at *3. It held that "all employees in the class were subject to the same security check requirements before leaving the building. Plaintiffs' theory of liability directly challenged that practice," which "is by its nature a common question eminently suited for class treatment." *Id.* at *4. It then affirmed a jury verdict that the security check "was an impediment to employees' ability to take an uninterrupted meal break outside the control of their employer," rejecting the argument that class members who never left were uninjured. *Id.* This is Plaintiff's theory here. UPS's assertion that *Hamilton* is limited to employees who left the facility is contradicted by the Ninth Circuit's holding that Walmart "provided no meal breaks free from impediments or discouragement" as to all 452,491 breaks. 2022 WL 2374445, at *4.

UPS's three post-*Hamilton* district court decisions involved different theories on different records, and none cites *Hamilton*. In *Depina v. FedEx Ground Package System, Inc.*, 2024 WL 5430193 (N.D. Cal. Nov. 8, 2024), the theory was that "long security lines" shortened breaks, security was "at the discretion of the individual facility," some facilities "lack security screening altogether," and FedEx paid employees "the exact time they spent waiting on the security line"

during breaks. *Id.* at *2-3, *7. The court found no "consistent policy regarding security." *Id.* at *12. Here, however, UPS admits that it has one mandatory screening policy at all 39 facilities and pays nothing during meal periods.

In *Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1232695 (N.D. Cal. Mar. 30, 2021), meal periods were 45 minutes long, so "basic arithmetic" showed no uniform failure to provide 30-minute lunch breaks where bag checks were only five minutes long. *Id.* at *5. *Figueroa* involved variation in the bag policy among class members and recanting declarants. *Id.* at *1, *5. Here, UPS gave 30-minute lunches and the wait time at the bag checks prevented employees from being free from control for the full time. Additionally, Saechao's record reflects a single statewide policy and badge system across 39 facilities. *Valencia v. VF Outdoor, LLC*, 2022 WL 4397084 (E.D. Cal. Sept. 23, 2022), also involved 45-minute meal periods, bag checks only for employees carrying bags, and a plaintiff who "always had 30 minutes away from the facility." *Id.* at *4-5, *9, *12.

**D. Waiver Is UPS's Burden, And UPS's Records Resolve It.**

For the missed meal theory, UPS argues that Plaintiff signed a waiver and presents no evidence as to whether others may have signed similar waivers. Waiver is an affirmative defense, and thus the burden is on the employer. *Donohue v. AMN Servs., LLC*, 11 Cal.5th 58, 77 (2021). UPS's records contain information regarding each employee's "Waiver status" and a "Waiver Audit" that "[s]hows waiver status of those without a signed waiver," Felsing Decl., Ex. A at UPS004981-82, and UPS admits "some employees have not signed a first meal waiver." Brown Decl., Ex. 33 (Fact 70); Ex. 5 (Felsing Depo.) 26:11-17. As a result, applying UPS's waiver defense is a records-based exercise, not an individualized one. Crandall himself simply "assum[ed] first meal break waivers are in place" for every shift of six hours or less, Crandall Decl. ¶ 55, an assumption UPS's own Fact 70 refutes. Even if Crandall's assumption is correct, his own analysis of the GTS data identifies more than 2,000 shifts with facial meal period violations and no premium.

Plaintiff's expert, Regus, independently found a similar number. Regus Reply Decl. ¶ 5. "If such waivers were not in place, I found an additional 92,729 shifts where the Employee was paid for more than five hours and up to six hours worked, where the first meal period was either missed,

late, … or short." *Id*. Without it, the same data shows 95,743 such shifts, at all 34 facilities in the data and affecting 2,167 of the 2,907 employees in it. *Id.* Measuring the workday from clock in, rather than from the later of clock in or scheduled start as UPS does, raises the total to 120,192 shifts, affecting 76.5% of the employees in the data. *Id.* ¶ 7. Each premium can then be valued from the employee's pay rate in the corresponding payroll records. *Id.* ¶ 6.

No waiver is available for shifts over six hours. Lab. Code § 512(a). UPS concedes Plaintiff worked more than 6 hours on three shifts, and on December 7, 2024 she worked 6.25 hours with no meal period and no premium. Crandall Decl. ¶ 27. Crandall's analysis of shifts over six hours found that 27.1% had no recorded first meal period and 30.3% had a non-compliant one. *Id.* ¶ 55, Ex. 3. Whether UPS rebutted the *Donohue* presumption for those shifts by paying premiums is a payroll question answered from the same records. *Donohue,* 11 Cal.5th at 77. The unpaid walk time discussed in Section V compounds the problem. UPS's data shows more than 2,000 shifts of exactly 299 minutes and more than 1,400 shifts of exactly 359 minutes with no meal period, measured from clock in. Regus Reply Decl. ¶ 8. Adding the security to clock time to those shifts pushes them past the five and six hour thresholds, and past six hours no waiver is available. *Id.*; *see id.* ¶ 13.

Nor does *Hale* help UPS. *Donohue* adopted the *Brinker* concurrence "in full": when "time records show missed, short, or delayed meal periods with no indication of proper compensation, then a rebuttable presumption arises," which the employer may rebut with evidence of compensation or of compliant meal periods. *Donohue*, 11 Cal.5th at 75-77. "Representative testimony, surveys, and statistical analysis . . . are available as tools to render manageable determinations of the extent of liability." *Id.* at 77. Crandall has already run the premium half of that rebuttal from UPS's payroll data. Crandall Decl. ¶ 55. What remains is a records question, not an individualized one.

## V. Common Issues Predominate As To The Rest Break Claim.

UPS argues that rest breaks are usually 15 minutes, that security is quick, and that cases which have examined security and rest breaks deny certification. However, "[d]uring required rest periods, employers must relieve their employees of all duties and relinquish any control over how

employees spend their break time." *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal.5th 257, 260 (2016). UPS's policy requiring every employee to empty pockets, tender bags, and clear a metal detector twice to step outside the gate has not relinquished control, and whether that policy violates *Augustus* is a common question for the whole Class.

UPS's authority is *Figueroa* and *Valencia*, both of which resolved the rest break question on the merits at certification. The Ninth Circuit has since held that approach improper. In *Miles v. Kirkland's Stores, Inc.*, 89 F.4th 1217 (9th Cir. 2024), the court reversed the denial of certification of a rest break class based on a policy requiring employees to remain on premises, and noted that the district court "appears to have assumed that on-premises rest breaks do not violate California law so long as the employees are not tasked with any responsibilities. But cf. *Augustus* . . . . That is a merits question that should be left for summary judgment or trial, not at class certification." *Miles*, 89 F.4th at 1224 n.2. *Miles* is a published Ninth Circuit case; *Figueroa* and *Valencia* are district court cases. UPS's own declarants confirm the control: "employees [are] expected to be back at work when the belts start back up after the 15-minute break." Felsing Decl. ¶ 7(b), (c). And UPS concedes it does not record rest breaks, Brown Decl., Ex. 33 (Fact 77), which is why the claim is properly resolved by the policy, the shift length records, and Labor Code section 226.7(c). Those records make the claim straightforward to compute. In the data UPS produced, more than 84% of shifts lasted at least 3.5 hours, including shifts worked by 97.5% of the employees in the data and at all 34 facilities, and UPS's payroll data reflects no rest period premiums. Regus Reply Decl. ¶ 10. Each premium can be valued from the hourly rates in the same payroll records. *Id.*

## VI. Common Issues Predominate As To The Unpaid Time Claims.

### A. *Huerta* Supports Plaintiff.

UPS reads *Huerta* to hold that travel time on employer premises, even when subject to employer rules, was not compensable. This misreads the ruling. *Huerta* held that "an employee's time spent on an employer's premises awaiting and undergoing an employer-mandated exit procedure . . . is compensable as 'hours worked,'" because the employee "remained confined to the employer's premises until he completed the exit procedure." 15 Cal.5th at 915, 920. Additionally,

the drive between the gate and the parking lot was not compensable because the only rules governing it were rules "designed to ensure safe, lawful, and orderly conduct while traveling on the employer's premises," which the court contrasted with "the mandatory bus ride to the worksite in *Morillion*, and . . . the exit security procedure here." *Id.* at 928-30.

The time at issue here is not a drive across an open lot governed by traffic rules. It is the interval between two employer-mandated control points: the security station the employee has just cleared (or is about to enter) and the time clock UPS placed inside the secured perimeter. During that interval the employee is confined by the same screening *Huerta* held compensable, and cannot leave without submitting to it. Whether that confinement satisfies the control test is a legal question common to every Class member, and it can be decided on summary judgment.

**B. The Off-The-Clock Walk Is Compensable Regardless Of Employees' Actions.**

UPS argues that employees may arrive early, clock in, and do "personal things," so the walk cannot be measured. Opp. 12:15-25, 13:11-17, 30:12-24. Plaintiff does not seek pay for personal time. She seeks pay for the necessary walk from security to the clock at the start of the shift and from the clock to security at the end, which every employee must make and which UPS admits it does not pay. Terpening Depo. 42:12-17; Cheung Depo. 97:20-98:24. UPS's written policy requires employees to "record accurately all time that you work" and defines "Work" to include "waiting to start work if the person reported to work on time." Brown Decl., Ex. 5, Depo. Ex. 3 at UPS001407. Yet UPS uses the clock-in time only when it benefits UPS: an employee who clocks in early is paid from the later scheduled start, but an employee who clocks in late is paid from the clock-in. Opp. 13:2-8; Terpening Decl. (Dkt. 67) ¶ 4; Terpening Depo. 29:5-25 ("otherwise someone could punch in an hour early and . . . we'd be paying everybody overtime").

Plaintiff's expert explained how the records isolate the walk. The SCAR badge out at the interior reader and the GTS clock in are both time-stamped; the lag between them is the walk. Regus Decl. (Dkt. 50-1) ¶ 16 & n.13. He has now done so with UPS's data. Combining the GTS and SCAR records for 33 of the 34 facilities in UPS's production, Regus found a median of 85 seconds between exiting security and clocking in, and 165 seconds between clocking out and

entering security at the 31 facilities where departures could be matched, for a total of four minutes and ten seconds of unpaid time on a typical workday, and more for employees who leave and return during a shift. Regus Reply Decl. ¶¶ 12-13. To exclude employees who stopped along the way, the analysis uses the minimum observed interval as a benchmark, facility-by-facility: "one way to address that possibility would be to take the minimum amount of time that it took an employee in a particular location to go from security to the time clock. And use that as a benchmark to say that's the speed that somebody who doesn't stop to talk would take." Brown Decl., Ex. 39 (Regus Depo.) 89:17-90:14; see also *id.* 92:18-94:7 (same approach handles multiple time clocks and days without badge data). The same data supports other conservative measures, including the 25th percentile interval or a facility-by-facility or employee-by-employee calculation, and any SCAR time UPS rounded up, or guaranteed time paid beyond hours actually worked, can be measured and deducted. Regus Reply Decl. ¶ 15. UPS's "I don't know" quotation, Opp. 30:17-22, concerned a hypothetical about employees sleeping in a break room, not the security-to-clock walk, and Regus explained that his role is measurement: "if the finder of fact determines that that's compensable time, my opinion is that that unpaid compensation can be calculated." Regus Depo. 98:18-20, 130:10-131:6. Under *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-61 (2016), and *Senne*, 934 F.3d at 945, variation in the amount of walking time "did not preclude certification" in *Tyson* and does not here.

**C. The On-The-Clock Interval Is An Admitted Policy.**

UPS does not dispute that GTS records both the actual clock in and the scheduled start, that pay begins at the scheduled start when the employee clocks in early, and that employees "are supposed to be at their workstation at start-up because the belts have started running." Cheung Depo. 33:3-36:25. Whether the minutes between clock in and scheduled start, spent walking to an assigned work area where the employee must be when the belts start, are "hours worked" is a common question; the increment is already captured in UPS's own fields for every Class member. Regus Depo. 126:1-14, 127:17-20. Regus has now quantified it from the GTS data UPS produced: employees clocked in before their scheduled start on 65.6% of shifts, at all 34 facilities, affecting 82.9% of the employees in the data, for a total of 75,366.25 unpaid hours, each of which can be

valued at the employee's pay rate for the corresponding pay period. Regus Reply Decl. ¶ 11.

**D. The Union Guarantee And Overtime Threshold Are Damages Calculations.**

UPS argues that the CBA's 3.5 hour daily guarantee and overtime after five hours create an "individualized offset defense." Opp. 8:12-14, 10:12-17, 30:25-31:6. They do not. California's minimum wage "applies to each hour worked," and "no part of this rate may be used as a credit against a minimum wage obligation." *Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314, 323-24 (2005). Whether guaranteed pay for hours not worked may be credited against wages owed for hours worked is a single legal question for the Class. And if any credit were permitted, Crandall has already shown that the guarantee payments and overtime hours are itemized in UPS's payroll data by employee and pay period. Crandall Decl. ¶¶ 68-71, Ex. 11. Regus confirms that, if any credit is allowed, guaranteed time paid beyond hours actually worked can be measured and deducted from each employee's unpaid time. Regus Reply Decl. ¶ 15. A defense that is computed from the defendant's payroll records is a damages issue, not a predominance problem. *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (employer's "computerized payroll and time-keeping database would enable the court to accurately calculate damages"). UPS's point that Plaintiff "never worked over 8 hours," Opp. 15:6, ignores that under her CBA she earned overtime after five hours, which UPS concedes she did. Opp. 15:6-7; Crandall Decl. ¶ 38.

**VII. UPS's Remaining Arguments Lack Merit.**

**A. Plaintiff's Evidence Of A Common Policy Is The Best Evidence.**

UPS argues Plaintiff "presented no testimony from any other class member." Opp. 15:27-16:4. Rule 23 does not require it. In *Abdullah*, the Ninth Circuit affirmed certification of a meal period class on the employer's uniform policy and its designee's testimony about how that policy was "implemented on the ground," holding that the designee's "admissions were material" and that the employer's own employee declarations "did not indicate a lack of predominance." 731 F.3d at 965-66. The record here is stronger. UPS's designees testified that screening is mandatory for every employee entering or leaving each of the 39 facilities and follows the same badge in, screen, badge out sequence everywhere. *Supra* § III; Savage Depo. 27:13-28:10, 30:1-3, 35:18-36:11. UPS does

not dispute that uniform enforcement; it argues only that the equipment varies and the screening is quick. Opp. 10:18-11:2, 20:2-4, 21:1-2. And unlike in *Abdullah*, UPS's employee declarations agree with its designees on the point that matters: all 25, signed September 8, 2026 from five of 39 facilities, confirm that the declarant passes through security to leave for a break and badges at the start and end of screening, and most work sorts where "the supervisor announces the break over the intercom and operations shut down." *E.g.*, Brown Decl., Exs. 8 ¶¶ 10, 12, 23; 12 (Hardie) ¶¶ 10, 12-13, 24; 27 (Ramirez) ¶¶ 11-13. A uniform policy, uniformly enforced, "measured against wage order requirements," "is by its nature a common question eminently suited for class treatment." *Brinker*, 53 Cal.4th at 1033; *Hamilton*, 2022 WL 2374445, at *4. Additionally, Plaintiff's expert reviewed class-wide data across all UPS facilities that contained clear evidence that UPS's common policies prevented class members from getting compensated for all hours worked while at the security checkpoint. See Regus Reply Decl. ¶13.

**B. Plaintiff Is Typical And Adequate.**

UPS says Plaintiff "worked for UPS on one shift (Preload) at one facility (Visalia)." Opp. 7:2-3. She worked 29 shifts over two months, Opp. 14:23-24, was confined by the same security policy as every Class member, was paid from scheduled start rather than clock-in time, Regus Decl. ¶ 15; Brown Decl., Ex. 2 (Saechao Depo. Vol. II) 235:3-6, and had meal periods of exactly 30 minutes during which leaving required two screenings. Haffner Decl., Ex. 12 at UPS001251; Saechao Depo. Vol. II 206:3-207:4. That her job title and facility differ from some Class members is immaterial where the challenged policy is identical. *Abdullah*, 731 F.3d at 964. UPS's claim that her deposition testimony is "entirely different," Opp. 26:14-20, rests on her answer that a supervisor sometimes sent her home before six hours; that testimony is consistent with her declaration, which she reaffirmed under oath in Volume II. Saechao Depo. Vol. II 199:23-200:10, 206:3-18. UPS offers no conflict of interest and no reason to doubt counsel's qualifications. Opp. 18:10-17.

**VIII. The Case Is Manageable And Class Treatment Is Superior.**

UPS faults Plaintiff for not presenting a "viable trial plan." Rule 23 does not require one. "Nothing in the Advisory Committee Notes suggests grafting a requirement for a trial plan onto the

rule." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 n.4 (9th Cir. 2005) (declining to hold that "failure to adopt a trial plan or to articulate how the class action would be tried was an abuse of discretion," and explaining that *Valentino* "does not stand for this proposition"). What Rule 23 requires is a showing that the case can be tried with common proof. The motion made that showing: liability will be tried through UPS's policies, its 30(b)(6) testimony, and its records, and damages will be computed from GTS, SCAR, and payroll data using the formulas Regus described. Mot. 29:1-30:16; Regus Decl. ¶¶ 6-17. Crandall's declaration proves it works. Using UPS's data he identified, per shift, meal period length, shift length, mid-shift badge exits, security transit durations by facility, guarantee payments by pay period, and the records for every preloader at Visalia on a given day. Crandall Decl. ¶¶ 53-61, 66-71, 75-77, Exs. 1-14. If UPS's expert can do that for an opposition brief, a jury can do it at trial. *Leyva*, 716 F.3d at 514-15. Regus has done the same with UPS's data, down to the individual premium: for one employee in the week ending December 24, 2022, the records show three facial meal period violations, two premiums paid at the employee's $34.89 hourly rate, and a third unpaid premium worth the same $34.89. Regus Reply Decl. ¶ 6.

UPS's complaint that Plaintiff has not explained how "to deal with missing or incomplete badge records," Opp. 31:18-20, inverts the law. UPS installed the readers, instructs employees to badge, and concedes compliance is "sporadic." Opp. 11:20-25. "[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee," and "[i]f the records are incomplete or inaccurate . . . then the employer can offer evidence to rebut the presumption." *Donohue*, 11 Cal.5th at 76; see *id.* at 75; Mot. 30:9-13.

**IX. Conclusion.**

Therefore, Plaintiff respectfully requests that the Court certify the Class under Rule 23(a) and 23(b)(3), or, in the alternative, certify particular claims or issues under Rule 23(c)(4).

DATED: October 20, 2026

HAFFNER LAW PC
By: */s/ Trevor Weinberg*
Joshua H. Haffner
Trevor Weinberg
Samantha Salas
Attorneys for Plaintiff and all others similarly situated