ELIZABETH A. BROWN (SB# 235429)
JENNIFER SVANFELDT (SB# 233248)
MICHELLE T. MCGUINNESS (SB# 257151)
RYAN C. KING (SB# 351149)
lisabrown@gbgllp.com
jensvanfeldt@gbgllp.com
michellemcguinness@gbgllp.com
ryanking@gbgllp.com
GBG LLP
601 Montgomery Street, Suite 840
San Francisco, CA 94111
Telephone: (415) 603-5000
Facsimile: (415) 840-7210

Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANDY SAECHAO, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED PARCEL SERVICE, INC.; and DOES 1 through 10, inclusive,<br><br>Defendant. | Case No. 3:25-cv-02431-RFL<br><br>**DEFENDANT'S SUR-REPLY IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 19, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Rita F. Lin<br>Courtroom: 4 |

## Table of Contents


Page

I. REGUS CONCEDES HE DID NOT REBUT CRANDALL'S DECLARATION .................. 1

II. REGUS DECLARATION DOES NOT SUPPORT STATEMENTS IN THE REPLY ........... 1

A. Reply Distorts Regus's Calculations.................................................................... 1

B. Reply Attributes to Regus Conclusions He Did Not Make.............................................. 2

III. REGUS DECLARATION CANNOT SUPPORT CLASSWIDE DAMAGES......................... 2

A. The Facial Meal Violation Model is Not Tied to Any Common Theory........................ 2

B. *Hamilton v. Walmart* Only Highlights Flaws in Regus's Analysis ................................. 3

1. The Experts in *Hamilton* Reviewed Extensive Evidence of Security................. 3

2. Size of Facility is Not The Basis for Discouragement Theory ........................... 4

C. Rest Break Model is Improperly Based on a 10-Minute Assumption ............................ 4

D. Regus's Model for Plaintiff's Off-the-Clock Theory is Speculative ............................... 4

## Table of Authorities

**Page(s)**

**Cases**

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ........ 1

*Comcast Corp.v Behrend*,
569 U.S. 27 (2013) ........ 2

*Daly v. Fesco Agencies NA Inc.*,
108 F. App'x 476 (9th Cir. 2004) ........ 1

*Frlekin v. Apple Inc.*,
8 Cal 5th 1038 (2020) ........ 4

*Guidroz-Brault v. Mo. Pac. R. Co.,*
254 F.3d 825 (9th Cir. 2001) ........ 3

*Hamilton v. Wal-Mart Stores, Inc.*,
2019 WL 1949457 (C.D. Cal. Mar. 4, 2019) ........ 3

*Hamilton v. Wal-Mart Stores, Inc.*,
2022 WL 2374445 (9th Cir. June 30, 2022) ........ 3

*Huerta v. CSI Electrical Contractors*, *Inc.,*
15 Cal. 5th 908 (2024) ........ 4

*Morillion v. Royal Packing Co.*,
22 Cal. 4th 575 (2000) ........ 4

**Rules**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ........ 1

Justin Regus's Reply Declaration does not help Plaintiff satisfy Rule 23(b)(3).[1]

## I. REGUS CONCEDES HE DID NOT REBUT CRANDALL'S DECLARATION

The Court granted Plaintiff the opportunity to file a **rebuttal** expert declaration addressing the data reviewed by and the findings made by UPS's expert. Dkt. 84. Rebuttal testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party[’s]" expert. Fed. R. Civ. P. 26(a)(2)(D)(ii)*; see also Daly v. Fesco Agencies NA Inc.*, 108 F. App'x 476, 480 (9th Cir. 2004). Expert rebuttal may respond to, analyze, or critique the opinions of an opposing expert, but it may not be used to advance new arguments, theories, or analyses that should have been disclosed in the rebutting expert's original report. *See Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 896 (S.D. Cal. 2019). Regus admitted at deposition that he did not attempt to replicate Crandall's time analysis, that he does not rebut any of Crandall's findings, and thus concedes damages cannot be calculated on a classwide basis. Regus Deposition Transcript, Vol II ("Tr.") 166:22-167:9; 167:11-16 ("Q. Do you have an opinion one way or another whether Crandall's declaration is accurate? A. I don't."); 192:15-193:7. As such, Crandall's conclusions that experiences vary across facilities and putative class members, that time spent in security is minimal, if any, and that Regus's failure to consider waivers, overpayment for security time, the collective bargaining agreements, and overpayment for walk time render Regus's model inaccurate and unreliable, unsupported by common proof based on Plaintiff's theories of liability (e.g., confinement, discouragement, and interruption) stand unrebutted.

## II. REGUS DECLARATION DOES NOT SUPPORT STATEMENTS IN THE REPLY

### A. Reply Distorts Regus's Calculations

In preparing his Reply declaration, Regus had access to: class list (62,000+ employees); payroll data (54,000+ employees), badge data (45,000+ employees), SCAR data (44,000+ employees), and GTS data (11,000+ employees). Regus Decl., Appx. A; Crandall Decl. ¶¶6-10. Regus **did not use the vast majority of this data**. Tr. 299:22-300:5; 177:16-25; 178:6-11; 178:16 -179:3. Instead, Regus used only data from 2,907 putative class members for whom he found records in both GTS and SCAR, without any understanding of whether this subset was representative. Tr. 208:2-209:3; Regus Decl. ¶4. **This represents approximately 4.6% of the class and necessarily excludes all hub putative class members who used a different timekeeping system.** Tr. 211:21-212:14.

[1] Regus Reply Declaration and Reply were also untimely, both filed well after the 5:00 p.m. deadline.

Plaintiff, by contrast, purports to claim that the data Regus analyzed applies to all class members. The Reply repeatedly references "all employees," "class-wide data," "all records," "all shifts," and represents conclusions derived from the 2,907 employee subset as if it applies to all 62,000+ employees. *See* Reply, Dkt. 88, 4:6-9; 9:2-5; 10:17-20; 11:25; 12:25-27; 14:9-12. It does not.

### B. Reply Attributes to Regus Conclusions He Did Not Make

Plaintiff makes numerous broad statements in support of certification, attributing most of them to Regus. For example, the Reply claims that (1) Regus determined that "[a]ny reduction or interruption in the meal break at any of these facilities from having to go through a security check would 'result in a meal period shorter than required by California Labor Code.'" (Reply 4:15-17); (2) "Regus similarly determined that class members were widely discouraged from leaving the premises for rest breaks" (Reply 4:17-19). *See also* Reply 1:18-20; 4:13-14; 6:9-10; 7:3-4. **Regus denied** making these determinations and admitted he reviewed no evidence and conducted no analysis to support them or any other alleged Labor Code violation. When asked if he determined "whether class members [were] widely discouraged from leaving the premises" (as stated in the Reply), **Regus was clear: "No**. I would not say that that was part of my assignment." Tr. 157:4-19. Regus further disavowed other conclusions attributed to him. *See* Tr. 286:11-23 ("Q. Have you been asked to look at whether meal periods were actually interrupted? A…. no. Q. Have you been asked to opine on whether employees are confined to UPS facilities during meals? A. … no") (objection omitted); 179:23-180:4; 185:14-22; 251:4-8; 288:8-289:6. In sum, Regus's declaration does not help Plaintiff meet the *requirements* of Rule 23(b)(3).

## III. REGUS DECLARATION CANNOT SUPPORT CLASSWIDE DAMAGES

### A. The Facial Meal Violation Model is Not Tied to Any Common Theory

In *Comcast Corp.v Behrend*, 569 U.S. 27, 35 (2013), the United States Supreme Court opined "[A] model purporting to serve as evidence of damages in [a] class action **must measure only those damages attributable to [plaintiffs'] theory [of liability].** If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." (emphasis added). Here, Regus built a damages model on "facial" meal period violations visible on time and payroll records (e.g., missed, short, or late punches) without tying those numbers to any specific theory of liability. Tr. 299:22-300:5 ("Q. … And did your analysis of the facial violations **link it to any unlawful conduct of any kind**? A. … **no**, I was not asked to do that.") (emphasis added). Thus, Regus's own testimony precludes any conclusion that a short, late, or missed

meal break analysis described by Regus corresponds to a legal violation on a classwide basis. This flaw is evident in Regus's purported "example" of a putative class member for whom Regus computed three facial meal period violations and damages. Decl. ¶6. When examined, however, Regus admitted that one would not be a violation due to a meal period waiver, and the other two had a corresponding premium payment; in other words, this employee had no damages. Tr. 306:14-307:19.

Regus's further speculation in paragraph 7 that more meal period violations would exist if we counted time that employees were not working should be rejected. *Guidroz-Brault v. Mo. Pac. R. Co.,* 254 F.3d 825, 830-31 (9th Cir. 2001) (excluding expert testimony that "was not sufficiently founded on [the] facts" of the case.).

### B. *Hamilton v. Walmart* Only Highlights Flaws in Regus's Analysis

#### 1. The Experts in *Hamilton* Reviewed Extensive Evidence of Security

Plaintiff's discouragement theory hinges on one unpublished, non-precedential decision in *Hamilton v. Walmart*.[2] However, unlike the massive evidentiary record submitted by the plaintiff and reviewed by multiple plaintiffs' experts in *Hamilton*, Plaintiff here offers no evidence that could satisfy her burden under a discouragement theory. In *Hamilton*, the plaintiffs introduced detailed time-and-motion study evidence – including expert reports mapping facility layouts and walk times – demonstrating that employees spent up to **20 minutes** in security lines. That record included timecard data tracking post-clock-out security clearance and video footage allowing the expert to calculate lunch-period wait times, showing classwide evidence that security queues, facility size, and monitored doors physically constrained employees during breaks. *Hamilton v. Wal-Mart Stores, Inc.*, 2019 WL 1949457, at *14-16 (C.D. Cal. Mar. 4, 2019), affirmed in part, reversed in part, and remanded by *Hamilton v. Wal-Mart Stores, Inc.*, 2022 WL 2374445 (9th Cir. June 30, 2022).[3]

By contrast, Regus admitted that he did not conduct any study of mid-shift facility exits, did not conduct any time studies, did not conduct any review of security protocols, did not conduct any interviews with putative class members about their experiences in security, and did not compute any time in security even though that data was available to him. *See* Section II supra; *see also* Tr. 183:24-184:2; 184:15-186:3; 186:17-187:6. The only evidence before this Court of time spent in security is the Crandall declaration showing that it takes seconds and videos confirming the same. Crandall Decl., ¶¶

[2] Plaintiff dismisses certification denials in *Depina*, *Figueroa*, and *Valencia* partially because "none cites *Hamilton.*" (Reply 7:23). This is likely because *Hamilton* is nonprecedential and unpublished.
[3] *Hamilton* decertified the "meal period interruption theory." 2019 WL 1949457, at *15-16.

11(a), 17, 47-50. This evidence is unrebutted by Regus or any evidence submitted by the Plaintiff.

Unlike the cases cited to in Plaintiff's Reply, the record here lacks the **classwide** evidentiary and factual support that proved vital in those plaintiffs' victories. In *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000), the employees were subjected to long mandatory company bus rides and prohibited from driving themselves. *Id.* at 579-80. In *Frlekin v. Apple Inc.*, 8 Cal 5th 1038 (2020), employees were forced to locate and wait for authorized personnel, who would perform intrusive searches opening all of the employees' bag compartments and verify personal device serial numbers against company logs – adding up to 20 minutes to employees' exit process. *Id.* at 1043-44. In *Huerta v. CSI Electrical Contractors*, *Inc.,* 15 Cal. 5th 908 (2024), the ruling regarding *security checks*, which the Reply continues to conflate with non-compensable drive time, hinged on proof of inescapable vehicle queues during security screenings at the vehicle entry gate which caused 10 to 30+ minute delays. *Id.* at 915-16, 925. None of this evidence exists here.

**2. Size of Facility is Not The Basis for Discouragement Theory**

While he did not review evidence (e.g., videos or badge records) linked to Plaintiff's actual theory – i.e., interruption of meals or breaks by security – he testified that what he considered to be "discouragement" was, in part, the "**distance**" employees had to walk from the security check to the time clock. Tr. 270:21-271:25. However, Plaintiff expressly disavowed the "size" of the facility as a source of discouragement or confinement. Dkt. 50, Mot. at 23:12-13.

**C. <u>Rest Break Model is Improperly Based on a 10-Minute Assumption</u>**

Regus's Reply declaration contradicts the theory that walk time and security impermissibly shortened rest breaks. Based on 4.6% of the class, Regus opines that it takes 4 minutes and 10 seconds round trip to walk to and from security from a time clock. Regus Decl. ¶13. Regus does not separately compute time spent in security and does not rebut Crandall's conclusions that it takes seconds. *See* Sections I, III(B)(1), *supra*. UPS's policies provides for rest breaks of "at least 10 minutes" and putative class members and deponents confirmed that UPS provides 15 minutes. Dkt. 58-33, Facts 75-82. Even if Plaintiff could establish a classwide unlawful policy of "confinement" or "discouragement" for rest breaks, Regus's model does not account for his own computations and thus does not support damages.

**D. <u>Regus's Model for Plaintiff's Off-the-Clock Theory is Speculative</u>**

With respect to the off-the-clock theory focused on **walk time between security check and time clock**, Regus's Reply declaration pivots to a whole new theory – not pled by Plaintiff in her

motion – about hypothetical "queuing" at security checks. Regus Decl., ¶14-15. Yet any "queuing" must, according to UPS policies, be done **on the clock** and employees are expected to badge in at security to start being paid as soon as they arrive at security. Regus testified that he did not consider this fact – or the fact that UPS installed security badges on the outside of security stations precisely to capture and pay for the time in line. Tr. 180:21-181:16; 221:20-223:3, Ex. 7; 182:2-14. Despite his speculation of "what other explanation is there" – and having not considered that an employee after work may stop by to chat with a friend, go to the restroom before driving home, or wait for a ride – Regus did not confirm nor does Plaintiff present evidence of "queuing." Tr. 241:9-243:7. **Regus had access to badge data but did not use it**. Tr. 231:9-13; 244:14-22. Instead, Regus compared his non-random sample of approximately 2,907 individuals to the analysis Crandall performed on over 44,000 putative class members and speculated that Crandall's analysis, which only showed total duration of mere seconds in security, somehow confirmed his theory of queuing. Tr. 236:5-237:7; 238:8-239:20. It did not – neither the data analyzed, results reached or size of the group are at all comparable.

With respect to the off-the-clock theory focused on **time after clocking in but before employee starts work**, Regus's Reply declaration repeats his flawed theory from the original declaration – i.e., that there are two fields in GTS which can be subtracted from each other. That two fields can be subtracted from one another in either Plaintiff's records or records of 4.6% of the class alone does not mean that all putative class members were working between those two time entries (they were not and were expressly prohibited from doing so). First, the declaration does not address the other timekeeping system – STMS – and Regus's deposition confirms he did not analyze it or even really understand its existence despite available evidence. Tr. 210:1-211:12; 250:12-251:8, Ex. 8. Second, the declaration is misleading. Regus opines that this issue impacts 82.9% of employees, but that is limited to only 2,907 individuals (or 4.6% of the class) and it does not indicate how often any particular individual encountered the issue. Third, Regus omits from his declaration his own conclusion that in 17.4% of the instances analyzed, the scheduled and actual start time was the same, and in 17% of the instances, actual start time was after the scheduled, nor does it offset any allegedly underpaid hours for these records. Tr. 254:11-256:13. Finally, Regus does not rebut the total overpayment figures found by Crandall.

DATED: October 27, 2026 GBG LLP

BY: /s/ Elizabeth A. Brown
ELIZABETH A. BROWN
Attorneys for Defendant UNITED PARCEL SERVICE, INC.